

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y

★ JAN 20 2010 ★

BROOKLYN OFFICE

| | |
|---|---|
| B.H., on behalf of her minor daughter D.B.; <br> A.M., on behalf of her minor daughter M.M.; <br> D.L., on behalf of her minor daughter D.Y.; <br> L.W.; A.M.; and all others similarly situated, <br><br>         Plaintiffs, <br><br>       -versus- <br><br> CITY OF NEW YORK; MAYOR MICHAEL R. <br> BLOOMBERG, in his official capacity; <br> POLICE COMMISSIONER RAYMOND W. <br> KELLY, in his official capacity; ASSISTANT <br> CHIEF JAMES SECRETO, in his official capacity; <br> SERGEANT ROSLYN DOWNING-LEE, in her <br> individual and official capacities; SCHOOL <br> SAFETY OFFICER JANE DOE, in her <br> individual and official capacities; SCHOOL <br> SAFETY OFFICER KEVIN MAYES, in his <br> individual and official capacities; SCHOOL <br> SAFETY OFFICER JOHN DOE 1, in his <br> individual and official capacities; and SCHOOL <br> SAFETY OFFICER JOHN DOE 2, in <br> his individual and official capacities, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

**COMPLAINT**

CV 10 - 0210

**JURY TRIAL DEMANDED**

MAUSKOPF, J.

CARTER, M.J.

---

**PRELIMINARY STATEMENT**

1.     This class action, brought by five schoolchildren on behalf of themselves

and similarly situated middle and high school students enrolled in New York City public

schools, challenges unconstitutional policies and practices of the School Safety Division

of the New York City Police Department (NYPD) assigned to patrol these schools. The

School Safety Division includes over 5,200 School Safety Officers assigned to particular

public schools. These School Safety Officers do not carry firearms, but they wear NYPD

uniforms and, as peace officers employed by the NYPD, maintain full authority to stop,

1



frisk, detain, question, search, and arrest schoolchildren both on and off school grounds while they are on duty. The NYPD School Safety Division also includes at least 191 armed precinct-based police officers who are indistinguishable from the officers who patrol New York City streets, except that these officers have been assigned to patrol New York City public schools.

2.      Members of the NYPD School Safety Division, including both School Safety Officers and precinct-based officers assigned to public schools, engage in a policy and practice of unlawfully seizing and arresting schoolchildren, in violation of the Fourth Amendment of the United States Constitution and state law.  This policy and practice manifests itself in three ways:  (a) School Safety Division personnel arrest students for minor violations of school rules, conduct that does not constitute probable cause of criminal activity, and hold those students at police precincts; (b) School Safety Division personnel handcuff students and lock them in seclusion rooms in school buildings, without parental or teacher consent, for minor violations of school rules that do not constitute probable cause of criminal activity; and (c) School Safety Division personnel remove schoolchildren from schools and transport them to hospitals for emergency psychiatric evaluations, without parental or teacher consent, for minor violations of school rules that do not constitute probable cause of criminal activity and in the absence of any other legitimate cause for such evaluations.

3.      Members of the School Safety Division, including both School Safety Officers and precinct-based officers assigned to public schools, also engage in a policy and practice of using excessive force against schoolchildren.  School Safety Officers push, shove, grab, punch, and strike students.  In many instances, such aggressive

2

conduct is not pursuant to a lawful arrest, but rather for the purpose of securing compliance with a directive from a School Safety Officer, or for no legitimate reason at all. These physical altercations often cause injuries to the schoolchild, and in some cases, necessitate medical care or even hospitalization.

4.    In recent years, New York City has drastically increased the deployment of law enforcement personnel to patrol its public school hallways. Since the adoption of a Memorandum of Understanding (MOU) transferring school safety responsibilities from the New York City Board of Education to the NYPD in 1998, the number of police personnel assigned to patrol New York City public schools has grown by 73 percent, even though school crime was declining prior to the 1998 transfer and even though student enrollment is at its lowest point in over a decade.

5.    The NYPD School Safety Division constitutes the fifth largest police force in the country, with more officers than the police departments in Washington, D.C., Detroit, Baltimore, Dallas, Phoenix, Boston, or Las Vegas. New York City devotes more resources to School Safety Officers than to certain traditional educational posts; for example, although it employs over 5,200 police personnel to patrol public schools, it employs approximately 3,000 guidance counselors.

6.    Research demonstrates that law enforcement agencies frequently fail to account for the ways in which policing students in public schools differs from policing adults on the street. A study commissioned by the U.S. Department of Education found, "One [of] the most frequent and destructive mistakes many [] programs make is to fail to define [law enforcement's] roles and responsibilities in detail before—or even after—the

3

officers take up their posts in schools. When programs fail to do this, problems are often rampant in the beginning of the program --- and often persist for months and even years."

7. Indeed, such problems are endemic in New York City, where the 1998 MOU transferring school safety responsibilities to the NYPD failed to adequately define the roles and responsibilities of School Safety Officers. This failure by the City to institute an adequate school safety governance structure is evident in the challenged policy and practice of unlawfully seizing and arresting schoolchildren absent probable cause and in the challenged policy and practice of using excessive force against schoolchildren. Indeed, it is the stated policy of the NYPD that NYPD personnel should remove "unruly" children from the New York City public schools without defining any appropriate limits to that directive. This broad and undefined policy invites unconstitutional arrests and excessive force directed at schoolchildren.

8. As a result of these unconstitutional policies and practices, New York City public school students suffer ongoing harm. They face the humiliation and degradation of being paraded in handcuffs in front of their classmates and teachers, and taken to seclusion rooms. They face the humiliation and degradation of being hauled out of their schools in handcuffs – again in front of classmates and teachers – and being brought to the police precinct for booking. Because the arrests made by School Safety Division personnel are often groundless, the criminal cases are almost always diverted and/or the charges are dismissed. These subsequent dispositions do not mitigate the harm suffered by schoolchildren at the time of arrest.

9. In addition, the challenged policies and practices severely compromise students' ability to learn. Far from creating an environment of support and trust as

4

needed by students, these policies and practices generate fear, distrust, and even violence within the schools. As a result of these policies and practices, students fear the School Safety Officers in their schools. Many avoid certain hallways where they know a School Safety Officer will be patrolling; some even avoid going to school altogether for these reasons. Students report that they feel like criminals when they enter the school building. Fearful of abuse by the School Safety Officers assigned to their schools, many of these students are forced to transfer to different schools, creating significant disruptions to their education. Indeed, studies show that excessive policing in schools is likely to produce alienation and mistrust among students, and compromise the educational climate of schools, and may actually increase student disorder.

10.    The policies and practices challenged here constitute the official municipal policy of the Defendant City of New York and Defendants Bloomberg, Kelly, and Secreto (collectively City-Defendants). First, the seizures of students – by means of handcuffing, seclusion, and/or formal arrest - for minor misbehavior that falls short of probable cause of criminal activity constitutes the official stated policy of the City-Defendants. Second, the unlawful seizures and arrests of, and excessive use of physical force against, schoolchildren constitute municipal policy because they occur with such frequency as to amount to a custom and usage of the City-Defendants. Finally, City-Defendants' failure to appropriately train and supervise the members of the School Safety Division in order to address a known pattern of unconstitutional arrests and seizures, and the use of excessive force amounts to deliberate indifference, thus constituting official municipal policy.

5

11.    Accordingly, Plaintiffs seek class-wide declaratory and injunctive relief to prevent future abuses by members of the NYPD School Safety Division.

12.    In addition, two of the individual named Plaintiffs who have experienced serious physical assaults by members of the School Safety Division --- D.B. and L.W. --- seek money damages on behalf of themselves only.

## JURISDICTION AND VENUE

13.    This action is authorized by 42 U.S.C. §1983. Subject matter jurisdiction for these federal claims rests upon 28 U.S.C. §§ 1331 and 1343(a)(4). This court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

14.    Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper. Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief. The Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

15.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as this is a district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

Plaintiff-class representatives

16.    Plaintiff D.B. is fifteen years old and appears in this action by and through her mother, B.H. D.B. is enrolled in the 10th grade at Maxwell High School in Brooklyn. At all relevant times, D.B. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

17.    Plaintiff M.M. is thirteen years old and appears in this action by and through her mother, A.M. M.M. is enrolled in the 7th grade at the Hunts Point School in

the Bronx.  At all relevant times, M.M. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

18.     Plaintiff D.Y. is thirteen years old and appears in this action by and through her mother, D.L.  D.Y. is enrolled in the 8th grade at the Lou Gehrig School in the Bronx.  At all relevant times, D.Y. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

19.     Plaintiff L.W. is eighteen years old.  He is currently enrolled in the 10th grade at W.E.B. Dubois Academic High School in Brooklyn.  At all relevant times, L.W. was, and he continues to be, enrolled in public schools operated by the New York City Department of Education.

20.     Plaintiff A.M. is eighteen years old and is enrolled in the 12th grade at W.E.B. Dubois Academic High School in Brooklyn.  At all relevant times, A.M. was, and she continues to be, enrolled in the public schools operated by the New York City Department of Education.

Defendants

21.     Defendant City of New York is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.  The City of New York has established and maintains the NYPD and the New York City Department of Education as constituent departments or agencies of the City.

22.     Defendant Michael R. Bloomberg is the Mayor of the City of New York, with supervisory authority over the NYPD and the New York City Department of Education.  He is sued here in his official capacity.

7

23.    Defendant Raymond W. Kelly is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting, and managing all members of the NYPD School Safety Division. He is sued here in his official capacity.

24.    Defendant James Secreto is the Assistant Chief and Commanding Officer of the NYPD School Safety Division with supervisory authority over all personnel of the NYPD School Safety Division. He is sued here in his official capacity.

25.    Defendant School Safety Officer Sergeant Roslyn Downing-Lee is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times. She is sometimes referred to by students and school personnel as "Base." She is sued here in her official and individual capacities.

26.    Defendant School Safety Officer Jane Doe is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times. She is referred to by students and school personnel as Officer Edmonds, or by her former last name, Officer Epps. She is sued here in her official and individual capacities.

27.    Defendant School Safety Officer Kevin Mayes is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times. He is sued here in his official and individual capacities.

28.    Defendant School Safety Officer John Doe 1 is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times. He is referred to by students and school personnel as Officer Richardson. He is sued here in his official and individual capacities.

8

29.     Defendant School Safety Officer John Doe 2 is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is referred to by students and school personnel as Officer Harrison. He is sued here in his official and individual capacities.

## CLASS ACTION ALLEGATIONS

30.     Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals. Plaintiffs ask the Court to certify as a class all children enrolled in New York City public middle and high schools who have been subjected to the policies and practices of unlawful seizures, arrests, and excessive force by members of the School Safety Division, or who are at risk of being subjected to these policies and practices in the future.

31.     This action satisfies all four requirements of Rule 23(a):

a.     *Numerosity:*  Joinder of all class members is impracticable because of the size of the class and the fact that the class includes some members who cannot be identified with any degree of specificity.  Approximately 445,156 students are enrolled in New York City's public middle schools and high schools. The identity of those who will attend these schools and be subjected to the challenged policies and practices in the future cannot be determined.

b.     *Commonality:* There are questions of law and fact common to all members of the class, including, but not limited to, whether City-Defendants maintain a policy or practice of unlawfully seizing and arresting schoolchildren and whether City-Defendants maintain a policy or practice of using excessive

force against these schoolchildren, in violation of the schoolchildren's constitutional rights.

      c.    *Typicality:* The claims of the representative Plaintiffs are typical of those of the class. Each named Plaintiff has been subjected to the challenged policies and practices and, by virtue of his or her continued enrollment in a New York City public middle school or high school, remains at risk of being subjected to these policies and practices again in the future.

      d.    *Adequacy of Representation:* The class representatives and class counsel will fairly and adequately represent the interests of the class. The class representatives have no interests in this matter that are antagonistic to other Plaintiffs. Class counsel has many years of experience in civil rights and class action litigation.

32.    Class-wide declaratory and injunctive relief is appropriate under Rule 23(b)(2) because City-Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

## STRUCTURE OF THE SCHOOL SAFETY DIVISION

33.    Since 1998, the NYPD School Safety Division has retained authority to patrol the buildings and grounds of public schools operated by the New York City Department of Education and to engage in policing activities with respect to those schools. Today, the School Safety Division includes over 5,200 School Safety Officers assigned to patrol specific school sites. Upon information and belief, the School Safety Division assigns between three and eight School Safety Officers to each New York City

public middle school and high school. In addition, the School Safety Division includes at least 191 precinct-based police officers assigned to patrol public schools generally.

34.     School Safety Officers wear NYPD-issued uniforms and, as peace officers, maintain full authority to stop, frisk, detain, question, search, and arrest schoolchildren both on and off school grounds while they are on duty.   Although School Safety Officers carry handcuffs, they do not carry firearms.

35.     Unlike other NYPD police officers who ordinarily receive six months of training prior to being deployed to city streets, School Safety Officers receive only fourteen weeks of training prior to being deployed to New York City public schools.

36.     Job qualifications for School Safety Officers differ from those for ordinary NYPD police officers as well.  Unlike other NYPD police officers, School Safety Officers are not required to have at least 60 hours of college credit or at least two years of military service to qualify.  On information and belief, School Safety Officers are also subject to less rigorous medical, psychological, and character screenings.  On information and belief, the base salary for School Safety Officers is $31,259.  By contrast, the base salary for ordinary NYPD police officers is approximately $43,062, and many NYPD police officers earn a great deal more.

37.     According to testimony submitted to the New York City Council by Gregory Floyd, the president of the union representing all NYPD School Safety Officers, School Safety Officers who are injured on the job, unlike ordinary NYPD officers, are not eligible for disability insurance coverage.  Rather, they are required to use their sick leave and vacation days, unless and until they obtain a favorable ruling from a

compensation hearing; such rulings typically are not made until a year and a half after an injury is sustained.

38.    Notwithstanding these differences, all members of the NYPD School Safety Division, including School Safety Officers, are law enforcement officers. They are not employees of the Department of Education, nor are they educators. School principals have repeatedly informed complaining parents that neither they nor any other school administrator has any supervisory control or authority over the School Safety Officers.

39.    Underscoring the nature of this chain-of-command, there have been a number of highly publicized incidents in which school principals and/or teachers were arrested for attempting to protect their students from abuses by members of the NYPD.

40.    For example, on October 9, 2007, a student at East Side Community High School in Manhattan who was trying to enter school early to catch up on schoolwork became involved in an altercation with a School Safety Officer who refused her entry. The School Safety Officer decided to arrest the student and parade her in handcuffs out of the school's main entrance in front of other students who were gathering to enter the building to start the school day. The school principal, concerned that such a display would be disruptive to other students and unnecessarily degrading to the arrested girl, insisted that the School Safety Officer escort the girl out of the building through a side door rather than the front door.

41.    In response, the School Safety Officer arrested the principal and charged him with obstruction of governmental administration and resisting arrest. Unsurprisingly, the judge who heard these charges ultimately dismissed them, observing, "Unfortunately,

12

this incident highlights the tension between school administrators and the NYPD concerning a principal's authority in overseeing school premises. Further, this incident highlights the need to exercise sensitivity in effectuating student arrests." This incident was widely reported in the media, including by the New York Daily News, the Village Voice, the New York Post, and the New York Times.

42.     Similarly, on March 8, 2005, police personnel arrested two teachers from the New School for Arts and Sciences in the Bronx and charged them with disorderly conduct. The incident began with a fight between two students; the police were summoned, but by the time they arrived, the students had been separated and order had been restored. Nonetheless, the officers began directing abusive language at the teachers and tried to arrest one of the students. When the teachers objected to the officers' conduct, the officers arrested the teachers as well as the students. In March 2007, the City of New York paid $60,002 to settle a civil lawsuit brought by the two teachers alleging unlawful arrest. This incident was widely reported in the media, including in the New York Times and the New York Post.

43.     In early February 2005, a School Safety Officer arrested the principal of the Bronx Guild High School for purportedly interfering in the School Safety Officer's attempt to arrest an unruly student. According to accounts of the incident, the principal had already sequestered the student in a separate room and was speaking with him, when the School Safety Officer entered and tried to arrest the student. When the principal objected, reasoning that the student should be punished through school disciplinary procedures rather than arrest, the School Safety Officer arrested the principal, handcuffed him, and escorted him from the building in front of teachers and students. The principal

13

was charged with third-degree assault, obstruction of governmental administration, and refusing to aid a police officer. The charges against the principal were later dropped, and the School Safety Officer was temporarily transferred to another public school site. This incident also gained wide media coverage, including in the New York Times, New York Daily News, Newsday, and the New York Post.

## FACTS RELATING TO THE CLASS REPRESENTATIVES

### M.M.

44.    Plaintiff M.M. is thirteen years old and enrolled in the 7th grade at Hunts Point School in the Bronx. During the past year, members of the NYPD School Safety Division assigned to M.M.'s school subjected her to an unreasonable seizure and an unlawful arrest as well as general intimidation and harassment.

45.    In March 2009, when M.M. was in the 6th grade at Hunts Point School, she was subjected to an unlawful seizure and arrest.

46.    That day, she was drawing on paper during class. Her friend reached over to her desk and drew on her paper. Playfully, she drew on his, and then they both drew a line on each other's desk with erasable markers.

47.    When the teacher saw the marks, she told the children that they should erase the marks immediately. The children went to get tissues to erase the marks, but did not have time to do so before School Safety Officers arrived. The School Safety Officers escorted M.M. and her friend out of the classroom and to the security office.

48.    Without the presence of M.M.'s mother, and without informing M.M. of her right to remain silent, an armed NYPD officer interrogated her, stating, "You know

14

that's graffiti, right?" M.M. explained that she had planned to erase the marks but did not have the opportunity.

49.    A School Safety Officer took M.M. back to the classroom so that she could get her jacket and book bag. He then handcuffed her in the hallway. Because classes were changing, other students and staff could see M.M. being escorted, handcuffed, by the School Safety Officer through the building. M.M. repeatedly complained that the handcuffs were hurting her, but the School Safety Officer refused to loosen them, even when a school official requested that they be loosened.

50.    M.M. and her classmate were placed again in the security office at the school. M.M., who was by now quite frightened, asked for her mother, and started to cry. The armed NYPD officer told M.M. that he would not call her mother. School Safety Officers then required M.M. to remove her shoes and sweater for a pat-down search. They also searched through her book bag. No school officials were present during the searches.

51.    The armed NYPD officer and School Safety Officers then transported M.M. and her friend, who were still in handcuffs, to the local police precinct. M.M. observed one of the officers shove her classmate into a police car, causing the child to fall.

52.    At the precinct, M.M.'s mother was waiting. She was distraught to see M.M. being brought into the precinct in handcuffs and disheveled—M.M.'s jacket was falling off, her shoelaces were untied, her hair was ruffled, and she was crying and pleading "mommy get me out of here." The children were taken to a small room and

handcuffed to a bench. The children were fingerprinted and photographed, although neither was given Miranda warnings.

53.    The police officer who had arrested M.M. threatened to place her and her friend with the general jail population, whom he described as "killers" and "murderers." He proceeded to show pictures of such people. After threatening to put the children in the general adult population, the officer told them, "You are going to have to scream and you'll be lucky if anyone comes to help you." He taunted them by asking, "You scared, you scared?" When M.M., who was held in the room for several hours, managed to fall asleep at one point, the officer awakened her by yelling, "Nobody cares about you in here. In school, people care. Nobody cares in here. This is real life. You all are going to get in trouble for what you all do."

54.    As they left the precinct, M.M. was given a summons for Family Court. Later, M.M. met with a probation officer and agreed to write a 1,000-word essay on what she did wrong. On information and belief, any charges against M.M. have been dismissed.

55.    A week after the arrest, M.M.'s mother met with the principal of the Hunts Point School to file a complaint. The principal responded that there was nothing he could do because, according to him, it was a police matter.

56.    In another incident, on November 5, 2009, M.M. and two boys were involved in a verbal argument. The next day, she heard that one of the boys had been injured.

16

57.     M.M. was called into the dean's office.  Without a parent or attorney present, the same officer who had arrested M.M. in March interrogated her and accused her of being involved in the physical assault of the injured boy.

58.     M.M. denied the accusation, but the officer stated that he would place M.M. in jail if he found out she was lying.

59.     Later that afternoon, the police officer called M.M. on a classroom telephone to say that he was calling M.M.'s mother to tell her that M.M. would be "locked up" soon.  The officer never actually contacted M.M.'s mother.

60.     M.M. continues to fear the NYPD officers at her school.  She fears that they will subject her to unlawful seizures, arrests, excessive force, and harassment in the future.

D.Y.

61.     Plaintiff D.Y. is thirteen years old and enrolled in the 8th grade at the Lou Gehrig School in the Bronx.  During the past school year, D.Y. was unlawfully arrested and physically assaulted by School Safety Officers at the school.

62.     At around 8:30 a.m. on October 7, 2009, D.Y.'s mother dropped off D.Y. and her friends across the street from the school.  As the three girls were approaching the school entrance, two adults approached and began threatening them.  Frightened, D.Y. sent her mother a text message to come back to help them.

63.     A School Safety Officer observed the exchange and instructed the girls and the two strangers to go into the school building.  The strangers entered the building, but the girls were afraid to follow them.  D.Y. said that she did not want to enter the building, but rather that she would wait for her mother.

17

64.    When D.Y. refused to enter the school building with the strangers, the School Safety Officer grabbed D.Y.'s arm and twisted it painfully.  A second School Safety Officer arrived on the scene and painfully twisted D.Y.'s other arm.  D.Y. reflexively tried to pull her arms towards her and asked the School Safety Officers to let her go.  In response to this entreaty from D.Y. – a 13-year-old girl whose arms were being restrained by two adults – the first School Safety Officer spoke into his hand-held radio saying, "we need back-up."

65.    A third School Safety Officer then came out of the building and grabbed one of D.Y.'s arms from the second School Safety Officer.  "These little girls think they're all grown," she said and pushed D.Y. into a gate.

66.    "Put handcuffs on her," the first School Safety Officer told the School Safety Officer who had just arrived on the scene.  This latter School Safety Officer pulled D.Y.'s arms behind D.Y.'s back and fastened handcuffs to D.Y.'s wrists.

67.    As they entered the school building, the School Safety Officer who had handcuffed D.Y. put her foot out, tripping D.Y. and causing her to fall stomach-first onto the floor.  The School Safety Officer then put her knee on D.Y.'s back, while simultaneously yelling at D.Y. to "get up."

68.    After allowing D.Y. to get to her feet, the School Safety Officer brought D.Y. into the school's security office and forcefully threw her into a seat at a desk.  D.Y. sat there in handcuffs.

69.    When D.Y.'s mother arrived at the school at approximately 9:30 a.m., she encountered the School Safety Officer who had radioed for "back-up" and asked to see her daughter.  The School Safety Officer refused and sent D.Y.'s mother to the school

office. Eventually, D.Y.'s mother was allowed to go to the school security office where she found her daughter still handcuffed. It was only at this point – and at the request of D.Y.'s mother – that D.Y.'s handcuffs were removed, approximately an hour after they had been applied. D.Y. was released from school and went home with her mother.

70.    Although School Safety Officers had told D.Y.'s mother that D.Y. would face a disorderly conduct charge, on information and belief, no charges were ever filed against D.Y.

71.    D.Y. required medical treatment for stomach and back pains sustained as a result of the assault.

72.    The School Safety Officers continue to harass and engage in menacing behavior toward D.Y. One of the School Safety Officers involved has given D.Y. intimidating looks in the hallways of the school on several occasions. One of the other School Safety Officers shoved D.Y. in front of the school on several occasions.

73.    D.Y. continues to fear that the School Safety Officers assigned to her school will assault or arrest her.

<u>D.B.</u>

74.    On December 8, 2008, D.B. was fourteen years old and in the 9th grade at Maxwell High School in Brooklyn when members of the NYPD School Safety Division physically assaulted and unlawfully arrested her.

75.    Everyday, students at Maxwell High School are required to pass through metal detectors and to put their school bags through scanners that are staffed by School Safety Officers from the NYPD School Safety Division.

76.     At approximately 7:00 a.m. on December 8, 2008, D.B. arrived at school, put her book bag through the scanner, and walked through the metal detector. Initially, her coat set the metal detector off, but after she removed her coat and placed it through the scanner, the metal detector did not sound when she walked through again. Both her bag and her coat cleared the scanner.

77.     Satisfied that D.B. was not carrying any contraband, a School Safety Officer instructed D.B. to proceed to class.

78.     D.B. went to retrieve her book bag from the scanner. However, at that moment, a second School Safety Officer, Sergeant Downing-Lee (known to students as Officer "Base") grabbed the book bag and tried to pull it away from D.B. without explanation. D.B. held on to her book bag, and a tugging match ensued between D.B. and School Safety Officer Sergeant Downing-Lee.

79.     Because D.B.'s book bag had cleared the scanner, there was no reason to suspect that D.B.'s bag contained any contraband or other suspicious items. There was no probable cause that D.B. was in any way involved in criminal activity.

80.     Nonetheless, School Safety Officer Sergeant Downing-Lee and a third School Safety Officer, Defendant Jane Doe, known as Officer Edmonds or Epps, began to push D.B. out of the building.

81.     As D.B. was being forcefully, and for no apparent reason, ejected from the school building, she demanded her coat.

82.     School Safety Officer Sergeant Downing-Lee, who had been pushing D.B. toward the door, shoved the coat in D.B.'s face. D.B. pushed her away.

83.    School Safety Officer Sergeant Downing-Lee grabbed D.B. by the hair, and a physical altercation ensued between fourteen-year old D.B. on the one hand and School Safety Officer Sergeant Downing-Lee and School Safety Officer Edmonds on the other.  During the course of this altercation, D.B. was punched approximately seven times on the left side of her head.  D.B. was then placed in a headlock, handcuffed, and arrested.  Her bag, the strap of which had fallen around her neck, was pulling on her neck and choking her with its weight.  However, her requests that the strap be removed were ignored.

84.    D.B. was taken to the local police precinct and charged with assault and trespass.  Despite the fact that D.B. was physically injured, the police did not initially permit D.B. to go to the hospital.  In fact, it was only when D.B.'s mother called 911 for medical assistance that EMTs arrived and determined that D.B. needed to go to the hospital.  D.B. was then taken from the precinct to the hospital by ambulance, where she received medical treatment.  At the hospital, a School Safety Officer barred D.B.'s mother from sitting with D.B. while D.B. received medical attention, threatening D.B.'s mother with arrest if she violated this command.

85.    D.B. was then taken to Spofford Juvenile Center (now Bridges Juvenile Center) where she was detained overnight.  For the first time since that morning, D.B. was finally able to speak with her mother, though it was over the phone.

86.    The charges against D.B. were eventually dismissed.  She entered into Adjustment Services, a probation program designed to divert juveniles from the criminal justice system, without ever seeing a judge.  A school discipline charge accusing D.B. of

injuring School Safety Officer Sergeant Downing-Lee was dropped due to a lack of evidence. D.B.'s probation officer released her from the Adjustment Services program.

87.    As a result of the incident, D.B. has suffered from headaches, nose bleeds, neck and back pain, anxiety, and restlessness. She also has difficulty sleeping and often sleeps with her mother since the incident.

88.    D.B. and her mother filed a notice of claim with the Comptroller of the City of New York with respect to this incident on March 3, 2009. More than thirty days have elapsed since service of that filing, and City-Defendants have made no attempt to adjust or pay the claim.

89.    Since the incident, School Safety Officer Sergeant Downing-Lee continues to harass D.B. by making sound effects and beating a desk when D.B. passes her. On one occasion, while D.B. waited for the elevator by the security desk, School Safety Officer Sergeant Downing-Lee threatened D.B. and other students standing nearby that she would kick them out of school if they did not get out of the hallway.

90.    D.B. continues to fear that School Safety Officers at school will physically attack her, seize her belongings, or unlawfully arrest her again in the future.

L.W.

91.    On October 28, 2008, L.W. was sixteen years old and enrolled in the 10th grade at Hillcrest High School, when he was physically beaten and unlawfully arrested by School Safety Officers.

92.    During gym class, a classmate asked L.W. to pass a cell phone to another classmate; L.W. agreed. Possession of a cell phone is a violation of school rules, but obviously not a violation of the criminal law.

22

93.     The gym teacher observed the transfer of the cell phone and summoned school officials. The school officials escorted L.W. to the dean's office.

94.     Three School Safety Officers, Officers Kevin Mayes, John Doe 1 (known as Officer Richardson), and John Doe 2 (known as Officer Harrison), were present in the dean's office when L.W. arrived. The three School Safety Officers went with school officials into a smaller suite within the dean's office to complete suspension paperwork.

95.     The School Safety Officers then returned to where L.W. was waiting. School Safety Officer Mayes informed L.W. that he had to be searched. No school officials were present at the time.

96.     L.W. refused the search, stating that he did not have a cell phone. He shook out his shirt and shorts to demonstrate that he did not have a cell phone and stated that he did not want the three School Safety Officers laying their hands on him.

97.     School Safety Officer Mayes insisted that L.W. would need to be searched and began to put on rubber gloves.

98.     School Safety Officer Mayes then pushed L.W. into a storage room, grabbed L.W.'s arm and shirt, swung at L.W., and threw L.W. to the ground.

99.     L.W. tried to block the blows, but Officer Mayes punched L.W. more than five times, including on his face, forehead, right eye, and right ear. L.W.'s face was swollen and he was bleeding and spitting up blood.

100.    The School Safety Officers picked L.W. up from the ground, handcuffed him, poked him in his eyes, and threw him back on the floor. They then removed L.W.'s sneakers and searched L.W.'s person, finding no cell phone.

23

101.    Approximately twenty minutes later, an ambulance arrived. Medics
immobilized L.W. on a stretcher and put him in a neck brace as precautionary measures
to keep him stable. They then transported L.W. to the hospital; upon information and
belief, the School Safety Officers had urged that L.W. undergo an emergency psychiatric
evaluation.

102.    On information and belief, hospital officials declined to conduct a
psychiatric evaluation, but instead treated L.W. for his injuries, providing him with pain
medication and conducting a CT scan.

103.    L.W. was later charged with disorderly conduct as a result of this incident.
Those charges have since been dismissed.

104.    L.W. served a notice of claim with the Comptroller of the City of New
York on January 26, 2009. More than thirty days have elapsed since service of that
filing, and City-Defendants have made no attempt to adjust or pay the claim.

105.    L.W. fears that School Safety Officers will physically attack or unfairly
arrest him again at school in the future.

A.M.

106.    On January 18, 2007, A.M. was fifteen years old and enrolled in the 10th
grade at Samuel J. Tilden High School in Brooklyn, when she was physically assaulted
and unlawfully arrested at school by a member of the NYPD School Safety Division.

107.    At approximately noon on that day, A.M. was staying late in her
classroom to complete a final exam.

108.    As she exited the classroom and went toward the cafeteria for her lunch
period, a School Safety Officer stopped her and instructed her to use an alternate

stairwell. A.M. complied by turning around and using the other stairwell to travel from the third to the second floor.

109.    On the second floor, a school official stopped A.M. and instructed her to go to the detention room instead of the cafeteria because she was not supposed to be in the hallways at that time. A.M. explained that she was in the hallway because she had just finished a final exam, but complied with the school official's instructions and began to walk toward the detention room.

110.    A School Safety Officer, who had been watching the conversation between A.M. and the school official, then approached A.M. from behind, grabbed A.M.'s book bag, yanked it up, pulling A.M. with it, and yelled at A.M. to go to the detention room. A.M. explained that she was going to the detention room, and the School Safety Officer then pushed A.M.

111.    A.M. was surprised and upset that the School Safety Officer had pushed her and she asked for the School Safety Officer's badge number. This request made the School Safety Officer angry at A.M. and he threatened to "lock up" A.M.

112.    The School Safety Officer then grabbed A.M. by her wrist and quickly and forcefully twisted it up and behind her back. He handcuffed that wrist as he pushed the left side of A.M.'s body and face against the wall. As A.M. screamed in pain, the School Safety Officer responded by twisting her left arm higher. A.M. unsuccessfully tried to use her free hand to push the School Safety Officer away.

113.    A second School Safety Officer was summoned, and escorted A.M. in handcuffs through the hallways to the dean's office. In the office, the School Safety Officer searched A.M.'s belongings.

25

114.    After A.M. complained about her shoulder hurting, a school official called A.M.'s mother, and A.M. was transported to the hospital for medical treatment. The examining doctor told A.M. that she had probably sprained her shoulder, and that she should take painkillers for her injury.

115.    A.M. was then transported to the local police precinct where she was taken to a back room, made to sit on a bench, and handcuffed to a pole. Shortly afterwards, A.M. was allowed to leave and was given a summons for Family Court, but no charges were listed on the form that she was given. She was never given her Miranda warnings, was never fingerprinted, and was never formally charged with any crime.

116.    At Family Court, A.M. met with a probation officer. On the probation officer's recommendation, A.M. agreed to attend a one-day anger management class and serve 120 days of probation. A.M. was never informed of any specific charges against her, and she never went before a judge. On information and belief, any charges against A.M. have been dismissed.

117.    A.M.'s mother made an inquiry about how to file a complaint about the incident. A state legislator told her to file a formal complaint with the Civilian Complaint Review Board of the NYPD about the incident. A.M.'s mother did so online on January 30, 2007, but she did not receive a response.

118.    A.M. fears that School Safety Officers at her school will subject her to physical attacks or unfair arrests and seizures again in the future. A.M. felt humiliated in front of her peers for being arrested at school. She is afraid to write in her notebooks for fear that the police will use anything she writes against her. As a result of the incident, A.M. transferred to another public school.

## FACTS ESTABLISHING OFFICIAL MUNICIPAL POLICY

119.    The experiences of the class representatives do not constitute isolated incidents. Rather, they are part of a larger pattern and practice that exists within the New York City public schools.

120.    Members of the NYPD School Safety Division subject New York City public middle school and high school students to unjustified seizures and arrests with unacceptable frequency. Members of the NYPD School Safety Division handcuff students and/or place them in seclusion rooms, against their will and without parental consent, not for violations of the law, but rather for minor classroom misbehavior (such as being late to class). Upon information and belief, a significant number of students are ultimately handcuffed and transported to local precincts by members of the NYPD School Safety Division, not for criminal violations, but for—at most—breaking school rules. Upon information and belief, a significant number of children who disobey orders are seized and transported, against their will and without parental consent, for emergency psychiatric evaluations. In addition, upon information and belief, a significant number of schoolchildren under the age of 16 have been arrested at school for non-criminal violations even though such arrests are prohibited by state law.

121.    Moreover, students in middle schools and high schools in New York City repeatedly have been physically attacked by members of the NYPD School Safety Division. Members of the NYPD School Safety Division often push, shove, and grab students. Schoolchildren have been assaulted and brutally beaten by members of the NYPD School Safety Division. In some cases, the assaults were sufficiently severe as to result in physical injury and the need for medical attention. In many instances, such

27

aggressive conduct is not pursuant to a lawful arrest, but rather for the purpose of securing compliance with a directive from a member of the NYPD School Safety Division unrelated to criminal conduct and often for no legitimate reason at all.

122.    The challenged conduct by members of the NYPD School Safety Division constitutes official municipal policy.  First, the policy and practice of unlawfully seizing and arresting students for minor school misbehavior that does not amount to probable cause of criminal activity is the official stated policy of the NYPD, which broadly authorizes law enforcement personnel to remove "unruly" children from schools. Second, both challenged policies and practices—the unlawful seizures and arrests of, as well as the use of excessive force against, schoolchildren—are so widespread and frequent as to constitute a custom and usage of members of the NYPD School Safety Division.  Third, City-Defendants were well-aware of, yet deliberately indifferent to, the prevalence of the challenged policies here, failing to make meaningful attempts to improve the training and supervision of members of the NYPD School Safety Division. For each of these reasons, the policies and practices here are directly attributable to City-Defendants.

Official Stated Policy

123.    The policy and practice of unlawfully seizing and arresting schoolchildren for minor misbehavior that does not establish probable cause of criminal activity constitutes the official policy of the City of New York, as set forth by Defendant Police Commissioner Raymond W. Kelly and Defendant Assistant Chief James Secreto, Commanding Officer of the NYPD School Safety Division, both of whom have final decision-making authority in these matters.

28

124.    On June 11, 2007, Defendant Police Commissioner Kelly submitted a letter to New York City Councilmember Robert Jackson indicating that the duties of School Safety Officers include "removing unruly students" and "enforc[ing] the rules and regulations" of the "Student Disciplinary Code."

125.    Likewise, on October 10, 2007, Defendant Assistant Chief Secreto testified before the New York City Council and submitted an accompanying written statement indicating that School Safety Officers are responsible for "removing unruly" students from public school sites.

126.    In this context, the removal of an "unruly" student by members of the NYPD School Safety Division constitutes a seizure and/or an arrest; students are not free to leave once seized and/or arrested and, often, they are transported to a local police precinct and booked even when they have done nothing more than arguably violate school rules in a non-criminal matter. In addition, although neither Defendant Kelly nor Defendant Secreto further defined the term "unruly," as a matter of logic and plain language, the term encompasses minor misbehavior that does not amount to probable cause of criminal activity.

127.    In these ways, the policy and practice of unlawfully seizing and arresting schoolchildren for minor school misbehavior, absent probable cause of criminal activity, constitutes official municipal policy, as articulated by officials with final decision-making authority in these matters.

<u>Custom and Usage</u>

128.    The experiences of the five class representatives are by no means unique or anomalous. Rather, they are representative of widespread and frequent actions by

members of the School Safety Division. They occur as part of a larger pattern and practice of unlawfully seizing and arresting students absent probable cause and of using excessive force against schoolchildren, a pattern and practice so prevalent as to amount to a custom and usage of City-Defendants.

129.    On June 11, 2007, Defendant Police Commissioner Kelly reported to New York City Councilmember Robert Jackson in a letter that, since 2002, the City had received 2,670 complaints against School Safety Officers, resulting in an average of 500 per year. Assuming that there were between 4,000 and 5,000 School Safety Officers employed during this period, these figures indicate that one complaint had been filed for every eight to ten School Safety Officers per year. Moreover, Defendant Police Commissioner Kelly noted in the letter that 27 percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against regular NYPD officers.

130.    More recently, on November 10, 2009, Defendant Assistant Chief Secreto testified before the New York City Council that during the 2008 calendar year, there had been 1,159 complaints filed against School Safety Officers. This figure suggests a staggering rate of almost one complaint for every four School Safety Officers employed. Assistant Chief Secreto further explained that 15 percent of these complaints alleged excessive force, abuse of authority, discourtesy, or offensive language by School Safety Officers. Moreover, upon information and belief, these figures vastly underestimate the number of actual complaints, because, as stated during a New York City Council hearing on the School Safety Division held in 2007 and as set forth in a report published by the New York Civil Liberties Union and the American Civil Liberties Union, submitted to

30

City-Defendants in 2007, many parents have been given improper information as to how to file a complaint regarding the conduct of a School Safety Officer.

131.    In addition, countless other New York City public school students have been victims of the challenged policies and practices.

A.T.

132.    A.T. was subjected to an unlawful seizure and severely beaten by School Safety Officers when he was enrolled in the 11th grade at the High School for Law Enforcement and Public Safety in Queens.

133.    On November 5, 2008, A.T. was using a restroom in the school locker room between classes. As he exited, two School Safety Officers ordered him to stop for no reason. A.T. continued walking, explaining that he was going to his next class. One of the School Safety Officers yelled that A.T. was being "disrespectful," and walked in front of A.T., putting his hand into A.T.'s chest. A.T. told the School Safety Officer not to touch him and tried to walk around him. The School Safety Officer immediately pushed A.T. against the wall, stating, "Oh I see. I have to teach you some respect," and then began taunting A.T. that he was "little" and "weak."

134.    The School Safety Officer, an adult male weighing approximately 200 pounds, grabbed A.T., saying that he was going to "teach him a lesson." A second School Safety Officer – a woman – hit A.T. in the head several times. At that point, the male School Safety Officer put his foot behind A.T. and caused A.T. to fall to the ground before himself falling on top of A.T.

135.    The female School Safety Officer handcuffed A.T.'s right hand, but could not cuff the left hand, which was pinned under the weight of the 200-pound male School

Safety Officer. When A.T. attempted to free his left hand, the female School Safety Officer banged A.T.'s head repeatedly on the floor. She then handcuffed A.T.'s left hand to his right hand.

136.    A third School Safety Officer who had been summoned picked A.T. up from the floor, and began banging A.T.'s body against the wall, stating, "You hit my man. You hit my friend."

137.    The School Safety Officers transported A.T. to the principal's office in an elevator. In the elevator, the third School Safety Officer hit A.T.'s body against the elevator wall.

138.    A.T. was held in the principal's office for several hours before being allowed to go home by himself.

139.    The School Safety Officers charged A.T. with disorderly conduct, although on information and belief, those charges have been dismissed.

140.    As a result of this incident, A.T. transferred to a different school. He was treated at a hospital for bruises sustained on the right side of his forehead, his cheek, and his hip, and for his swollen wrists.

141.    A.T.'s mother filed a complaint regarding the incident with the Internal Affairs Bureau (IAB) of the NYPD and met with IAB personnel. On information and belief, the IAB has taken no further action to investigate the incident or discipline the offending School Safety Officers.

M.D.

142.    M.D. is sixteen years old and enrolled in the 11th grade in the Urban Assembly School for Applied Math and Science in the Bronx.

143.     Toward the end of the 2008-2009 school year, he witnessed a 13-year old girl (and fellow student) in an argument with the school principal in the cafeteria. A School Safety Officer assigned to his school overheard the argument as well and immediately grabbed the 13-year old girl by the throat. He choked her by pushing her against the wall by the throat. The School Safety Officer threatened to place the girl in handcuffs if she tried to move or speak. When the principal attempted to intervene, the School Safety Officer threatened to handcuff the principal as well. The incident happened during lunch period when the cafeteria was full of students. According to M.D., the girl involved in the incident subsequently transferred to another school.

144.     In the winter of the 2007-08 school year, M.D. witnessed another incident involving a different School Safety Officer and a ninth-grade classmate. The student had attempted to re-enter the school building shortly after school ended to retrieve a hat. The School Safety Officer refused to permit the student to re-enter the building, resulting in a verbal exchange. The School Safety Officer then challenged the student to a physical fight, throwing down his hands in an aggressive stance and asking him "do you want to go at it?" Two other students were able to diffuse the situation by taking the student out of the building with them.

145.     M.D. fears that he will be subject to excessive force in the future by School Safety Officers stationed at his school. He does not trust that they can or will keep him safe.

<u>B.E.</u>

146. B.E. was enrolled in the 11th grade at Samuel J. Tilden High School in Brooklyn, when he was severely beaten by the School Safety Officers assigned to his school.

147. On January 12, 2007, B.E. stayed late after his math class to speak with his teacher about additional work assignments. In the hallway on the way to his next class, the assistant principal ordered B.E. to proceed to detention for being late. When B.E. tried to explain the reason he was late, the assistant principal summoned an armed police officer from the NYPD.

148. The officer immediately grabbed B.E., bashed B.E.'s head into a brick wall, and then proceeded to spray B.E. with mace. The officer handcuffed B.E. and summoned six additional officers, including both School Safety Officers and armed members of the NYPD.

149. B.E. was arrested and transported to a hospital for treatment of his injuries. He was then transported to the local precinct, where he spent approximately seven-and-a-half hours, and then to central booking, where he spent approximately nineteen hours. He was charged with five criminal offenses, for which he received three days of community service and probation. He was also suspended from school for five days, although, after an appeal, the Department of Education expunged the suspension from B.E.'s records. B.E. has since graduated high school and now attends college.

150. This incident was reported in the Village Voice and documented in a report titled "Criminalizing the Classroom: The Over-Policing of New York City Schools," described *infra* Paragraphs 184-188.

A.P.

34

151. On October 10, 2007, A.P. testified before the New York City Council that on March 30, 2007, a 300-pound School Safety Officer physically assaulted him. He was twelve years old and enrolled in Intermediate School 291 in Brooklyn at the time.

152. A.P. stated that he had been in the hallway cutting class, when the School Safety Officer approached him, pushed him, and demanded his identification. A.P. complied, but the School Safety Officer continued to abuse him verbally and then shoved A.P. into the lockers. When A.P. pushed back, other School Safety Officers immediately placed A.P.'s left hand in handcuffs. The first School Safety Officer then punched the boy in the chest. The boy hit the School Safety Officer's back with his remaining free hand and the other School Safety Officers immediately cuffed that hand as well. Once both of A.P.'s hands were in handcuffs, the first School Safety Officer punched A.P. in the face creating a laceration that resulted in significant bleeding.

153. A.P. was charged with assaulting an officer, taken to the local precinct, and held over the weekend. After a full trial, all charges against him were dismissed.

154. When A.P.'s father went to the precinct to file a complaint against the School Safety Officer, the police refused to accept his complaint. A.P.'s mother subsequently managed to lodge a formal complaint about the incident with the IAB, but that agency never responded. As a result of the incident, A.P. transferred to a different school.

S.C.

155. S.C. is seventeen years old and enrolled in the 12th grade at Robert F. Kennedy High School in Queens. In the fall of 2008, a NYPD School Safety Officer assigned to his school kicked in the door to a bathroom stall occupied by S.C. The door

hit S.C. in the head, causing bleeding and pain, but the School Safety Officer refused to help him in a clear violation of the NYPD patrol guide. The School Safety Officer said to S.C. "that's life. It will stop bleeding" before leaving the restroom.

156.    When S.C. reported the incident to his school principal, the principal responded that there was nothing he could do about it. S.C.'s father sought to complain directly with the NYPD precinct that covers the school, but the precinct cancelled both meetings that the father had scheduled. Eventually, S.C. and his father found out that the School Safety Officer had been transferred to a middle school in the area.

157.    Finding no other recourse, S.C. and his parents filed a civil suit against City-Defendants, which settled for $55,500 in money damages. They also filed a formal complaint with the IAB and participated in an interview with IAB personnel. In addition to being presented in open testimony before the New York City Council and being recounted in the legal suit against City-Defendants, this incident was widely reported by the New York Daily News, the New York Post, El Diario, and television station New York 1.

C.S.

158.    C.S., who is sixteen years old and a senior at Bushwick School for Social Justice in Brooklyn, testified before the New York City Council on November 10, 2009 about two unlawful seizures that she suffered at the hands of NYPD School Safety Officers. She testified that on one occasion, a School Safety Officer assigned to her school handcuffed her to a chair after she had a verbal argument with a classmate.

159.    On another occasion, when C.S. was a freshman, she activated the metal detector at the entrance of the school because she had bobby pins in her hair. Without

parental notification or consent, three School Safety Officers escorted C.S. into a bathroom and instructed all of the other girls in the bathroom to leave. A School Safety Officer then required C.S. to submit to an invasive search during which a metal detector wand was placed against C.S.'s skin under her bra, purportedly to ensure that she was not hiding a razor, cell phone, or iPod between her bra and her body. In testimony, C.S. stated, "Every day I go to school and I face being harassed, pushed, shoved, yelled at, disrespected and illegally searched." She continued, "I thought the School Safety Officers are supposed to keep me safe, but all they implement is fear."

<u>Legal Aid Society Clients</u>

160.    Nancy Rosenbloom, an attorney for the Legal Aid Society testified before the New York City Council on November 10, 2009 that a student client - a small twelve-year old girl - had been improperly arrested for allegedly assaulting a large, male School Safety Officer assigned to her school. She testified that after the juvenile court judge heard testimony and reviewed the videotape showing that the School Safety Officer, in fact, had been the initial aggressor, the judge dismissed all charges against the girl.

161.    Ms. Rosenbloom further testified before the New York City Council on November 10, 2009, that in another case, her office defended a child accused of assaulting a School Safety Officer stationed at the child's school. All charges were dismissed, however, after a videotape of the incident showed that several School Safety Officers had initiated the altercation by pushing the student into a corner, hitting him, and then laughing.

162.    Ms. Rosenbloom further testified that her office had recently defended a student who had been unlawfully arrested by a School Safety Officer for standing outside

his school at 2:45 p.m., immediately after classes had been dismissed. The child was ultimately incarcerated for over twenty-four hours as a result.

Queens Legal Services Client

163.    During the same New York City Council hearing held on November 10, 2009, Tara Foster, an attorney with the Education Rights Project of Queens Legal Services, testified that she had defended a student who had been charged with striking a School Safety Officer. During the child's hearing, student witnesses testified that, in fact, the School Safety Officer initiated the altercation by becoming verbally and physically aggressive toward the student, pushing her against the wall, grabbing her by the hair, dragging her and punching her in the head. The School Safety Officer also stomped on the cell phone of one of the witnesses who attempted to videotape the incident. After a full hearing, school disciplinary charges against the student were dismissed on the merits. On information and belief, the School Safety Officer was not punished.

R.M.

164.    The complaint in *Morgan v. City of New York, et al.*, No. 09-cv-3619 (E.D.N.Y filed Aug. 20, 2009) alleges that R.M., then fifteen years old and a student at Hillcrest High School in Queens, was severely beaten by School Safety Officers on three separate occasions—two of which were spurred by a cell phone.

165.    During the first incident, R.M. was observed using a cell phone in school and taken to the dean's office. School Safety Officers then took R.M. to a room in the dean's office and beat him "about the head, shoulders, arms, and legs."

166.    Later that same year, School Safety Officers beat R.M. when he asked them to hold his cell phone so as not to be late to class. R.M. was then handcuffed and

taken to a locked office in the school. He was subsequently transported in handcuffs to the psychiatric ward of North Shore Long Island Jewish Hospital and treated for his physical injuries.

167.    After R.M. filed notices of claim with respect to these two incidents, School Safety Officers retaliated against him by dragging him into a stairwell, choking him, and threatening him.

168.    As a result of these beatings, R.M. suffered extensive injuries including to both knees, one of which required surgery to repair. He was forced to transfer to another public school in New York City, disrupting his education.

169.    R.M. filed a civil complaint in the Eastern District of New York on August 20, 2009, naming as defendants the City of New York and the NYPD, among others, and seeking compensatory and punitive damages as a result of these beatings. This civil lawsuit is pending.

170.    In addition to receiving notice of these incidents through the notices of claim and the complaint, City-Defendants obtained knowledge of these incidents through widespread news coverage, including articles published in the New York Times, the New York Daily News, and the Village Voice.

J.R.

171.    According to court filings, a School Safety Officer assigned to United High School in Manhattan unlawfully arrested student J.R. *Ramos v. City of New York*, No. 05-cv-637 (S.D.N.Y. filed Jan. 18, 2005). Specifically, it was alleged that the School Safety Officer assigned to the student's school refused to permit the student to leave class to attend a student council meeting and mocked him because he perceived the student to

be gay. When the student requested that the School Safety Officer consult with the principal regarding the student council meeting, the School Safety Officer placed the student in handcuffs, subjected him to a search, and pushed him against the wall. The complaint further alleged a pattern and practice of School Safety Officers unlawfully using force and restraining students without legal justification, and a failure to discipline the officer involved in that case. The case was settled for $12,500.

R.B.

172.    R.B., a student enrolled in the Campus Magnet High School in Queens, filed a complaint alleging that School Safety Officers assigned to that school placed him in handcuffs, arrested him, and transported him to a local precinct for allegedly stealing a classmate's metrocard, even though the classmate had clearly stated that R.B. was not the person who had taken the metrocard. *Bazile v. City of New York*, 07-cv-5347 (E.D.N.Y. filed Dec. 19, 2007). The case was settled for $32,500.

A.H.

173.    The complaint in *Brackson v. City of New York* (N.Y. Sup. Ct. filed on or about Dec. 14, 2009) alleges that School Safety Officers at Evander Childs High School in the Bronx subjected A.H. to false arrest, assault, battery, false imprisonment, and intentional infliction of emotional distress. It also asserts claims for negligent hiring, training, supervision, and retention by the City.

174.    A.H. asserts that she was in class at school and "got up from her seat to help a fellow student who was having trouble with the class curriculum." When the teacher observed A.H. get up, she ordered A.H. to leave the classroom. According to the

complaint, A.H. "refused to leave the classroom and tried to explain that she had just gotten up from her seat to help a fellow student."

175.    The teacher called School Safety Officers, who then "used physical force to remove [A.H.] from the classroom by first handcuffing one arm as they aggressively jerked and pried her away from her desk." The officers handcuffed A.H.'s "arms behind her back so tight [*sic*] that her skin ruptured causing her to bleed and suffer severe pain and discomfort." A.H. asked for medical attention, but when the school nurse arrived, officers "refused to take off the handcuffs so that the nurse could properly treat her."

176.    A.H. was then taken to a police precinct and charged with disorderly conduct and resisting arrest. She spent approximately thirty hours in jail. The criminal charges against A.H. were dismissed, but the excessive force used by the School Safety Officers "resulted in permanent keloid scarring" on A.H.'s wrists. A.H.'s civil lawsuit is pending.

C.R.

177.    Publicly available legal documents indicate that student C.R., who was sixteen years old and enrolled in Samuel Gompers High School in the Bronx, was unlawfully seized, arrested, and beaten by NYPD School Safety Officers on March 19, 2007. The complaint in that case, *Rodriguez v. City of New York*, 08-cv-11300 (S.D.N.Y. filed Dec. 20, 2008), alleged that School Safety Officers assigned to C.R.'s school escorted C.R. out of the classroom for talking too much, shoved him, threw him against the wall, jumped on him when he fell to the ground, and handcuffed him. As alleged, C.R. began bleeding and had to be hospitalized, requiring stitches to his head. The

School Safety Officers charged C.R. with assault, resisting arrest, and harassment. The defendants settled that suit for $39,000.

T.G.

178.   Publicly available legal documents further indicate that student T.G., who was sixteen years old and enrolled in Intermediate School 291 in Brooklyn, filed a lawsuit, *Gray v. City of New York*, No. 4247-05 (N.Y. Sup. Ct., filed Feb. 2005), alleging that the School Safety Officers assigned to her school verbally and physically assaulted her.

C.C.

179.   A complaint was filed in *Crowther v. City of New York*, No. 08-cv-2671 (E.D.N.Y. filed July 2, 2008), by C.C., a student who was enrolled in the Thomas Jefferson High School in Brooklyn. The complaint alleges that a School Safety Officer assigned to C.C.'s school subjected C.C. to excessive force, false arrest, and malicious prosecution, and alleges a systemic pattern and practice of similar abuses.

L.S.

180.   Publicly available legal documents describe a lawsuit filed by student L.S., who was enrolled in Middle School 232 in the Bronx. The documents relating to that suit, *Suazo v. City of New York*, 020389-08E (N.Y. Sup. Ct. filed May 12, 2008), allege that L.S. was walking on the sidewalk outside of his school right after classes were dismissed. As alleged, without provocation School Safety Officers assigned to his school physically assaulted L.S., resulting in his hospitalization. The next day, when L.S. and his mother went to the school to file a complaint about the incident, L.S. was placed

under arrest. All criminal charges against L.S. were dismissed. Upon information and belief, his civil lawsuit against the defendants remains pending.

J.G.

181.    Publicly available legal documents indicate that student J.G. was enrolled in the High School of Fashion Industries in Manhattan and filed a lawsuit *Gonzalez v. City of New York*, No. 116093-07 (N.Y. Sup. Ct. filed Nov. 20, 2007), alleging that J.G. was stopped by School Safety Officers assigned to his school for being in the hallway without a hall pass. As alleged, six School Safety Officers then became involved, physically assaulting J.G., throwing him to the ground, and beating him, resulting in a fracture to J.G.'s left hand that required surgery, multiple bruises around his head, neck, and shoulders, and other physical injuries.

P.C.

182.    Publicly available legal documents indicate that P.C., who was enrolled in Bryant High School in Queens, filed a suit, *Chiaramonte v. City of New York*, No. 18348-07 (N.Y. Sup. Ct. filed July 17, 2007), alleging that she was physically assaulted and handcuffed by the School Safety Officers assigned to her school, resulting in physical injury.

Deliberate Indifference in Failure to Train and Supervise

183.    City-Defendants have been well aware of the allegations described above and the pervasive nature of the pattern and practice by members of the NYPD School Safety Division of unlawfully seizing and arresting schoolchildren, and subjecting them to excessive force. Yet, City-Defendants have been deliberately indifferent to this pattern and practice, and have not attempted to remedy it.

43

184.    City-Defendants have had actual knowledge of a pattern and practice of abuse by members of the NYPD School Safety Division for several years beyond the numerous episodes described above. In March 2007, the New York Civil Liberties Union and the American Civil Liberties Union published a report titled *Criminalizing the Classroom: The Over-Policing of New York City Schools*, documenting instances of abuses by members of the NYPD School Safety Division.

185.    The *Criminalizing the Classroom* report documented the unlawful seizure, arrest, and beating of B.E., described *supra* Paragraphs 146-150. It documented the unlawful seizure, arrest, and beating of class representative A.M., described *supra* Paragraphs 106-118.

186.    In addition, the report documented the unlawful seizure and arrest of another student, "Jimmy," for allegedly throwing rather than handing his wallet to a School Safety Officer as he passed through the metal detector; when school officials objected to Jimmy's arrest, the School Safety Officer threatened to handcuff them as well. On another occasion, the report indicated that Jimmy was handcuffed and issued a summons for trying to retrieve his gym clothes from the gym. All charges against the child were summarily dismissed.

187.    The report further documented the unlawful seizure, arrest, and use of excessive force on "M.M." (not the class representative M.M.), who asked for her cell phone, which had been confiscated, to be returned. Two School Safety Officers threw M.M. to the ground, handcuffed her, and confined her to a holding room for approximately an hour.

188.   City-Defendants, including Defendant Assistant Chief Secreto and all senior personnel within the NYPD School Safety Division, received copies of the *Criminalizing the Classroom* report.

189.   City-Defendants obtained further knowledge of the challenged patterns and practices through the publication of other reports documenting abuses by members of the NYPD School Safety Division. *See, e.g.,* Drum Major Institute for Public Policy, *A Look at the Impact Schools* (June 2005); Kevin P. Brady, Sharon Balmer and Deinya Phenix, *School—Police Partnership Effectiveness in Urban Schools: An Analysis of New York City's Impact Schools Initiative* (Education and Urban Society, Aug. 2007); National Education and Social Rights Initiative and Teachers Unite, *Teachers Talk: School Culture, Safety, and Human Rights* (Oct. 2008); and Urban Youth Collaborative, *Bill of Rights* (2006).

190.   City-Defendants also obtained actual knowledge of the pattern and practice by members of the NYPD School Safety Division of unlawfully arresting schoolchildren, based on letters submitted by the American Civil Liberties Union and the New York Civil Liberties Union to Defendant Police Commissioner Kelly dated October 7, 2008, and November 4, 2008. These letters document that a significant number of schoolchildren under the age of 16 have been arrested at school for non-criminal violations even though such arrests are prohibited by state law.

191.   City-Defendants also obtained actual knowledge of the patterns and practices challenged here from media reports. In addition to widespread coverage of the incidents involving the inappropriate arrests of school principals and schoolteachers, described *supra* Paragraphs 39-43, and the incidents involving R.M., *supra* Paragraphs

45

164-170, and S.C., *supra* Paragraphs 155-157, the New York Daily News reported on

June 19, 2008, that a NYPD School Safety Officer handcuffed a five-year old boy and

transported him to a psychiatric hospital, without parental consent, after the boy threw

what was described as a "temper tantrum." Likewise, on March 10, 2008, the New York

Daily News reported that a NYPD School Safety Officer handcuffed two four-year old

boys for refusing to take a nap.

     192.    City-Defendants also obtained actual knowledge of the patterns and

practices challenged here from complaints filed with the IAB regarding conduct by

members of the NYPD School Safety Division. As described *supra* Paragraph 129,

between 2002 and 2007, the police received 2,670 complaints against School Safety

Officers, resulting in an average of 500 per year, or one complaint for every eight to ten

School Safety Officers per year. Twenty-seven percent of those complaints were

substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed

with the Civilian Complaint Review Board against NYPD officers not assigned to the

public schools.

     193.    Also, as described more fully *supra* Paragraph 130, during the 2008

calendar year, there were 1,159 complaints filed against School Safety Officers,

suggesting a staggering rate of almost one complaint for every four School Safety

Officers employed. Fifteen percent of these complaints alleged excessive force, abuse of

authority, discourtesy, or offensive language by School Safety Officers.

     194.    City-Defendants also obtained actual knowledge of the patterns and

practices challenged here from notices of claims and complaints asserted against them

challenging the conduct of members of the NYPD School Safety Division. Among the

incidents for which notices of claims and complaints have been filed are those involving the unlawful seizure and arrest and/or physical assault of students R.M., J.R., R.B., A.H., C.R., T.G., C.C., L.S., J.G., and P.C., *supra* Paragraphs 164-182.

195.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on October 10, 2007 regarding the NYPD School Safety Division. Defendant Assistant Chief Secreto was present at this hearing and testified on behalf of himself and Defendant Police Commissioner Kelly. At that hearing, a number of children offered testimony regarding abuse suffered at the hands of School Safety Officers as described above. At the same hearing, Gregory Floyd, the president of the union representing all School Safety Officers, testified that he agreed with the statement that "we need to have more mediation training, more conflict resolution, knowing [*sic*] how to diffuse situations among not only staff and teachers and administrators, but also for students."

196.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on November 10, 2009 regarding the NYPD School Safety Division. Defendant Assistant Chief James Secreto was present at this hearing and testified on behalf of himself and Defendant Police Commissioner Kelly. During that hearing, testimony was offered regarding the unlawful seizures, arrests, and beatings of a number of children including S.C., C.S., Legal Aid Society's clients and Queens Legal Services' clients, *supra* Paragraphs 155-163, by members of the NYPD School Safety Division.

197.    In addition, during that same hearing, a representative from the National Economic and Social Rights Initiative (NESRI) reported the results of a survey of New

York City public school parents and teachers that the organization had conducted.
NESRI concluded that "Safety Agents are inappropriately involved in disciplinary
matters that should be dealt with by school staff." NESRI further reported that "Students
[they] interviewed had been harassed, handcuffed, patted down and in some cases
arrested for shouting in hallways, being late to school or class, [*sic*] talking back to a
safety employee."

198.    Similarly, the President of the United Federation of Teachers, Michael
Mulgrew, testified during the November 10, 2009 hearing as follows: "If a student is
disruptive inside of a classroom, and the school has a real safety plan, there's a way for
them to remove them without using a safety agent. But in too many places, what they'll
do is wait till the situation's getting out of control, they bring in a safety agent, and the
next thing you know a student's getting arrested when nobody wants a student being
arrested. You should not be arrested for you know, having a bad day in school. Let's be
clear. You shouldn't be."

199.    Notwithstanding this detailed knowledge of the patterns and practices
challenged here, City-Defendants have failed to undertake any meaningful attempts to
curtail these patterns and practices, in blatant disregard of the rights of New York City
public schoolchildren.

200.    City-Defendants have actively resisted efforts to provide public
information to parents and students who seek to file complaints. Defendants have refused
to institute an effective complaint mechanism for parents and students. Defendants have
actively resisted reforming the process for reporting complaints against School Safety
Officers. They have refused to support a requirement that schools post information on

how to file a complaint against a member of the NYPD School Safety Division, even knowing that 311 operators often direct complainants to the Department of Education or the Civilian Complaint Review Board, which have no authority over School Safety Officers.

201.    City-Defendants have refused to restructure their training program. According to testimony by the president of the union representing School Safety Officers before the New York City Council on November 10, 2009, City-Defendants have made absolutely no changes to the NYPD's training program for School Safety Officers since 2007, notwithstanding the revelations of countless stories regarding abuses by School Safety Officers.

202.    City-Defendants have refused adequately to discipline offending School Safety Officers. They have failed to remove School Safety Officers who are demonstrably unable to work with children in a safe and effective manner. Upon information and belief, in several instances, City-Defendants have responded to complaints of abuse on the part of NYPD School Safety Division personnel by temporarily transferring the personnel to other public school sites.

203.    City-Defendants have failed to convene the statutorily required monthly School Safety Committees in each school operated by the Department of Education. More specifically, school staff and members of the NYPD School Safety Division are required to review policies and procedures relating to School Safety Officers during such meetings. These meetings have failed to take place even though the United Federation of Teachers has filed grievances based on this failure.

204.    City-Defendants have failed to provide the tools and support necessary to ensure a professionalized workforce within the NYPD School Safety Division. As of 2007, the School Safety Division was losing approximately 40 members per month due to attrition; as of 2009, the attrition rate was 50 percent over five years, meaning that about half of all members quit within five years, which, according to the president of the union representing School Safety Officers, occurs largely because of the low salary and a perception among School Safety Officers that they do not receive sufficient "respect."

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION: UNLAWFUL SEIZURES AND ARRESTS IN VIOLATION OF THE FEDERAL CONSTITUTION

205.    Plaintiffs incorporate herein by reference paragraphs 1 through 204.

206.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of unreasonably seizing and unlawfully arresting New York City public middle and high school students absent probable cause of criminal activity in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

207.    Defendants School Safety Officers Downing-Lee and Jane Doe (known as Officer Edmonds or Epps) are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and unlawfully arresting individually named Plaintiff D.B. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

208.    Defendants School Safety Officers Mayes, John Doe 1 (known as Officer Richardson), and John Doe 2 (known as Officer Harrison) are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and unlawfully arresting individually named Plaintiff L.W. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

SECOND CAUSE OF ACTION:  EXCESSIVE FORCE IN VIOLATION OF THE
FEDERAL CONSTITUTION

209.    Plaintiffs incorporate herein by reference paragraphs 1 through 204.

210.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of using excessive force against New York City public middle and high school students in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

211.    Defendants School Safety Officers Downing-Lee and Jane Doe (known as Officer Edmonds or Epps), are liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named Plaintiff D.B. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

212.    Defendants School Safety Officers Mayes, John Doe 1 (known as Officer Richardson), and John Doe 2 (known as Officer Harrison) are liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named Plaintiff L.M. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

THIRD CAUSE OF ACTION: SUBSTANTIVE DUE PROCESS

213.    Plaintiffs incorporate herein by reference paragraphs 1 through 204.

214.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of abuses against New York City public middle and high school students that shocks the conscience in violation of the Fourteenth Amendment to the United States Constitution.

215.    Defendants School Safety Officers Downing-Lee and Jane Doe (known as Officer Edmonds or Epps) are liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff D.B. that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

216.    Defendants School Safety Officers Mayes, John Doe 1 (known as Officer Richardson), and John Doe 2 (known as Officer Harrison) are liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff L.M. that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

### FOURTH CAUSE OF ACTION: UNLAWFUL SEIZURES AND ARRESTS IN VIOLATION OF THE NEW YORK STATE CONSTITUTION

217.    Plaintiffs incorporate herein by reference paragraphs 1 through 204.

218.    City-Defendants are liable for the unreasonable seizures and unlawful arrests of New York City public middle and high school students in violation of Article I §12 of the New York Constitution.

219.    Defendants School Safety Officers Downing-Lee and Jane Doe (known as Officer Edmonds or Epps) are liable pursuant to Article I §12 of the New York Constitution for the unreasonable seizure and unlawful arrest of individually named Plaintiff D.B.

220.    Defendants School Safety Officers Mayes, John Doe 1 (known as Officer Richardson), and John Doe 2 (known as Officer Harrison) are liable pursuant to Article I §12 of the New York Constitution for the unreasonable seizure and unlawful arrest of individually named Plaintiff L.M.

## FIFTH CAUSE OF ACTION: FALSE ARRESTS IN VIOLATION OF NEW YORK STATE LAW

221.    Plaintiffs incorporate herein by reference paragraphs 1 through 204.

222.    City-Defendants are liable for the false arrest of New York City public middle and high school students in violation of New York State law.

223.    Defendants School Safety Officers Downing-Lee and Jane Doe (known as Officer Edmonds or Epps) are liable for the false arrest of individually named Plaintiff D.B. in violation of New York State law.

224.    Defendants School Safety Officers Mayes, John Doe 1 (known as Officer Richardson), and John Doe 2 (known as Officer Harrison) are liable for the false arrest of individually named Plaintiff L.M. in violation of New York State law.

## SIXTH CAUSE OF ACTION: ASSAULT AND BATTERY IN VIOLATION OF NEW YORK STATE LAW

225.    Plaintiffs incorporate herein by reference paragraphs 1 through 204.

226.    City-Defendants are liable for the assaults and batteries of New York City public middle and high school students in violation of New York State law.

227.    Defendants School Safety Officers Downing-Lee and Jane Doe (known as Officer Edmonds or Epps) are liable for the assault and battery of individually named Plaintiff D.B. in violation of New York State law.

228.    Defendants School Safety Officers Mayes, John Doe 1 (known as Officer Richardson), and John Doe 2 (known as Officer Harrison) are liable for the assault and battery of individually named Plaintiff L.M. in violation of New York State law.

### **PRAYER FOR RELIEF**

53

WHEREFORE the Plaintiffs respectfully request that the Court:

1. Assume jurisdiction over this matter;

2. Certify this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2);

3. Declare that the policies and practices of City-Defendants to seize and arrest schoolchildren in New York City public middle schools and high schools absent probable cause of criminal activity violates these students' federal and state rights;

4. Declare that the policies and practices of City-Defendants to use excessive force against schoolchildren in New York City public middle schools and high schools violates these students' federal and state rights;

5. Enjoin any further violations of Plaintiffs' constitutional and statutory rights, including, but not limited to an injunction that requires City-Defendants to:

    a. Develop a transparent and meaningful mechanism to file complaints against members of the NYPD School Safety Division;

    b. Develop guidelines to ensure that schoolchildren are not unlawfully or inappropriately arrested;

    c. Ensure sufficient accountability by revising the disciplinary policies and procedures for members of the NYPD School Safety Division who are found to have committed abuses, including by prohibiting them from having future contact with students where appropriate;

    d. Ensure that school administrators have an appropriate role with respect to the maintenance of school safety, including by mandating compliance with state law requiring regular communications between school-building officials and police personnel;

54

e.   Implement improved training for members of the NYPD School Safety Division with respect to the use of the power to seize and arrest, and the use of force in the context of interactions with schoolchildren in New York City public middle and high schools;

6.   Award compensatory damages for injuries sustained by named Plaintiffs D.B. and L.W.;

7.   Award the Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

8.   Grant any other relief the Court deems necessary or proper.

Dated this 20th day of January, 2010.

Respectfully submitted by.

ARTHUR N. EISENBERG, ESQ. (AE-2012)
aeisenberg@nyclu.org
DONNA LIEBERMAN (DL-1268)
ADRIANA C. PIÑON, ESQ. (AP-0798)
UDI OFER, ESQ.*
JOHANNA E. MILLER, ESQ.*
KATHRYN HUNT MUSE, ESQ.*
NAOMI R. SHATZ, ESQ.*
NEW YORK CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 19th Floor
New York, NY 10004
(212) 607-3324

*Not admitted in the Eastern District of New York

CATHERINE Y. KIM, ESQ. (CK-0572)
ckim@aclu.org
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad St., 18th Floor
New York, NY 10004
(212) 549-2682

JOSHUA COLANGELO-BRYAN, ESQ. (JCB-6838)
colangelo.bryan.joshua@dorsey.com
DORSEY & WHITNEY, LLP
250 Park Avenue
New York, NY 10177
(212) 415-9234

Attorneys for Plaintiffs