**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| B.H., on behalf of her minor daughter D.B.; | ) | |
| A.M., on behalf of her minor daughter M.M.; | ) | |
| D.L., on behalf of her minor daughter D.Y.; | ) | |
| L.W.; A.M.; and all others similarly situated, | ) | |
| | ) | |
| Plaintiffs, | ) | **AMENDED COMPLAINT** |
| | ) | |
| -versus- | ) | 10 CV 0210 (RRM)(ALC) |
| | ) | |
| CITY OF NEW YORK; MAYOR MICHAEL R. | ) | |
| BLOOMBERG, in his official capacity; | ) | |
| POLICE COMMISSIONER RAYMOND W. | ) | |
| KELLY, in his official capacity; ASSISTANT | ) | **JURY TRIAL DEMANDED** |
| CHIEF JAMES SECRETO, in his official capacity; | ) | |
| SERGEANT ROSLYN DOWNING-LEE, in her | ) | |
| individual and official capacities; SCHOOL | ) | |
| SAFETY OFFICER JANE DOE, in her | ) | |
| individual and official capacities; SCHOOL | ) | |
| SAFETY OFFICER KEVIN MAYES, in his | ) | |
| individual and official capacities; SCHOOL | ) | |
| SAFETY OFFICER JOHN DOE 1, in his | ) | |
| individual and official capacities; and SCHOOL | ) | |
| SAFETY OFFICER JOHN DOE 2, in | ) | |
| his individual and official capacities, | ) | |
| | ) | |
| Defendants. | ) | |

**PRELIMINARY STATEMENT**

1.      This class action lawsuit, brought by six schoolchildren on behalf of

themselves and similarly situated middle school and high school students enrolled in

New York City public schools, challenges unconstitutional policies and practices of the

School Safety Division, a branch of the New York City Police Department (NYPD),

that patrols these schools.  The NYPD School Safety Division includes over 5,000

School Safety Officers assigned to particular public schools.  These School Safety

Officers do not carry firearms, but they wear NYPD-issued uniforms and, as peace

1

officers employed by the NYPD, maintain full authority to stop, frisk, detain, question, search, and arrest individuals both on and off school grounds.  The NYPD School Safety Division also includes at least 191 armed precinct-based police officers who are indistinguishable from the officers who patrol New York City streets, except that these officers have been assigned to patrol New York City public schools.

2.      Members of the NYPD School Safety Division, including both School Safety Officers and precinct-based officers assigned to public schools, engage in a policy and practice of unlawfully seizing and arresting schoolchildren, in violation of the Fourth Amendment of the United States Constitution and state law.  This policy and practice manifests itself in two ways:  (a) NYPD School Safety Division personnel arrest students for minor violations of school rules that do not constitute probable cause of criminal activity, and detain those students off school grounds, often at police precincts; and (b) NYPD School Safety Division personnel handcuff students and detain them in seclusion rooms in school buildings for minor violations of school rules that do not constitute probable cause of criminal activity.

3.      Members of the NYPD School Safety Division, including both School Safety Officers and precinct-based officers assigned to public schools, also engage in a policy and practice of using excessive force against schoolchildren.  Such excessive force includes pushing, shoving, grabbing, punching, and striking students.  In many instances, this force is not used pursuant to a lawful arrest, but rather for the purpose of securing compliance with a directive from a School Safety Officer, or for other unjustified reasons.  These physical altercations often cause injuries to schoolchildren that, in some cases, require medical care or hospitalization.

2

4.      In recent years, New York City has drastically increased the deployment of law enforcement personnel to patrol its public school hallways.  Since the adoption of a Memorandum of Understanding (MOU) transferring school safety responsibilities from the New York City Board of Education to the NYPD in 1998, the number of police personnel assigned to patrol New York City public schools has grown by 73 percent, even though school crime was declining prior to the 1998 transfer and student enrollment is at its lowest point in over a decade.

5.      The NYPD School Safety Division constitutes the fifth largest police force in the country, with more officers than the police departments in Washington, D.C., Detroit, Baltimore, Dallas, Phoenix, Boston, or Las Vegas.  New York City deploys more School Safety Officers than guidance counselors:  there are over 5,200 police personnel in public schools and there are only approximately 3,000 guidance counselors.

6.      Research demonstrates that law enforcement agencies frequently fail to account for the ways in which policing students in public schools differs from policing adults on the street.  A study commissioned by the U.S. Department of Education found, "One [of] the most frequent and destructive mistakes many [] programs make is to fail to define [law enforcement's] roles and responsibilities in detail before—or even after—the officers take up their posts in schools.  When programs fail to do this, problems are often rampant in the beginning of the program—and often persist for months and even years."

7.      Such problems are endemic in New York City, where the 1998 MOU transferring school safety responsibilities to the NYPD failed to adequately define the

roles and responsibilities of members of the NYPD School Safety Division.  This failure by the City to institute an adequate school safety governance structure is evident in the challenged policy and practice of unlawfully seizing and arresting schoolchildren absent probable cause and in the challenged policy and practice of using excessive force against schoolchildren.  Indeed, it is the stated policy of the NYPD that NYPD personnel should remove "unruly" children from New York City public schools, yet the term "unruly" has not been defined and no other limits to this policy, or protocols respecting this policy, have been enunciated.  This broad and undefined policy invites unconstitutional arrests of, and excessive force directed at, schoolchildren.

8.      As a result of these unconstitutional policies and practices, New York City public school students miss school and suffer psychological and physical injury.  They also suffer ongoing harm.  They face the humiliation and degradation of being paraded in handcuffs in front of their classmates and teachers, and taken to seclusion rooms.  They face the humiliation and degradation of being hauled out of their schools in handcuffs—again in front of classmates and teachers—and being brought to police precincts for booking.  Because the arrests made by NYPD School Safety Division personnel are often groundless, any resulting criminal cases are almost always dismissed and/or diverted to non-punitive processes.  These subsequent dispositions do not mitigate the harm suffered by schoolchildren at the time of arrest, however.

9.      In addition, the challenged policies and practices severely compromise students' ability to learn.  Far from creating an environment of support and trust as needed by students, these policies and practices generate fear, distrust, and even violence within the schools.  As a result of these policies and practices, students fear the

School Safety Officers in their schools.  Many avoid certain hallways where they know a School Safety Officer will be patrolling; some even avoid going to school altogether. Students report that they feel like criminals when they enter their school buildings. Fearful of abuse by School Safety Officers, many of these students are forced to transfer to different schools, significantly disrupting their education.  Indeed, educational experts believe that excessive policing in schools is likely to produce alienation and mistrust among students, compromise the educational climate of schools, and may actually increase student disorder.

10.     The policies and practices challenged here constitute the official municipal policy of the Defendant City of New York and Defendants Michael R. Bloomberg, Raymond W. Kelly, and Thomas Chan, who has succeeded former Defendant James Secreto as the Assistant Chief and Commanding Officer of the NYPD School Safety Division and thus is automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules of Civil Procedure (collectively City-Defendants).  First, the seizures of students—by means of handcuffing, seclusion, and/or formal arrest—for minor misbehavior that falls short of probable cause of criminal activity constitutes the official stated policy of the City-Defendants.  Second, the unlawful seizures and arrests of, and use of excessive physical force against, schoolchildren constitute municipal policy because they occur with such frequency as to amount to a custom and usage of the City-Defendants.  Finally, City-Defendants' failure to appropriately train and supervise the members of the NYPD School Safety Division in order to address a known pattern of unconstitutional arrests and seizures, and the use of excessive force, amounts to deliberate indifference, thus constituting official municipal policy.

11.     Accordingly, Plaintiffs seek class-wide declaratory and injunctive relief to prevent future abuses by members of the NYPD School Safety Division.

12.     In addition, two of the individually named Plaintiffs who have experienced serious physical assaults by members of the NYPD School Safety Division—D.B. and L.W.—seek money damages on behalf of themselves only.

## JURISDICTION AND VENUE

13.     This action is authorized by 42 U.S.C. §1983.  Subject matter jurisdiction for Plaintiffs' federal claims rests upon 28 U.S.C. §§ 1331 and 1343(a)(4). This court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

14.     Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and proper.  Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief. The Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as this is a district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

Plaintiff-Class Representatives

16.     Plaintiff D.B. is fifteen years old and appears in this action by and through her mother, B.H.  D.B. is enrolled in the 10th grade at Maxwell High School in Brooklyn.  At all relevant times, D.B. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

6

17.     Plaintiff M.M. is fourteen years old and appears in this action by and through her mother, A.M.  M.M. is enrolled in the 7th grade at the Hunts Point School in the Bronx.  At all relevant times, M.M. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

18.     Plaintiff D.Y. is fourteen years old and appears in this action by and through her mother, D.L.  D.Y. is enrolled in the 8th grade at the Lou Gehrig School in the Bronx.  At all relevant times, D.Y. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

19.     Plaintiff N.C. is fourteen years old and appears in this action by and through his mother, K.C.  N.C. is enrolled in the 8th grade at the Urban Assembly School for Wildlife Conservation in the Bronx.  At all relevant times, N.C. was, and he continues to be, enrolled in public schools operated by the New York City Department of Education.

20.     Plaintiff L.W. is eighteen years old.  He is enrolled in the 10th grade at W.E.B. Dubois Academic High School in Brooklyn.  At all relevant times, L.W. was, and he continues to be, enrolled in public schools operated by the New York City Department of Education.

21.     Plaintiff A.M. is eighteen years old and is enrolled in the 12th grade at W.E.B. Dubois Academic High School in Brooklyn.  At all relevant times, A.M. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

22.     Plaintiff El Puente de Williamsburg, Inc. (El Puente), is an incorporated not-for-profit membership human rights organization located in Brooklyn, New York.

Founded in 1982, El Puente has approximately 2,000 members many of whom are New York City public middle school and high school students.  El Puente supports the ability of New York City youth to become leaders for peace and justice.  To that end, it seeks to promote educational opportunities in a supportive and nurturing environment for New York City youth.  El Puente sponsors numerous educational programs dedicated to community and youth development.  It operates programs at four locations throughout Brooklyn known as Leadership Centers, as well as a Community Health and Environment Center.

Defendants

23.     Defendant City of New York (referred to at times as the City) is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.  The City has established and maintains the NYPD and the New York City Department of Education as constituent departments or agencies of the City.

24.     Defendant Michael R. Bloomberg is the Mayor of the City of New York, with supervisory authority over the NYPD and the New York City Department of Education.  He is sued here in his official capacity.

25.     Defendant Raymond W. Kelly is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting, and managing all members of the NYPD School Safety Division.  He is sued here in his official capacity.

26.     Since the filing of the initial Complaint in this action, Defendant Thomas Chan has succeeded former Defendant James Secreto as the Assistant Chief and Commanding Officer of the NYPD School Safety Division, with supervisory

authority over all personnel of the NYPD School Safety Division.  Defendant Chan is sued here in his official capacity.

28.     Defendant School Safety Officer Sergeant Roslyn Downing-Lee is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  She is sometimes referred to by students and school personnel as "Base."  She is sued here in her official and individual capacities.

28.     Defendant School Safety Officer Jane Doe, who after the filing of the initial complaint was definitively identified as Takasha Edmond, is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  She is sued here in her official and individual capacities.

29.     Defendant School Safety Officer Kevin Mayes is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

30.     Defendant School Safety Officer John Doe 1, who after the filing of the initial complaint was definitively identified as Gregory Richardson, is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

31.     Defendant School Safety Officer John Doe 2, who after the filing of the initial complaint was definitively identified as David Harrison, is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

## CLASS ACTION ALLEGATIONS

32.     Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals. Plaintiffs ask the Court to certify as a class all middle school and high school students enrolled in New York City public schools who:  (1) have been subjected to an unlawful seizure and arrest or who are at risk of being subjected to an unlawful seizure and arrest because of City-Defendants' policies and practices, or (2) have been subjected to excessive force or who are at risk of being subjected to excessive force because of City-Defendants' policies and practices.

33.     This action satisfies all four requirements of Rule 23(a):

a.     *Numerosity:*  Joinder of all class members is impracticable because of the size of the class and the fact that the class includes some members who cannot be identified with any degree of specificity.  According to the enrollment figures for the 2009-2010 academic year, approximately 185,050 students are enrolled in the City's middle schools and approximately 270,000 are enrolled in the City's high schools.  According to the Kids' Well-being Indicators Clearinghouse, a project of the New York State Council on Children and Families that provides timely access to data regarding New York's youth, a majority of these students live in poverty.  The identity of those who will attend these schools and be subjected to the challenged policies and practices in the future cannot be determined.

b.     *Commonality:*  There are questions of law and fact common to all members of the class, including, but not limited to, whether City-Defendants

10

maintain a policy and practice of unlawfully seizing and arresting schoolchildren, and whether City-Defendants maintain a policy and practice of using excessive force against schoolchildren, in violation of federal and state law.

c.  *Typicality:*  The claims of the representative Plaintiffs are typical of those of the class.  Each named Plaintiff has been subjected to the challenged policies and practices and, by virtue of his or her continued enrollment in a New York City public middle school or high school, remains at risk of being subjected to these policies and practices again in the future.

d.  *Adequacy of Representation:*  The class representatives and class counsel will fairly and adequately represent the interests of the class.  The class representatives have no interests in this matter that are antagonistic to other class members.  Class counsel has many years of experience in civil rights and class action litigation.

34.  Class-wide declaratory and injunctive relief is appropriate under Rule 23(b)(2) because City-Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

## STRUCTURE OF THE NYPD SCHOOL SAFETY DIVISION

35.  Since 1998, the NYPD School Safety Division has had authority to patrol the buildings and grounds of public schools operated by the New York City Department of Education and to engage in policing activities with respect to those schools.  Today, the NYPD School Safety Division includes over 5,000 School Safety Officers assigned to patrol specific school sites.  Upon information and belief, the NYPD School Safety Division assigns between three and eight School Safety Officers

to each New York City public middle school and high school.  In addition, the NYPD School Safety Division includes at least 191 precinct-based police officers assigned to patrol public schools generally.

36.     School Safety Officers wear NYPD-issued uniforms and, as peace officers, maintain full authority to stop, frisk, detain, question, search, and arrest individuals both on and off school grounds.  School Safety Officers do not carry firearms, but they do carry handcuffs.

37.     Unlike other NYPD police officers who ordinarily receive six months of training prior to being deployed to city streets, School Safety Officers receive only fourteen weeks of training prior to being deployed to New York City public schools.

38.     Job qualifications for School Safety Officers differ from those for other NYPD police officers as well.  Unlike other NYPD police officers, School Safety Officers are not required to have at least sixty hours of college credit or at least two years of military service to qualify.  On information and belief, School Safety Officers are also subjected to less rigorous medical, psychological, and character screenings than other NYPD police officers.  On information and belief, the base salary for School Safety Officers is $31,259.  In contrast, the base salary for other NYPD police officers is approximately $43,062, and many NYPD police officers earn a great deal more.

39.     According to testimony submitted to the New York City Council by Gregory Floyd, the president of the union representing all School Safety Officers, School Safety Officers who are injured on the job, unlike other NYPD officers, are not eligible for disability insurance coverage.  Rather, they are required to use their sick leave and vacation days, unless and until they obtain a favorable ruling from a

compensation hearing; such rulings typically are not made until a year and a half after an injury is sustained.

40.     Notwithstanding these differences, all members of the NYPD School Safety Division, including School Safety Officers, are law enforcement officers.  They are not employees of the New York City Department of Education, nor are they educators.  Principals and school administrators have no ultimate authority over School Safety Officers and have repeatedly informed parents of this.

41.     Underscoring this fact, there have been a number of highly publicized incidents in which school principals and/or teachers were arrested for attempting to protect their students from abuses by members of the NYPD School Safety Division.

42.     For example, on October 9, 2007, a student at East Side Community High School in Manhattan, who was trying to enter school early to catch up on schoolwork, became involved in an altercation with a School Safety Officer who refused her entry.  The School Safety Officer decided to arrest the student and parade her in handcuffs out of the school's main entrance in front of other students who were gathering to enter the building to start the school day.  The school principal, concerned that such a display would be disruptive to other students and unnecessarily degrading to the arrested girl, argued that the School Safety Officer should escort the girl out of the building through a side door rather than the front door.

43.     In response, the School Safety Officer arrested the principal and charged him with obstruction of governmental administration and resisting arrest.  Unsurprisingly, the judge who heard these charges ultimately dismissed them, observing:  "Unfortunately, this incident highlights the tension between school

13

administrators and the NYPD concerning a principal's authority in overseeing school premises. Further, this incident highlights the need to exercise sensitivity in effectuating student arrests." This incident was widely reported in the media, including by the New York Daily News, the Village Voice, the New York Post, and the New York Times.

44.     Similarly, on March 8, 2005, police personnel arrested two teachers from the New School for Arts and Sciences in the Bronx and charged them with disorderly conduct. The incident began with a fight between two students; the police were summoned, but by the time they arrived, the students had been separated and order had been restored. Nonetheless, the officers began directing abusive language at the teachers and tried to arrest one of the students. When the teachers objected to the officers' conduct, the officers arrested the teachers as well as the students. In March 2007, the City paid $60,002 to settle a civil lawsuit brought by the two teachers alleging unlawful arrest. This incident was widely reported in the media, including by the New York Times and the New York Post.

45.     In early February 2005, a School Safety Officer arrested the principal of the Bronx Guild High School for purportedly interfering with the School Safety Officer's attempt to arrest a student. According to accounts of the incident, the School Safety Officer barged into a classroom to arrest a student—who had made a loud statement in the hallway—without any prior notice to the principal or the classroom teacher. The principal and a school aide intervened to protect the student and were charged with second-degree assault and obstruction of governmental administration. The student missed almost two months of school as a result of the incident and

14

ultimately transferred to a different school.  The charges against the principal were later

dropped, and the School Safety Officer was temporarily reassigned to another public

school site.  This incident also gained wide media coverage, including in the New York

Times, the New York Daily News, Newsday, and the New York Post.

## **FACTS RELATING TO THE CLASS REPRESENTATIVES**

<u>M.M.</u>

46.     Plaintiff M.M. is fourteen years old and enrolled in the 7th grade at the

Hunts Point School in the Bronx.  During the past two school years, members of the

NYPD School Safety Division assigned to M.M.'s school subjected her to an

unreasonable seizure and an unlawful arrest as well as general intimidation and

harassment.

47.     On March 10, 2009, when M.M. was twelve and in the 6th grade at the

Hunts Point School, she was subjected to an unlawful seizure and arrest.

48.     That day, she was drawing on paper during class.  A classmate reached

over to her desk and drew on her paper.  Playfully, she drew on his, and then each drew

a line on the other's desk with erasable markers.

49.     When the teacher saw the marks, she told the children that they should

erase the marks.  The children went to get tissues to erase the marks, but did not have

time to do so before School Safety Officers arrived.  The School Safety Officers

escorted M.M. and her classmate out of the classroom and to the security office, where

an armed precinct-based police officer of the NYPD School Safety Division awaited

them.

50.     Without the presence of M.M.'s parent, and without informing M.M. of her right to remain silent, the police officer interrogated her, stating, "You know that's graffiti, right?"  M.M. explained that she had planned to erase the marks, but had not had the opportunity.

51.     A School Safety Officer took M.M. back to the classroom so that she could get her jacket and book bag.  He then handcuffed her in the hallway.  Because this occurred between class periods, other students and staff saw M.M. being escorted in handcuffs by the School Safety Officer through the building.  M.M. repeatedly complained that the handcuffs were hurting her, but the School Safety Officer refused to loosen them, even when a school official requested that they be loosened.

52.     M.M. and her classmate were placed again in the security office at the school.  M.M., who was by now quite frightened, asked for her mother and started to cry.  The armed NYPD police officer told M.M. that he would not call her mother. School Safety Officers then required M.M. to remove her shoes and sweater for a pat-down search.  They also searched her book bag.  No school officials were present during the searches.

53.     The armed NYPD police officer and School Safety Officers then transported M.M. and her classmate, who were still in handcuffs, to the local police precinct.  M.M. observed one of the officers shove her classmate into a police car, causing the child to fall.

54.     At the precinct, M.M.'s mother was waiting.  She was distraught to see M.M. being brought into the precinct in handcuffs and disheveled—M.M.'s jacket was falling off, her shoelaces were untied, her hair was in disarray, and she was crying and

pleading, "Mommy get me out of here."  The children were taken to a small room and handcuffed to a bench.  The children were fingerprinted and photographed.  Neither was given Miranda warnings.

55.     The police officer who had arrested M.M. threatened to place her and her friend with the general jail population, whom he described as "killers" and "murderers."  He proceeded to show pictures of such people.  The officer then told them, "You're going to have to scream and you'll be lucky if anyone comes to help you."  He taunted them by asking, "You scared, you scared?"  When M.M., who was held in the room for several hours, managed to fall asleep at one point, the police officer awakened her by yelling, "Nobody cares about you in here.  In school, people care.  Nobody cares in here.  This is real life.  You all are going to get in trouble for what you all do."

56.     As M.M. left the precinct, she was given a summons for Family Court. Later, M.M. met with a probation officer and agreed to write a 1,000-word essay on what she did wrong.  On information and belief, any charges against M.M. have been dismissed.

57.     A week after the arrest, M.M.'s mother met with the principal of the Hunts Point School to file a complaint.  The principal responded that there was nothing he could do because it was a police matter.

58.     In another incident, on November 5, 2009, M.M. and two boys were involved in a verbal argument.  The next day, she heard that one of the boys had been injured in an assault of some sort.

59.     M.M. was called into the dean's office.  Without a parent or attorney present, the same police officer who had arrested M.M. in March 2009 interrogated her and accused her of being involved in the physical assault of the injured boy.

60.     M.M. denied the accusation, but the police officer stated that he would place M.M. in jail if he found out she was lying.

61.     Later that afternoon, the police officer called M.M. on a classroom telephone to say that he was calling M.M.'s mother to tell her that M.M. would be "locked up" soon.  The police officer never actually contacted M.M.'s mother.

62.     M.M. continues to fear the NYPD School Safety Division personnel at her school.  She fears that they will subject her to unlawful seizures, arrests, excessive force, and harassment in the future.

<u>D.Y.</u>

63.     Plaintiff D.Y. is fourteen years old and enrolled in the 8th grade at the Lou Gehrig School in the Bronx.  During the 2009-2010 school year, D.Y. was unlawfully arrested and physically assaulted by School Safety Officers at the school.

64.     At around 8:30 a.m. on October 7, 2009, when D.Y. was thirteen years old, D.Y.'s mother dropped off D.Y. and two friends across the street from the school.  As the three girls were approaching the school entrance, two adults they did not know began threatening them.  Frightened, D.Y. sent her mother a text message, asking her mother to return to the school.

65.     A School Safety Officer observed the threats from the two adults and instructed them and the girls to go into the school building.  The adults entered the

building, but the girls were afraid to follow them.  D.Y. said that she did not want to enter the building, but rather that she would wait for her mother.

66.     When D.Y. refused to enter the school building, the School Safety Officer grabbed D.Y.'s arm and twisted it painfully.  A second School Safety Officer arrived and painfully twisted D.Y.'s other arm.  D.Y. reflexively tried to pull her arms towards her and asked the School Safety Officers to let her go.  In response to this entreaty from D.Y.—a thirteen-year-old girl whose arms were being restrained by two adults—the first School Safety Officer spoke into his hand-held radio saying, "We need back-up."

67.     A third School Safety Officer then came out of the building and took one of D.Y.'s arms from the second School Safety Officer.  The third School Safety Officer stated "These little girls think they're all grown," and pushed D.Y. into a nearby gate.

68.     The first School Safety Officer told the School Safety Officer who had just arrived on the scene to "put handcuffs on her."  This latter School Safety Officer pulled D.Y.'s arms behind D.Y.'s back and fastened handcuffs to D.Y.'s wrists.

69.     The School Safety Officers then brought D.Y. into the school building. As they entered the building, the School Safety Officer who had handcuffed D.Y. tripped D.Y. with her foot, causing D.Y. to fall stomach-first onto the floor.  The School Safety Officer then put her knee on D.Y.'s back, while simultaneously yelling at D.Y. to "get up."

70.     After allowing D.Y. to get to her feet, the School Safety Officer brought D.Y. into the school's security office and forcefully threw her into a seat at a desk. D.Y. sat there in handcuffs.

71.     When D.Y.'s mother arrived at the school at approximately 9:30 a.m., she encountered the School Safety Officer who had radioed for "back-up" and asked to see her daughter.  The School Safety Officer refused and sent D.Y.'s mother to the school office.  Eventually, D.Y.'s mother was allowed to go to the school security office where she found her daughter still handcuffed.  It was only at this point—and at the request of D.Y.'s mother—that D.Y.'s handcuffs were removed, approximately an hour after they had been applied.  D.Y. was released from school and went home with her mother.

72.     Although School Safety Officers had told D.Y.'s mother that D.Y. would face a disorderly conduct charge, on information and belief, no charges were ever filed against D.Y.

73.     D.Y. required medical treatment for stomach and back pains sustained as a result of the assault.

74.     The School Safety Officers continue to harass, and engage in menacing behavior toward, D.Y.  One of the School Safety Officers involved in the original incident has given D.Y. intimidating looks in the hallways of the school on several occasions.  One of the other School Safety Officers shoved D.Y. in front of the school on several occasions.

75.     D.Y. continues to fear that the School Safety Officers assigned to her school will assault or arrest her.

N.C.

76.     On November 25, 2009, N.C. was thirteen years old and enrolled in the

8th grade at the Urban Assembly School for Wildlife Conservation in the Bronx when

he was assaulted and unlawfully arrested by members of the NYPD School Safety

Division.

77.     That morning, N.C. and his classmates were lined up in the cafeteria,

waiting to go to class.  The school principal told N.C. that he was to have an in-school

suspension for the day.  The principal informed N.C. that he was being suspended for

having left the lunchroom without permission the previous day.

78.     N.C. protested that a suspension would be unfair and attempted to leave

the cafeteria with the rest of his classmates.  The principal blocked N.C.'s path.  N.C.

attempted to go through a different set of doors to get to his classroom, but the principal

again blocked his path.  The principal then sent a staff member to summon a School

Safety Officer.

79.     A School Safety Officer arrived and immediately grabbed N.C. by the

hood of his sweatshirt.  N.C. asked to be let go.

80.     While pulling N.C.'s sweatshirt—which caused the sweatshirt to tear—

the School Safety Officer repeatedly said that if N.C. did not calm down she would not

release him.  N.C. replied that it would be difficult to stay calm while the School Safety

Officer was grabbing him.  N.C. also told the School Safety Officer that he would go

with the principal to serve the suspension if she would let him go.

81.     The School Safety Officer refused to release N.C. and told N.C. that she would let go when she was "good and ready."  She pushed him against a wall and asked that a second School Safety Officer be summoned.

82.     A second School Safety Officer arrived.  The first School Safety Officer pushed N.C. against the wall a second time.  N.C.'s head was cut and bleeding.

83.     The second School Safety Officer also grabbed N.C.  N.C. tried to move away, and the first School Safety Officer pushed him against the wall for a third time.  While N.C. was being held against the wall by both School Safety Officers, the first School Safety Officer punched N.C. in the face and struck him in the groin with her knee.

84.     The School Safety Officers then brought N.C. to the ground.  The second School Safety Officer squeezed her legs tightly around N.C.'s waist.  N.C. attempted to crawl away and the second School Safety Officer then sat on his back.  The first School Safety Officer jammed her knee into N.C.'s right shoulder.  After a few minutes, the second School Safety Officer got up, but the first School Safety Officer continued to press her knee against N.C.'s shoulder.  N.C. told the School Safety Officers that he had chronic asthma and was experiencing chest pains.  Nonetheless, the first School Safety Officer did not immediately get off of N.C.  N.C. was crying and pleading with the principal to call his mother.

85.     Several other School Safety Officers arrived.  One told N.C. to put his hands behind his back, which N.C. did.  The School Safety Officers handcuffed N.C. and took him to a small room at the school before transporting him to a local precinct.

86.     Once at the precinct, N.C. was taken into a small office and handcuffed to a metal bar for over two hours.  N.C. was never given Miranda warnings or offered any medical attention by the police.  On information and belief, no charges were filed and no legal process was instituted against N.C.

87.     After being handcuffed for over two hours, N.C. was released to his mother.  Upon seeing that her son was injured and his clothes torn, N.C.'s mother immediately demanded to speak to the School Safety Officers' supervisor.  She was told that the supervisor was on vacation and that she would have to speak to a different supervisor.  When the other supervisor arrived, N.C.'s mother lodged a verbal complaint.

88.     While waiting for the supervisor, N.C.'s mother had been approached by a police officer who expressed concern about the way N.C. had been treated.  This police officer gave N.C.'s mother a phone number for the NYPD Internal Affairs Bureau (IAB) to report the mistreatment.  N.C.'s mother called the IAB and spoke to an officer who asked whether N.C. was hurt, and called an ambulance for N.C.  N.C. and his mother were eventually transported to the hospital by the ambulance.  A police captain spoke to N.C.'s mother at the hospital about the incident.

89.     Also at the hospital, N.C.'s wounds were treated by a doctor.  These wounds included the cut to N.C.'s head as well as bruises to his wrists.

90.     Since the incident, N.C. has experienced back pains and headaches.  He avoids the School Safety Officers at school and worries that he may be assaulted by them again in the future.

<u>D.B.</u>

91.     On December 8, 2008, D.B. was fourteen years old and in the 9th grade at Maxwell High School in Brooklyn when members of the NYPD School Safety Division physically assaulted and unlawfully arrested her.

92.     Every day, students at Maxwell High School are required to pass through metal detectors and to put their school bags through scanners that are staffed by School Safety Officers.

93.     At approximately 7:00 a.m. on December 8, 2008, D.B. arrived at school, put her book bag through the scanner, and walked through the metal detector. Initially her coat set the metal detector off, but after she removed her coat and placed it through the scanner, the metal detector did not sound when she walked through again. Both her book bag and her coat cleared the scanner.

94.     Satisfied that D.B. was not carrying any contraband, a School Safety Officer instructed D.B. to proceed to class.

95.     D.B. went to retrieve her book bag from the scanner.  However, at that moment, a second School Safety Officer, Sergeant Downing-Lee (known to students as Officer "Base") grabbed the book bag and tried to pull it away from D.B. without explanation.  D.B. held on to her book bag, and a tugging match ensued between D.B. and Sergeant Downing-Lee.

96.     Because D.B.'s book bag had cleared the scanner, there was no reason to suspect that it contained any contraband or other suspicious items.

97.     Nonetheless, Sergeant Downing-Lee and a third School Safety Officer, Defendant Takasha Edmond, began to push D.B. out of the building.

98.     As D.B. was being forcefully, and for no apparent reason, ejected from the school building, she demanded her coat.

99.     Sergeant Downing-Lee, who had been pushing D.B. toward the door, shoved the coat in D.B.'s face.  D.B. pushed her away.

100.    Sergeant Downing-Lee grabbed D.B. by the hair, and a physical altercation ensued between the then fourteen-year-old D.B. on the one hand and Sergeant Downing-Lee and School Safety Officer Edmond on the other.  During the course of this altercation, D.B. was punched approximately seven times on the left side of her head.  D.B. was then placed in a headlock, handcuffed, and arrested.  Her bag, the strap of which had fallen around her neck, was pulling on her neck and choking her with its weight.  D.B.'s requests that the strap be removed were ignored.

101.    D.B. was then taken to the dean's office to await transport to the local police precinct.  D.B.'s mother, who had been informed of the situation by the dean, came to the school and saw D.B. in handcuffs in the dean's office.  Once the police arrived, D.B. was taken to the police precinct and charged with assault and trespass.  D.B.'s mother followed the police to the precinct, but was not allowed to see or speak to D.B.  While at the precinct, D.B's mother called 911 for medical assistance.

102.    Despite the fact that D.B. was physically injured, the police did not initially permit D.B. to go to the hospital.  In fact, it was only after D.B.'s mother called 911 that EMTs arrived and determined that D.B. needed to go to the hospital.  D.B. was then taken by ambulance from the precinct to the hospital, where she received medical treatment.  At the hospital, a School Safety Officer barred D.B.'s mother from sitting

25

with D.B. while D.B. received medical attention, threatening D.B.'s mother with arrest if she violated this command.

103.    D.B. was then taken to Spofford Juvenile Center (currently called Bridges Juvenile Center), where she was detained overnight.  For the first time since she left for school that morning, D.B. was finally able to speak with her mother, though it was over the phone.

104.    The charges against D.B. were eventually dismissed.  She entered into Adjustment Services, a probation program designed to divert juveniles from the criminal justice system, without ever seeing a judge.  A school discipline charge accusing D.B. of injuring Sergeant Downing-Lee was dropped due to a lack of evidence.  D.B.'s probation officer released her from the Adjustment Services program.

105.    As a result of the incident, D.B. has suffered from headaches, nose bleeds, neck and back pain, and anxiety.  She also has difficulty sleeping and often sleeps with her mother since the incident.

106.    D.B. and her mother filed a notice of claim with the Comptroller of the City of New York with respect to this incident on March 3, 2009.  More than thirty days have elapsed since service of that filing, and City-Defendants have made no attempt to adjust or pay the claim.

107.    Since the incident, Sergeant Downing-Lee continues to harass D.B. by making taunting noises and beating her hand on a desk when D.B. passes her.  On one occasion, while D.B. waited for the elevator by the security desk, Sergeant Downing-Lee threatened D.B. and other students standing nearby that she would kick them out of school if they did not leave the hallway.

108.     D.B. continues to fear that School Safety Officers will physically attack her, seize her belongings, or unlawfully arrest her again.

L.W.

109.     On October 28, 2008, L.W. was sixteen years old and enrolled in the 10th grade at Hillcrest High School, when he was physically beaten and unlawfully arrested by School Safety Officers.

110.     During gym class, a classmate asked L.W. to pass a cell phone to another classmate, which L.W. did.  Possession of a cell phone is a violation of school rules, but not a violation of the criminal law.

111.     The gym teacher observed the transfer of the cell phone and summoned school officials.  The school officials escorted L.W. to the dean's office.

112.     After L.W. arrived at the dean's office, three School Safety Officers, Kevin Mayes, Gregory Richardson, and David Harrison, entered the office.

113.     School Safety Officer Mayes informed L.W. that he had to be searched. No school officials were present at the time.

114.     L.W. stated that he did not have a cell phone.  He shook out his shirt and gym shorts to demonstrate that he did not have a cell phone or other contraband and stated that he did not want the three School Safety Officers laying their hands on him.

115.     School Safety Officer Mayes insisted that L.W. would need to be searched and began to put on rubber gloves.

116.     School Safety Officer Mayes then pushed L.W. into a storage room, grabbed L.W.'s arm and shirt, swung at L.W., and threw L.W. to the ground.

117.    Officer Mayes punched L.W. more than five times, including on his forehead, right eye, and right ear.  L.W.'s face was swollen, and he was bleeding and spitting up blood.

118.    The School Safety Officers picked L.W. up from the ground, handcuffed him, and threw him back on the floor.  During this time, one of the School Safety Officers poked L.W. in the eye.  The School Safety Officers then removed L.W.'s sneakers and searched L.W.'s person, finding no cell phone or any other items.

119.    Approximately twenty minutes later, an ambulance arrived.  Medics immobilized L.W. on a stretcher and put him in a neck brace as precautionary measures to keep him stable.  They then transported L.W. to the hospital; upon information and belief, the School Safety Officers had urged that L.W. undergo an emergency psychiatric evaluation.

120.    On information and belief, hospital officials declined to conduct a psychiatric evaluation, but instead treated L.W. for his injuries, providing him with pain medication and conducting a CT scan.

121.    L.W. was later charged with disorderly conduct as a result of this incident.  Those charges have since been dismissed.

122.    L.W. served a notice of claim with the Comptroller of the City of New York on January 26, 2009.  More than thirty days have elapsed since service of that filing, and City-Defendants have made no attempt to adjust or pay the claim.

123.    L.W. fears that School Safety Officers will physically attack or illegally arrest him again at school.

<u>A.M.</u>

124.     On January 18, 2007, A.M. was fifteen years old and enrolled in the 10th

grade at Samuel J. Tilden High School in Brooklyn, when she was physically assaulted

and unlawfully arrested at school by a member of the NYPD School Safety Division.

125.     At approximately noon on that day, A.M. was in a classroom after the

class period had ended to complete a final exam.  After completing the exam, she exited

the classroom and went toward the cafeteria for her lunch period.  A school official

stopped A.M. and instructed her to go to the detention room instead of the cafeteria

because she was not supposed to be in the hallway at that time.  A.M. explained that

she was in the hallway because she had just finished a final exam, but complied with

the school official's instructions and began to walk toward the detention room.

126.     A School Safety Officer, who had been watching the conversation

between A.M. and the school official, then approached A.M. from behind and grabbed

A.M.'s book bag, pulling A.M. along with it.  The School Safety Officer yelled at A.M.

to go to the detention room.  A.M. explained that she already was going to the detention

room, but the School Safety Officer then pushed her.

127.     A.M. was surprised and upset that the School Safety Officer had pushed

her and she asked for the School Safety Officer's badge number.  The School Safety

Officer threatened to "lock up" A.M.

128.     The School Safety Officer then grabbed A.M. by her wrist and quickly

and forcefully twisted it up and behind her back.  He handcuffed that wrist as he pushed

the side of A.M.'s body and face against a wall.  A.M. screamed in pain and the School

Safety Officer responded by twisting her arm higher.  A.M. unsuccessfully tried to use

her free hand to push the School Safety Officer away.  The School Safety Officer grabbed A.M.'s free hand and handcuffed it behind A.M.'s back.

129.     A second School Safety Officer was summoned, and escorted A.M. in handcuffs through the school to the dean's office.  In the office, the School Safety Officer searched A.M.'s belongings.

130.     After A.M. complained about her shoulder hurting, a school official called A.M.'s mother, and A.M. was transported to the hospital for medical treatment. The examining doctor told A.M. that she had probably sprained her shoulder, and that she should take painkillers for her injury.

131.     A.M. was then transported to the local police precinct, where she was taken to a back room, made to sit on a bench, and handcuffed to a pole.  Shortly afterwards, A.M. was allowed to leave and was given a summons for Family Court, but no charges were listed on the form that she was given.  She was never given Miranda warnings, was never fingerprinted, and was never formally charged with any crime.

132.     At Family Court, A.M. met with a probation officer.  On the probation officer's recommendation, A.M. agreed to attend a one-day anger management class and serve 120 days of probation.  A.M. was never informed of any specific charges against her, and she never went before a judge.  On information and belief, any charges against A.M. have been dismissed.

133.     A.M.'s mother visited a state senator to discuss the issue, and asked how to file a complaint about the incident.  The senator told her to file a formal complaint with the Civilian Complaint Review Board of the NYPD.  A.M.'s mother did so online on January 30, 2007, but she did not receive a response.

134.    A.M. fears that School Safety Officers at her school will subject her to physical attacks or unlawful arrests and seizures again.  A.M. felt humiliated in front of her peers for being arrested at school.  As a result of the incident, A.M. transferred to another public school.

### FACTS RELATING TO ORGANIZATIONAL PLAINTIFF

135.    El Puente's members seek to provide information to, and raise the consciousness of, parents and institutions regarding the problems and concerns of youth in New York City.  El Puente also strives to promote the establishment and the ongoing evaluation of community priorities in the service of New York City youth.

136.    To further its mission, El Puente engages in advocacy to reform and improve New York City public schools.  From 2007-2009, El Puente's members mounted a successful advocacy campaign to improve the nutritive value of lunches served in their schools.  In 1990, El Puente led a campaign to reorganize Brooklyn's Eastern District High School—then one of the most violent and over-crowded schools in the City—into several smaller schools that would better address the needs of students.  The campaign was successful and the Eastern District building now houses several schools that boast low incident rates and improved graduation rates.  In 1987, El Puente coordinated a thirty-day community boycott of P.S. 16 to protest a wall built in the school hallway for religious purposes, because the wall created a disruptive physical barrier for public school students.  In addition, El Puente supports teachers and administrators in public schools in creating a supportive educational environment for youth that emphasizes a greater role for administrators in school safety.

137.    El Puente's work to advance school reform is illustrated in the founding of the El Puente Academy for Peace and Justice (the Academy), a public high school with 180 students that is operated by the New York City Department of Education. Following its successful application to a school reform initiative by New Visions for Public Schools (formerly the Fund for New York City Education), El Puente founded the Academy in 1993.  El Puente's vision for the Academy was a small public school where education would emerge from the community.  The Academy has received accolades for its excellence in education.  Although El Puente does not operate the Academy, the two institutions work in close collaboration.

138.    El Puente members are expected to advance the mission of the organization.  After an orientation to El Puente's mission and courses, members are inducted into the organization in a formal initiation ceremony.  As part of this ceremony, members agree to abide by El Puente's guiding principles and rules of conduct, and acknowledge their rights and responsibilities as members.  Members also receive a Membership Handbook that outlines El Puente's mission and guiding principles.  Membership Coordinators at each Leadership Center work with individual members to ensure their curriculum includes courses in all of El Puente's core areas of arts, education, scientific research, wellness, and community environmental action.

139.    El Puente members agree to participate in El Puente's various courses and advocacy campaigns as an integral part of membership; however, members also have input into the development of courses and the selection of campaigns.  In this way, El Puente provides a means through which members express their collective views and advance their collective interests.

140.    Because El Puente's mission and programming are geared toward
supporting young people in their academic, social, political and personal development,
their membership naturally consists largely of students currently enrolled in public
middle schools and high schools.  These members attend various public schools in
Brooklyn, including J.H.S. 291, Murry Bergtraum High School for Business Careers,
J.H.S. 383 Philippa Schuyler, and Progress High School for Professional Careers.  El
Puente staff at the Leadership Centers work closely with student members and speak
with them about their experiences at school.  They report that several student members
have had or have witnessed altercations with School Safety Officers at their schools
that were triggered by non-criminal behavior.  El Puente staff report that School Safety
Officers sometimes taunt students and threaten them with arrest.  As a result, El
Puente's student members fear they will be victimized by School Safety Officers
engaging in unlawful arrests and/or misusing physical force.

### FACTS ESTABLISHING OFFICIAL MUNICIPAL POLICY

141.    The experiences of the class representatives do not constitute isolated
incidents.  Rather, they are part of a larger pattern and practice that exists within the
New York City public schools.

142.    Members of the NYPD School Safety Division engage in a pattern and
practice of subjecting New York City public middle school and high school students to
unlawful seizures and arrests by:  (a) arresting students for minor violations of school
rules that do not constitute probable cause of criminal activity, and removing and
holding those students off school grounds, often at police precincts; and (b) handcuffing
students and detaining them in seclusion rooms in school buildings, for minor

violations of school rules that do not constitute probable cause of criminal activity. Students who are arrested are then removed from schools, typically in handcuffs, and held at police precincts, or are transported to hospitals for emergency psychiatric evaluations in the absence of any legitimate cause for such evaluations.  In addition, upon information and belief, a significant number of schoolchildren under the age of sixteen have been arrested at school for allegedly having committed non-criminal violations even though such arrests are prohibited by state law.

143.     Members of the NYPD School Safety Division also engage in a pattern and practice of using excessive force against schoolchildren.  Such excessive force includes pushing, shoving, grabbing, punching, and striking students.  In many instances this force is not used pursuant to a lawful arrest, but rather for the purpose of securing compliance with a directive from a School Safety Officer or for other unjustified reasons.  These physical altercations often cause injuries to schoolchildren that, in some cases, require medical care or hospitalization.

144.     The challenged conduct by members of the NYPD School Safety Division constitutes official municipal policy.  First, the policy and practice of unlawfully seizing and arresting students for minor school misbehavior that does not amount to probable cause of criminal activity is the official stated policy of the NYPD, which broadly authorizes law enforcement personnel to remove "unruly" children from schools.  Second, both challenged policies and practices—the unlawful seizures and arrests of, as well as the use of excessive force against, schoolchildren—are so widespread and frequent as to constitute a custom and usage of members of the NYPD School Safety Division.  Third, City-Defendants were well aware of, yet deliberately

34

indifferent to, the prevalence of the challenged policies, failing to make meaningful

attempts to improve the training and supervision of members of the NYPD School

Safety Division.  For each of these reasons, the policies and practices here are directly

attributable to City-Defendants.

### Official Stated Policy

145.    The policy and practice of unlawfully seizing and arresting

schoolchildren for minor misbehavior that does not establish probable cause of criminal

activity constitutes the official policy of the City, as set forth by Defendant Police

Commissioner Raymond W. Kelly and the predecessor of Defendant Assistant Chief

Thomas Chan, Commanding Officer of the NYPD School Safety Division, both of

whom have or had final decision-making authority in these matters.

146.    On June 11, 2007, Defendant Police Commissioner Kelly submitted a

letter to New York City Councilmember Robert Jackson indicating that the duties of

School Safety Officers include "removing unruly students" and "enforc[ing] the rules

and regulations" of the "Student Disciplinary Code."

147.    Likewise, on October 10, 2007, James Secreto, then an Assistant Chief

and the Commanding Officer of the NYPD School Safety Division (and Defendant

Chan's predecessor), submitted a written statement to the New York City Council,

stating that School Safety Officers are responsible for "removing unruly" students from

public schools.

148.    In this context, the removal of an "unruly" student by members of the

NYPD School Safety Division constitutes a seizure and/or an arrest; students are not

free to leave once seized and/or arrested, and often they are transported to a local police

35

precinct even when they have done nothing more than arguably violate school rules in a

non-criminal matter.  In addition, although neither Defendant Kelly nor former

Assistant Chief Secreto further defined the term "unruly," as a matter of logic and plain

language, the term encompasses minor misbehavior that does not amount to probable

cause of criminal activity.

149.    In these ways, the policy and practice of unlawfully seizing and arresting

schoolchildren for minor school misbehavior, absent probable cause of criminal

activity, constitutes official municipal policy, as articulated by officials with final

decision-making authority in these matters.

### Custom and Usage

150.    The experiences of the six class representatives are by no means unique

or anomalous.  Rather, they are representative of widespread and frequent actions by

members of the NYPD School Safety Division.  They occur as part of a larger pattern

and practice of unlawfully seizing and arresting students absent probable cause and of

using excessive force against schoolchildren, which is so prevalent as to amount to a

custom and usage of City-Defendants.

151.    The existence of this custom and usage is underscored by reference to

the remarkable number of complaints that are filed against School Safety Officers.  On

June 11, 2007, Defendant Police Commissioner Kelly reported to New York City

Councilmember Robert Jackson in a letter that, since 2002, the City had received 2,670

complaints against School Safety Officers, an average of 500 per year.  Assuming that

there were between 4,000 and 5,000 School Safety Officers employed during this

period, these figures indicate that one complaint had been filed for every eight to ten

School Safety Officers per year.  Moreover, Defendant Police Commissioner Kelly noted in the letter that 27 percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against regular NYPD police officers.

152.    More recently, on November 10, 2009, James Secreto, then an Assistant Chief and Commanding Officer of the NYPD School Safety Division, testified before the New York City Council that during the 2008 calendar year, there had been 1,159 complaints filed against School Safety Officers.  This figure represents a staggering rate of almost one complaint for every four School Safety Officers.  Former Assistant Chief Secreto further explained that 15 percent of these complaints alleged excessive force, abuse of authority, discourtesy, or offensive language by School Safety Officers.

153.    Moreover, upon information and belief, these figures vastly underestimate the number of complaints that could have been lodged against School Safety Officers.  As stated during a New York City Council hearing on the NYPD School Safety Division held in 2007, and as set forth in a report published by the New York Civil Liberties Union and the American Civil Liberties Union submitted to City-Defendants in 2007, many parents have been given improper information as to how to file a complaint regarding the conduct of a School Safety Officer.  For example, the report documents confusion among 311 operators, who directed calls to the Department of Education rather than the NYPD's IAB, which is the only agency that has jurisdiction over such matters.  It also reports that NYPD School Safety Division operators directed callers to the School Safety borough office that covers the school in which the incident occurred, instead of to the IAB.

154.    The additional incidents described below underscore the systematic

nature of the abuses suffered by schoolchildren in New York City public schools.

<u>A.T.</u>

155.    A.T. was subjected to an unlawful seizure and severely beaten by School

Safety Officers when he was enrolled in the 11th grade at the High School for Law

Enforcement and Public Safety in Queens.

156.    On November 5, 2008, A.T. was using a restroom in the school locker

room between classes.  As he exited, two School Safety Officers ordered him to stop

for no stated or apparent reason.  A.T. continued walking, explaining that he was going

to his next class.  One of the School Safety Officers yelled that A.T. was being

"disrespectful," and walked in front of A.T., putting his hand against A.T.'s chest.  A.T.

told the School Safety Officer not to touch him and tried to walk around the School

Safety Officer.  The School Safety Officer immediately pushed A.T. against the wall,

stating, "Oh I see.  I have to teach you some respect."  He then began saying that A.T.

was "little" and "weak."

157.    The School Safety Officer, an adult male weighing approximately 200

pounds, grabbed A.T., saying that he was going to "teach him a lesson."  A second

School Safety Officer—a woman—hit A.T. in the head several times.  At that point, the

male School Safety Officer put his foot behind A.T. and caused A.T. to fall to the

ground before himself falling on top of A.T.

158.    The female School Safety Officer handcuffed A.T.'s right hand, but

could not cuff the left hand, which was pinned under the weight of the 200-pound male

School Safety Officer.  When A.T. attempted to free his left hand, the female School

38

Safety Officer banged A.T.'s head repeatedly on the floor.  She then handcuffed A.T.'s left hand.

159.    A third School Safety Officer, who had been summoned, picked A.T. up from the floor, and began banging A.T.'s body against the wall, stating, "You hit my man.  You hit my friend."

160.    The School Safety Officers transported A.T. to the principal's office in an elevator.  In the elevator, the third School Safety Officer shoved A.T.'s body against the elevator wall.

161.    A.T. was held in the principal's office for several hours before being allowed to go home by himself.

162.    The School Safety Officers charged A.T. with disorderly conduct, although on information and belief, those charges have been dismissed.

163.    As a result of this incident, A.T. was treated at a hospital for bruises sustained on the right side of his forehead, his cheek, and his hip, and for his swollen wrists.  He subsequently transferred to another school.

164.    A.T.'s mother filed a complaint regarding the incident with the IAB of the NYPD and met with IAB personnel.  On information and belief, the IAB has taken no further action to investigate the incident or discipline the offending School Safety Officers.

M.D.

165.    M.D. was sixteen years old and enrolled in the 10th grade at the Urban Assembly School for Applied Math and Science in the Bronx, when, towards the end of the 2008-2009 school year, he witnessed a thirteen-year-old female student in an

argument with the school principal in the cafeteria. A School Safety Officer assigned to the school overheard the argument as well and immediately grabbed the thirteen-year-old girl by the throat and pushed her against a wall. The School Safety Officer threatened to place the girl in handcuffs if she tried to move or speak. When the principal attempted to intervene, the School Safety Officer threatened to handcuff the principal as well. The incident happened during a lunch period when the cafeteria was full of students. According to M.D., the girl involved in the incident subsequently transferred to another school.

166.    In the winter of the previous school year, M.D. witnessed another incident between a different School Safety Officer and a 9th grade classmate. The student had attempted to re-enter the school building shortly after school ended to retrieve a hat. The School Safety Officer refused to permit the student to re-enter the building, resulting in a verbal exchange. The School Safety Officer then challenged the student to a physical fight, throwing down his hands in an aggressive stance and asking the student "Do you want to go at it?" Two other students were able to defuse the situation by taking the student out of the building with them.

167.    M.D. fears that he will be subjected to excessive force in the future by School Safety Officers stationed at his school. He does not trust that they will keep him safe.

B.E.

168.    B.E. was seventeen years old and enrolled in the 11th grade at Samuel J. Tilden High School in Brooklyn when he was severely beaten by the School Safety Officers assigned to his school.

40

169.    On January 12, 2007, B.E. stayed late after his math class to speak with his teacher about additional work assignments.  In the hallway on the way to his next class, the assistant principal ordered B.E. to proceed to detention for being late.  When B.E. tried to explain the reason he was late, the assistant principal summoned an armed NYPD police officer.

170.    The officer immediately grabbed B.E., hit B.E.'s head against a brick wall, and sprayed B.E. with mace.  The officer handcuffed B.E. and summoned six additional officers, including both School Safety Officers and armed police officers.

171.    B.E. was arrested and transported to a hospital for treatment of his injuries.  He was then transported to the local precinct, where he spent approximately seven-and-a-half hours, and then to central booking, where he spent approximately nineteen hours.  He was charged with five criminal offenses, for which he received three days of community service and probation.  He was also suspended from school for five days, although, after an appeal, the New York City Department of Education expunged the suspension from B.E.'s records.  B.E. has since graduated high school and now attends college.

172.    This incident was reported in the Village Voice and documented in a report titled "Criminalizing the Classroom:  The Over-Policing of New York City Schools," described *infra* Paragraphs 220-223.

A.P.

173.    On October 10, 2007, A.P. testified before the New York City Council that on March 30, 2007, a 300-pound School Safety Officer physically assaulted him. He was twelve years old and enrolled in I.S. 291 in Brooklyn at the time.

174.    A.P. stated that he had been in the hallway during class time, when the School Safety Officer approached him, pushed him, and demanded his identification. A.P. complied, but the School Safety Officer continued to abuse him verbally and then shoved A.P. into lockers.  When A.P. pushed back, other School Safety Officers intervened and placed A.P.'s left hand in handcuffs.  The first School Safety Officer then punched A.P. in the chest.  A.P. hit the School Safety Officer's back with his remaining free hand and the other School Safety Officers immediately cuffed that hand as well.  Once both of A.P.'s hands were in handcuffs, the first School Safety Officer punched A.P. in the face, creating a laceration that resulted in significant bleeding.

175.    A.P. was charged with assaulting an officer, taken to the local precinct, and held over the weekend.  After a full trial, all charges against him were dismissed.

176.    When A.P.'s father went to the precinct to file a complaint against the School Safety Officer, the police refused to accept his complaint.  A.P.'s mother subsequently managed to lodge a formal complaint about the incident with the IAB, but that agency never responded.  As a result of the incident, A.P. transferred to a different school.

C.S.

177.    C.S., who is sixteen years old and a senior at Bushwick School for Social Justice in Brooklyn, testified before the New York City Council on November 10, 2009 about two unlawful seizures that she had suffered at the hands of School Safety Officers.  She testified that on one occasion, a School Safety Officer assigned to her school handcuffed her to a chair after she had a verbal argument with a classmate.

178.    On another occasion, when C.S. was a freshman, she activated the metal detector at the entrance of the school because she had bobby pins in her hair.  Three School Safety Officers escorted C.S. into a bathroom and instructed all of the other girls in the bathroom to leave.  A School Safety Officer then required C.S. to submit to an invasive search during which a metal detector wand was placed against C.S.'s skin under her bra, purportedly to ensure that she was not hiding a razor, cell phone, or iPod between her bra and her body.  In testimony, C.S. stated, "Every day I go to school and I face being harassed, pushed, shoved, yelled at, disrespected and illegally searched." She continued, "I thought the School Safety Officers are supposed to keep me safe, but all they implement is fear."

K.W.

179.    K.W. is fifteen years old and enrolled in the 8th grade at the William A. Morris School (I.S. 61) in Staten Island.  On January 14, 2010, when K.W. was fourteen years old, he was assaulted and unlawfully arrested by members of the NYPD School Safety Division.

180.    At about 12:30 p.m. on that day, K.W. was on the playground during recess when he saw a friend being escorted into the school building by a School Safety Officer.  K.W. followed his friend into the building and ultimately into the dean's office.

181.    K.W. knocked on the half-open office door and asked the School Safety Officer what was happening.  The School Safety Officer told K.W. it was "none of [his] business."  The School Safety Officer then partially closed the door on K.W., catching K.W.'s body between the door and its frame.

43

182.     As K.W. walked away, he muttered an insult to the School Safety Officer, and the School Safety Officer grabbed K.W. from behind by the jacket and put his right forearm into K.W.'s throat, pushing K.W. against the wall.  K.W. pushed the School Safety Officer's hands away from him.

183.     A second School Safety Officer grabbed K.W. by the arm.  The first School Safety Officer then handcuffed K.W. and sat him in a chair.  Approximately four more School Safety Officers entered the room.  The School Safety Officers searched K.W. by going through his pockets and removing his shoes before putting him back in the chair.  The School Safety Officers then brought K.W., still in handcuffs, into another room and left him there for approximately forty-five minutes.

184.     At about 2:30 p.m., School Safety Officers drove K.W. to the local precinct.  At the precinct, K.W. was taken to a back room and made to sit on a bench, still in handcuffs, for about four hours.  He was driven to Bridges Juvenile Center at approximately 8:00 p.m.  Only there did the officers remove K.W.'s handcuffs before searching him and putting him in a cell.

185.     The next day K.W. was taken to Family Court, where he saw a probation officer and entered the Adjustment Services program.  He was given two months' probation.

186.     K.W. has since returned to school and continues to fear that the School Safety Officers assigned to his school will assault or arrest him.

Legal Aid Society Clients

187. Nancy Rosenbloom, an attorney for the Legal Aid Society, testified before the New York City Council on November 10, 2009 that a student client—a small twelve-year-old girl—had been improperly arrested for allegedly assaulting a large, male School Safety Officer assigned to her school. She testified that after the juvenile court judge heard testimony and reviewed the videotape showing that the School Safety Officer, in fact, had been the initial aggressor, the judge dismissed all charges against the girl.

188. Ms. Rosenbloom further testified that her office defended another child accused of assaulting a School Safety Officer. All charges were dismissed, however, after a videotape of the incident showed that several School Safety Officers had initiated the altercation by pushing the student into a corner, hitting him, and then laughing.

189. Ms. Rosenbloom also testified that her office had recently defended a student who had been unlawfully arrested by a School Safety Officer for standing outside his school at 2:45 p.m., immediately after classes had been dismissed. The child was ultimately incarcerated for over twenty-four hours as a result.

Queens Legal Services Client

190. During the same New York City Council hearing on November 10, 2009, Tara Foster, an attorney with the Education Rights Project of Queens Legal Services, testified that she had defended a student who had been charged with striking a School Safety Officer. During the child's hearing, student witnesses testified that, in fact, the School Safety Officer initiated the altercation by becoming verbally and

45

physically aggressive toward the student, pushing her against the wall, grabbing her by the hair, dragging her, and punching her in the head.  The School Safety Officer also stomped on the cell phone of one of the witnesses who attempted to videotape the incident.  After a full hearing, school disciplinary charges against the student were dismissed on the merits.  On information and belief, the School Safety Officer was not punished.

Notices of Claim and Lawsuits

R.M.

191.    The complaint in *Morgan v. City of New York, et al.*, No. 09-cv-3619 (E.D.N.Y filed Aug. 20, 2009) alleges that R.M., then fifteen years old and a student at Hillcrest High School in Queens, was severely assaulted by School Safety Officers on three separate occasions—two of which were spurred by alleged concerns regarding a cell phone.

192.    During the first incident, R.M. was observed using a cell phone in school and taken to the dean's office.  School Safety Officers then took R.M. to a room in the dean's office and assaulted him "about the head, shoulders, arms, and legs."

193.    Later that same year, School Safety Officers assaulted R.M. when he asked them to hold his cell phone so as not to be late to class.  R.M. was then handcuffed and taken to a locked office in the school.  He was subsequently transported in handcuffs to the psychiatric ward of North Shore-Long Island Jewish Medical Center and treated for his physical injuries.

194.    After R.M. filed notices of claim with respect to these two incidents, School Safety Officers retaliated against him by dragging him into a stairwell, choking him, and threatening him.

195.    As a result of these assaults, R.M. suffered extensive injuries, including to both knees, one of which required surgery to repair.  He was forced to transfer to another public school in New York City, disrupting his education.

196.    R.M. filed a civil complaint in the Eastern District of New York on August 20, 2009, naming as defendants the City and the NYPD, among others, and seeking compensatory and punitive damages as a result of these beatings.  This civil lawsuit is pending.

197.    In addition to receiving notice of these incidents through the notices of claim and the complaint, City-Defendants obtained knowledge of these incidents through widespread news coverage, including articles published in the New York Times, the New York Daily News, and the Village Voice.

A.G.

198.    On February 1, 2010, twelve-year-old A.G. was enrolled in the 7th grade at Russell Sage Junior High School in Queens, when she was unlawfully arrested at her school.

199.    According to a notice of claim filed on A.G.'s behalf against the City, the NYPD, and the New York City Department of Education on March 29, 2010, A.G. had been arrested because she "'doodled' on a school desk in a water soluble, erasable, marker" on February 1, 2010.  School Safety Officers were contacted and they searched A.G.'s person and belongings without her consent.  According to the notice of claim,

47

the School Safety Officers "told her she was going to be arrested because she was caught 'doing graffiti,'" although "the 'doodles' were neither permanent nor caused any permanent damage to school property."

200.    A.G. was then placed in metal handcuffs and walked "through the school in front of her classmates and teachers and across the street to the 112th Precinct."  NYPD police officers told A.G.'s mother that "she would not be permitted to be in the same room with her daughter in the precinct building and ordered her to go home and await their call."

201.    At the precinct, police officers "handcuffed [A.G.] to a pole and forced her to remain handcuffed to the pole for over two (2) hours."

202.    A.G.'s mother, M.C., told the New York Daily News that when A.G. was released from police custody, she was given a summons for Family Court for later that week.  A.G. appeared in Family Court, and was told to complete eight hours of community service, a book report, and an essay on what she had learned from the experience.  In the days after her arrest, A.G. vomited due to the trauma of the incident.

203.    M.C. also reported to the media that school officials told her that they had no control over whether NYPD personnel handcuffed and arrested students, because it was a matter of  "agency policy" and decision-making.  In addition to having been arrested and detained, A.G. initially received a five-day suspension for her doodling in erasable ink, but after media reports of this incident the school terminated the suspension early.

S.C.

204.     S.C. is seventeen years old and enrolled in the 12th grade at Robert F.

Kennedy High School in Queens.  In the fall of 2008, a School Safety Officer assigned

to his school kicked in the door to a bathroom stall occupied by S.C.  The door hit S.C.

in the head, causing bleeding and pain, but the School Safety Officer refused to help

him in a clear violation of the NYPD patrol guide.  The School Safety Officer said to

S.C. "That's life.  It will stop bleeding." before leaving the restroom.

205.     When S.C. reported the incident to his school principal, the principal

responded that there was nothing he could do about it.  S.C.'s father sought to complain

directly to the NYPD precinct that covers the school, but the precinct cancelled both

meetings that the father had scheduled.  Eventually, S.C. and his father found out that

the School Safety Officer had been transferred to a middle school in the area.

206.     Finding no other recourse, S.C. and his parents filed a civil suit against

the City, which settled for $55,500 in money damages.  They also filed a formal

complaint with the IAB and participated in an interview with IAB personnel.  In

addition to being presented in open testimony before the New York City Council and

being recounted in the legal suit against City-Defendants, this incident was widely

reported by the New York Daily News, the New York Post, El Diario, and television

station New York 1.

J.R.

207.     According to court filings, a School Safety Officer assigned to United

High School in Manhattan allegedly arrested student J.R. unlawfully.  *Ramos v. City of*

*New York*, No. 05-cv-637 (S.D.N.Y. filed Jan. 18, 2005).  Specifically, it was alleged

that the School Safety Officer assigned to the student's school refused to permit the student to leave class to attend a student council meeting and mocked him because he perceived the student to be gay.  When the student requested that the School Safety Officer consult with the principal regarding the student council meeting, the School Safety Officer placed the student in handcuffs, subjected him to a search, and pushed him against the wall.  The complaint further alleged a pattern and practice of School Safety Officers unlawfully using force and restraining students without legal justification, and a failure to discipline the officer involved in that case.  The case was settled for $12,500.

R.B.

208.     R.B., a student enrolled in the Campus Magnet High School in Queens, filed a complaint alleging that School Safety Officers assigned to that school placed him in handcuffs, arrested him, and transported him to a local precinct for allegedly stealing a classmate's Metrocard, even though the classmate had clearly stated that R.B. was not the person who had taken the Metrocard.  *Bazile v. City of New York*, No. 07-cv-5347 (E.D.N.Y. filed Dec. 19, 2007).  The case was settled for $32,500.

A.H.

209.     The complaint in *Brackson v. City of New York* (N.Y. Sup. Ct. filed on or about Dec. 14, 2009) alleges that School Safety Officers at Evander Childs High School in the Bronx subjected A.H. to false arrest, assault, battery, false imprisonment, and intentional infliction of emotional distress.  It also asserts claims for negligent hiring, training, supervision, and retention by the City.

50

210.   A.H. is a special education student.  She asserts that she was in class and "got up from her seat to help a fellow student who was having trouble with the class curriculum."  When the teacher observed A.H. get up, she ordered A.H. to leave the classroom.  According to the complaint, A.H. "refused to leave the classroom and tried to explain that she had just gotten up from her seat to help a fellow student."

211.   The teacher called School Safety Officers, who then "used physical force to remove [A.H.] from the classroom by first handcuffing one arm as they aggressively jerked and pried her away from her desk."  The officers handcuffed A.H.'s "arms behind her back so tight [*sic*] that her skin ruptured causing her to bleed and suffer severe pain and discomfort."  A.H. asked for medical attention, but when the school nurse arrived, officers "refused to take off the handcuffs so that the nurse could properly treat her."

212.   A.H. was then taken to a police precinct and charged with disorderly conduct and resisting arrest.  She spent approximately thirty hours in jail.  The criminal charges against A.H. were dismissed, but the excessive force used by the School Safety Officers "resulted in permanent keloid scarring" on A.H.'s wrists.  A.H.'s civil lawsuit is pending.

C.R.

213.   Publicly available legal documents allege that student C.R., who was sixteen years old and enrolled in Samuel Gompers High School in the Bronx, was unlawfully seized, arrested, and beaten by School Safety Officers on March 19, 2007.  The complaint in that case, *Rodriguez v. City of New York*, No. 08-cv-11300 (S.D.N.Y. filed Dec. 20, 2008), alleged that School Safety Officers assigned to C.R.'s school

51

escorted C.R. out of a classroom for talking too much, shoved him, threw him against a wall, jumped on him when he fell to the ground, and handcuffed him.  As alleged, C.R. began bleeding and had to be hospitalized, requiring stitches to his head.  The School Safety Officers charged C.R. with assault, resisting arrest, and harassment.  The defendants settled that suit for $39,000.

    <u>T.G.</u>

214.    Publicly available legal documents indicate that student T.G., who was sixteen years old and enrolled in I.S. 291 in Brooklyn, filed a lawsuit, *Gray v. City of New York*, No. 4247-05 (N.Y. Sup. Ct., filed Feb. 2005), alleging that the School Safety Officers assigned to her school verbally and physically assaulted her.

    <u>C.C.</u>

215.    A complaint was filed in *Crowther v. City of New York*, No. 08-cv-2671 (E.D.N.Y. filed July 2, 2008), by C.C., a student who was enrolled in Thomas Jefferson High School in Brooklyn.  The complaint alleges that a School Safety Officer assigned to C.C.'s school subjected C.C. to excessive force, false arrest, and malicious prosecution, and alleges a systemic pattern and practice of similar abuses.

    <u>L.S.</u>

216.    Publicly available legal documents describe a lawsuit filed by student L.S., who was enrolled in Middle School 232 in the Bronx.  The documents relating to that suit, *Suazo v. City of New York*, No. 020389-08E (N.Y. Sup. Ct. filed May 12, 2008), allege that L.S. was walking on the sidewalk outside of his school right after classes were dismissed.  As alleged, without provocation School Safety Officers assigned to L.S.'s school physically assaulted him, resulting in his hospitalization.  The

next day, when L.S. and his mother went to the school to file a complaint about the incident, L.S. was placed under arrest.  All criminal charges against L.S. were dismissed.  Upon information and belief, his civil lawsuit against the defendants remains pending.

J.G.

217.    Publicly available legal documents indicate that student J.G. was enrolled in the High School of Fashion Industries in Manhattan and filed a lawsuit, *Gonzalez v. City of New York*, No. 116093-07 (N.Y. Sup. Ct. filed Nov. 20, 2007), alleging that he was stopped by School Safety Officers assigned to his school for being in the hallway without a hall pass.  As alleged, six School Safety Officers became involved, throwing J.G. to the ground and beating him, resulting in a fracture to J.G.'s left hand that required surgery, multiple bruises around his head, neck, and shoulders, and other physical injuries.

P.C.

218.    Publicly available legal documents indicate that P.C., who was enrolled in Bryant High School in Queens, filed a suit, *Chiaramonte v. City of New York*, No. 18348-07 (N.Y. Sup. Ct. filed July 17, 2007), alleging that she was physically assaulted and handcuffed by the School Safety Officers assigned to her school, resulting in physical injury.

## Deliberate Indifference in Failure to Train and Supervise

219.    City-Defendants have been aware of the incidents described above and the pervasive nature of the pattern and practice by members of the NYPD School Safety Division of unlawfully seizing and arresting schoolchildren, and the pattern and practice of subjecting them to excessive force.  Yet, City-Defendants have been deliberately indifferent to these patterns and practices, and have not attempted to remedy them.

220.    City-Defendants also have had actual knowledge of these patterns and practices for several years from sources other than described above.  In March 2007, the New York Civil Liberties Union and the American Civil Liberties Union published a report titled *Criminalizing the Classroom: The Over-Policing of New York City Schools*, documenting instances of abuses by members of the NYPD School Safety Division.

221.    The *Criminalizing the Classroom* report documented the unlawful seizure, arrest, and beating of B.E., described *supra* Paragraphs 168-172.  It documented the unlawful seizure, arrest, and beating of class representative A.M., described *supra* Paragraphs 124-134.

222.    In addition, the report documented the unlawful seizure and arrest of another student, "Jimmy," then a senior at New York Harbor School in Brooklyn. Jimmy was arrested for allegedly throwing, rather than handing, his wallet to a School Safety Officer as he passed through the metal detector; when school officials objected to Jimmy's arrest, the School Safety Officer threatened to handcuff them as well.  On another occasion, the report indicated, Jimmy was handcuffed and issued a summons

54

for trying to retrieve his gym clothes from the gym.  All charges against the child were summarily dismissed.

223.    The report further documented the unlawful seizure and arrest of, and the use of excessive force on, a female student who at that time was a senior at the Bushwick School of Social Justice.  She asked for her cell phone, which had been confiscated, to be returned.  Two School Safety Officers threw the student to the ground, handcuffed her, and confined her to a holding room for approximately an hour.

224.    City-Defendants and all senior personnel within the NYPD School Safety Division received copies of the *Criminalizing the Classroom* report.

225.    City-Defendants obtained further knowledge of the challenged patterns and practices through the publication of other reports documenting abuses by members of the NYPD School Safety Division.  *See, e.g.*, Drum Major Institute for Public Policy, *A Look at the Impact Schools* (June 2005); Kevin P. Brady, Sharon Balmer and Deinya Phenix, *School-Police Partnership Effectiveness in Urban Schools: An Analysis of New York City's Impact Schools Initiative* (Education and Urban Society, Aug. 2007); National Education and Social Rights Initiative and Teachers Unite, *Teachers Talk: School Culture, Safety, and Human Rights* (Oct. 2008); and Urban Youth Collaborative, *Bill of Rights* (2006).

226.    City-Defendants also obtained actual knowledge of the pattern and practice by members of the NYPD School Safety Division of unlawfully arresting schoolchildren, based on letters submitted by the American Civil Liberties Union and the New York Civil Liberties Union to Defendant Police Commissioner Kelly dated October 7, 2008 and November 4, 2008.  These letters documented that a significant

number of schoolchildren under the age of sixteen have been arrested at school for non-criminal violations, even though such arrests are prohibited by state law.

227.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from media reports.  In addition to widespread coverage of the incidents involving the inappropriate arrests of school principals and schoolteachers, described *supra* Paragraphs 41-45, and the incidents involving R.M., *supra* Paragraphs 191-197, A.G., *supra* Paragraphs 198-203, and S.C., *supra* Paragraphs 204-206, the New York Daily News reported on June 19, 2008 that a School Safety Officer handcuffed a five-year-old boy and transported him to a psychiatric hospital, without parental consent, after the boy threw what was described as a "temper tantrum."  Likewise, on March 10, 2008, the New York Daily News reported that a School Safety Officer handcuffed two four-year-old boys for refusing to take a nap.

228.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from complaints filed with the IAB regarding conduct by members of the NYPD School Safety Division.  As described *supra* Paragraph 151, between 2002 and 2007, the police received 2,670 complaints against School Safety Officers, which is an average of 500 per year, or one complaint for every eight to ten School Safety Officers per year.  Twenty-seven percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against NYPD police officers not assigned to the public schools.

229.    Also, as described more fully *supra* Paragraph 152, during the 2008 calendar year, there were 1,159 complaints filed against School Safety Officers, representing a staggering rate of almost one complaint for every four School Safety Officers employed.  Fifteen percent of these complaints alleged excessive force, abuse of authority, discourtesy, or offensive language by School Safety Officers.

230.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from notices of claims and complaints filed against them regarding the conduct of members of the NYPD School Safety Division.  Among the incidents for which notices of claims and complaints have been filed are those involving the unlawful seizure, arrest, and/or physical assault of students R.M., A.G., S.C., J.R., R.B., A.H., C.R., T.G., C.C., L.S., J.G., and P.C., *supra* Paragraphs 191-218.

231.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on October 10, 2007 regarding the NYPD School Safety Division.  Former Assistant Chief James Secreto was present at this hearing and testified on behalf of himself and Defendant Police Commissioner Kelly.  At that hearing, a number of children offered testimony regarding abuses suffered at the hands of School Safety Officers as described above.  At the same hearing, Gregory Floyd, the president of the union representing all School Safety Officers, testified that he agreed with the statement that "we need to have more mediation training, more conflict resolution, knowing [*sic*] how to diffuse [*sic*] situations among not only staff and teachers and administrators, but also for students . . . ."

232.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on November 10, 2009 regarding the NYPD School Safety Division.  Former Assistant Chief James Secreto was present at this hearing and testified on behalf of himself and Defendant Police Commissioner Kelly.  During that hearing, testimony was offered regarding the unlawful seizures, arrests, and beatings of a number of children—including A.P., *supra* Paragraphs 173-176, C.S., *supra* Paragraphs 177-178, S.C., *supra* Paragraphs 204-206, Legal Aid Society clients and Queens Legal Services clients, *supra* Paragraphs 187-190—by members of the NYPD School Safety Division.

233.    In addition, during that same hearing, a representative from the National Economic and Social Rights Initiative (NESRI) reported the results of a survey of New York City public school parents and teachers that the organization had conducted. NESRI concluded that "Safety Agents are inappropriately involved in disciplinary matters that should be dealt with by school staff."  NESRI further reported that "Students [it] interviewed had been harassed, handcuffed, patted down and in some cases arrested for shouting in hallways, being late to school or class, [*sic*] talking back to a safety employee."

234.    Similarly, the President of the United Federation of Teachers, Michael Mulgrew, testified during the November 10, 2009 hearing as follows: "If a student is disruptive inside of a classroom, and the school has a real safety plan, there's a way for them to remove them without using a safety agent.  But in too many places, what they'll do is wait till [*sic*] the situation's getting out of control, they bring in a safety agent, and the next thing you know a student's getting arrested when nobody wants a

student being arrested.  You should not be arrested for, you know, having a bad day in school.  Let's be clear.  You shouldn't be."

235.    Notwithstanding this detailed knowledge of the patterns and practices challenged here, City-Defendants have failed to undertake any meaningful attempt to curtail these patterns and practices, in blatant disregard of the rights of New York City public schoolchildren.

236.    City-Defendants have actively resisted efforts to provide public information to parents and students who seek to file complaints.  City-Defendants have refused to institute an effective complaint mechanism for parents and students.  City-Defendants have actively resisted reforming the process for reporting complaints against School Safety Officers.  In particular, they have refused to support a requirement that schools post information regarding the filing of a complaint against School Safety Officers, even knowing that 311 operators often direct complainants to the Department of Education or the Civilian Complaint Review Board, which have no authority over School Safety Officers.

237.    City-Defendants have refused to restructure their training program. According to testimony by the president of the union representing School Safety Officers before the New York City Council on November 10, 2009, City-Defendants have made absolutely no changes to the NYPD's training program for School Safety Officers since 2007, notwithstanding the countless stories regarding abuses by School Safety Officers.

238.    Upon information and belief, the current training does not include instruction on the enforcement of the Penal Code as distinct from the New York City

Department of Education's Citywide Standards of Discipline and Intervention

Measures (the Discipline Code).  In fact, School Safety Officers describe their job

duties and responsibilities to include "apprehending students and others violating

Department of Education Rules and Regulations."  *Floyd et al. v. City of New York*, No.

10-cv-02426, Compl. ¶ 35(h) (S.D.N.Y. filed Mar. 17, 2010).  The training is also

inadequate with respect to issues of adolescent development and behavior, as well as

the unique environment of a school.  Nor does it include instruction in mediation and

conflict resolution, despite indications by individuals such as Gregory Floyd, *supra*

Paragraph 231, that such topics should be addressed.  Rather, the training manual,

entitled Police Academy School Safety – Police Science, characterizes schoolchildren

as "extremely violent" and warns School Safety Officers of "a ticking youth time

bomb."

239.    City-Defendants have refused to discipline adequately offending School

Safety Officers who commit abuses.  They have failed to remove School Safety

Officers who are demonstrably unable to work with children in a safe and effective

manner.  Upon information and belief, in several instances, City-Defendants have

responded to complaints of abuse on the part of NYPD School Safety Division

personnel by temporarily transferring the personnel to other public school sites.

240.    City-Defendants have failed to convene the statutorily required monthly

School Safety Committees in each school operated by the New York City Department

of Education.  More specifically, school staff and members of the NYPD School Safety

Division are required to review policies and procedures relating to School Safety

Officers during such meetings.  These meetings have failed to take place even though the United Federation of Teachers has filed grievances based on this failure.

241.    City-Defendants have failed to provide the tools and support necessary to ensure a professionalized workforce within the NYPD School Safety Division.  As of 2007, the NYPD School Safety Division was losing approximately forty members per month due to attrition.  As of 2009, the attrition rate was 50 percent over five years, meaning that about half of all School Safety Officers quit over a five-year period.  According to the president of the union representing School Safety Officers, this occurs largely because School Safety Officers receive a low salary and believe that they do not receive sufficient "respect."

242.    In sum, City-Defendants know to a moral certainty that members of the NYPD School Safety Division will be called upon to address situations—involving  the seizure of, detention of, handcuffing of, or physical contact with, New York City public schoolchildren—in which the constitutional, statutory, and common law rights of the schoolchildren will be implicated.  Although there is a history of members of the NYPD School Safety Division mishandling such situations, as described *supra* Paragraphs 219-241, City-Defendants have failed to undertake any meaningful attempt to train members of the NYPD School Safety Division to avoid violations of schoolchildren's rights.  Appropriate training would improve the ability of members of the NYPD School Safety Division to make choices that prevent violations of schoolchildren's rights.  Without appropriate training, members of the NYPD School Safety Division will frequently continue to make choices that lead to the deprivation of schoolchildren's rights.

61

## CAUSES OF ACTION

FIRST CAUSE OF ACTION:  UNLAWFUL SEIZURES AND ARRESTS IN
VIOLATION OF THE FEDERAL CONSTITUTION

243.    Plaintiffs incorporate herein by reference Paragraphs 1 through 242.

244.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of unreasonably seizing and unlawfully arresting New York City public middle school and high school students absent probable cause of criminal activity in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

245.    Defendants School Safety Officers Downing-Lee and Edmond are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and unlawfully arresting individually named Plaintiff D.B. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

246.    Defendants School Safety Officers Mayes, Richardson, and Harrison are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and unlawfully arresting individually named Plaintiff L.W. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

SECOND CAUSE OF ACTION:  EXCESSIVE FORCE IN VIOLATION OF THE
FEDERAL CONSTITUTION

247.    Plaintiffs incorporate herein by reference Paragraphs 1 through 242.

248.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of using excessive force against New York City public middle school and high school students in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

249.     Defendants School Safety Officers Downing-Lee and Edmond are liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named Plaintiff D.B. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

250.     Defendants School Safety Officers Mayes, Richardson, and Harrison are liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named Plaintiff L.W. in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

THIRD CAUSE OF ACTION:  SUBSTANTIVE DUE PROCESS

251.     Plaintiffs incorporate herein by reference Paragraphs 1 through 242.

252.     City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of committing abuses against New York City public middle school and high school students that shocks the conscience in violation of the Fourteenth Amendment to the United States Constitution.

253.     Defendants School Safety Officers Downing-Lee and Edmond are liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff D.B. that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

254.     Defendants School Safety Officers Mayes, Richardson, and Harrison are liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff L.W. that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

FOURTH CAUSE OF ACTION:  UNLAWFUL SEIZURES AND ARRESTS IN
VIOLATION OF THE NEW YORK STATE CONSTITUTION

255.    Plaintiffs incorporate herein by reference Paragraphs 1 through 242.

256.    City-Defendants are liable for the unreasonable seizures and unlawful

arrests of New York City public middle school and high school students in violation of

Article I §12 of the New York Constitution.

257.    Defendants School Safety Officers Downing-Lee and Edmond are liable

pursuant to Article I §12 of the New York Constitution for the unreasonable seizure and

unlawful arrest of individually named Plaintiff D.B.

258.    Defendants School Safety Officers Mayes, Richardson, Harrison are

liable pursuant to Article I §12 of the New York Constitution for the unreasonable

seizure and unlawful arrest of individually named Plaintiff L.W.

FIFTH CAUSE OF ACTION:  FALSE ARRESTS IN VIOLATION OF NEW YORK
STATE LAW

259.    Plaintiffs incorporate herein by reference Paragraphs 1 through 242.

260.    City-Defendants are liable for the false arrest of New York City public

middle school and high school students in violation of New York State law.

261.    Defendants School Safety Officers Downing-Lee and Edmond are liable

for the false arrest of individually named Plaintiff D.B. in violation of New York State

law.

262.    Defendants School Safety Officers Mayes, Richardson, and Harrison are

liable for the false arrest of individually named Plaintiff LW. in violation of New York

State law.

SIXTH CAUSE OF ACTION:  ASSAULT AND BATTERY IN VIOLATION OF NEW YORK STATE LAW

263.    Plaintiffs incorporate herein by reference Paragraphs 1 through 242.

264.    City-Defendants are liable for the assaults and batteries of New York City public middle school and high school students in violation of New York State law.

265.    Defendants School Safety Officers Downing-Lee and Edmond are liable for the assault and battery of individually named Plaintiff D.B. in violation of New York State law.

266.    Defendants School Safety Officers Mayes, Richardson, and Harrison are liable for the assault and battery of individually named Plaintiff L.W. in violation of New York State law.

## **PRAYER FOR RELIEF**

WHEREFORE the Plaintiffs respectfully request that the Court:

1.    Assume jurisdiction over this matter;

2.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2);

3.    Declare that the policy and practice of City-Defendants to seize and arrest schoolchildren in New York City public middle schools and high schools absent probable cause of criminal activity violates these students' federal and state rights;

4.    Declare that the policy and practice of City-Defendants to use excessive force against schoolchildren in New York City public middle schools and high schools violates these students' federal and state rights;

5.    Enjoin any further violations of Plaintiffs' constitutional, statutory, and common law rights, including, but not limited to, an injunction that requires City-Defendants to:

    a.   Develop a transparent and meaningful mechanism to file complaints against members of the NYPD School Safety Division;

    b.   Develop guidelines to ensure that schoolchildren are not unlawfully or inappropriately arrested;

    c.   Ensure sufficient accountability by revising the disciplinary policies and procedures for members of the NYPD School Safety Division who are found to have committed abuses, including, when appropriate, by prohibiting them from having future contact with students;

    d.   Ensure that school administrators have an appropriate role with respect to the maintenance of school safety, including by mandating compliance with state law requiring regular communications between school-building officials and police personnel; and

    e.   Implement improved training for members of the NYPD School Safety Division with respect to the use of the power to seize and arrest, and the use of force in the context of interactions with schoolchildren in New York City public middle schools and high schools;

6.    Award compensatory damages for injuries sustained by named Plaintiffs D.B. and L.W.;

7.    Award the Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

8.    Grant any other relief the Court deems necessary or proper.

Dated this 18th day of June, 2010.


Respectfully submitted by.


   /s/ Arthur N. Eisenberg                   /s/ Dennis Parker       

ARTHUR N. EISENBERG, ESQ.  
aeisenberg@nyclu.org  
DONNA LIEBERMAN, ESQ.  
ADRIANA C. PIÑON, ESQ.  
apinon@nyclu.org  
UDI OFER, ESQ.  
uofer@nyclu.org  
KATHRYN HUNT MUSE, ESQ.  
kmuse@nyclu.org  
ALEXIS KARTERON, ESQ.*  
JOHANNA E. MILLER, ESQ.*  
NAOMI R. SHATZ, ESQ.*  
NEW YORK CIVIL LIBERTIES  
UNION FOUNDATION  
125 Broad St., 19th Floor  
New York, NY 10004  
(212) 607-3324  

DENNIS PARKER, ESQ.  
LAURENCE M. SCHWARTZTOL,  
ESQ.*  
DEUEL ROSS, ESQ.*  
AMERICAN CIVIL LIBERTIES  
UNION FOUNDATION  
125 Broad St., 18th Floor  
New York, NY 10004  
(212) 519-7832  


   /s/ Joshua Colangelo-Bryan   

JOSHUA COLANGELO-BRYAN  
ESQ.  
colangelo.bryan.joshua@dorsey.com  
JONATHAN MONTCALM, ESQ.*  
DORSEY & WHITNEY, LLP  
250 Park Avenue  
New York, NY 10177  
(212) 415-9200  

*Not admitted in the Eastern District  
of New York*

Attorneys for Plaintiffs