## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

_____

DESTINY BRUNO; D.L., on behalf of her minor          )
daughter D.Y.; LAMEAK WILLIAMS;                      )
NICHOLAS CRUZ-CARASQUILLO;                           )
NICHOLAS SUTTON; KION DICKEY;                        )
and all others  similarly situated; and              )
EL PUENTE DE WILLIAMSBURG, INC.,                     )
                                                     )
                                                     )          **SECOND AMENDED**
                       Plaintiffs,                   )          **COMPLAINT**
                                                     )
              -versus-                               )          10 CV 0210 (RRM)(SMG)
                                                     )
CITY OF NEW YORK; MAYOR MICHAEL R.                   )
BLOOMBERG, in his official capacity;                 )
POLICE COMMISSIONER RAYMOND W.                       )
KELLY, in his official capacity; ASSISTANT           )          **JURY TRIAL DEMANDED**
CHIEF BRIAN CONROY, in his official capacity;        )
SERGEANT ROSLYN DOWNING-LEE, in her                  )
individual and official capacities; SCHOOL           )
SAFETY OFFICER TAKASHA EDMOND, in her                )
individual and official capacities; SCHOOL           )
SAFETY OFFICER KEVIN MAYES, in his                   )
individual and official capacities; SCHOOL           )
SAFETY OFFICER GREGORY RICHARDSON,                   )
in his individual and official capacities; SCHOOL    )
SAFETY OFFICER DAVID HARRISON, in                    )
his individual and official capacities; SCHOOL       )
SAFETY OFFICER JOANNA BAPTISTE, in her               )
individual and official capacities; SCHOOL           )
SAFETY OFFICER TIMOTHY JORDAN, in his                )
individual and official capacities; and POLICE       )
OFFICER RON EBREO, in his individual and             )
official capacities,                                 )
                                                     )
                       Defendants.                   )

_____

### PRELIMINARY STATEMENT

1.      This class action lawsuit, brought by six schoolchildren on behalf of

themselves and similarly situated middle school and high school students enrolled in

New York City public schools, challenges unconstitutional policies and practices of the School Safety Division, a branch of the New York City Police Department (NYPD) that patrols these schools.  The NYPD School Safety Division includes over 5,000 School Safety Officers assigned to particular public schools.  These School Safety Officers do not carry firearms, but they wear NYPD-issued uniforms and, as peace officers employed by the NYPD, maintain full authority to stop, frisk, detain, question, search, and arrest individuals both on and off school grounds.  The NYPD School Safety Division also includes at least 191 armed police officers who are indistinguishable from the officers who patrol New York City streets, except that these officers have been assigned to patrol New York City public schools.

2.      Members of the NYPD School Safety Division, including both School Safety Officers and police officers assigned to public schools, engage in a policy and practice of unlawfully seizing and arresting schoolchildren, in violation of the Fourth Amendment of the United States Constitution and state law.  This policy and practice manifests itself in two ways:  (a) NYPD School Safety Division personnel arrest students for minor violations of school rules that do not constitute probable cause of criminal activity, and detain those students off school grounds, often at police precincts; and (b) NYPD School Safety Division personnel handcuff students and detain them in seclusion rooms in school buildings for minor violations of school rules that do not constitute probable cause of criminal activity.

3.      Members of the NYPD School Safety Division, including both School Safety Officers and police officers assigned to public schools, also engage in a policy and practice of using excessive force against schoolchildren.  Such excessive force

includes pushing, shoving, grabbing, punching, and striking students.  In many instances, this force is not used pursuant to a lawful arrest, but rather for the purpose of securing compliance with a directive from a School Safety Officer, or for other unjustified reasons.  These physical altercations often cause injuries to schoolchildren that, in some cases, require medical care or hospitalization.

4.      In recent years, New York City has drastically increased the deployment of law enforcement personnel to patrol its public schools.  Since the adoption of a Memorandum of Understanding (MOU) transferring school safety responsibilities from the New York City Board of Education to the NYPD in 1998, the number of police personnel assigned to patrol New York City public schools has grown by 73 percent, even though school crime was declining prior to the 1998 transfer and student enrollment is at historically low levels.

5.      The NYPD School Safety Division constitutes the fifth largest police force in the country, with more officers than the police departments in Washington, D.C., Detroit, Baltimore, Dallas, Phoenix, Boston, or Las Vegas.  New York City deploys more School Safety Officers than guidance counselors:  there are over 5,200 police personnel in public schools and there are only approximately 3,000 guidance counselors.

6.      Research demonstrates that law enforcement agencies frequently fail to account for the ways in which policing students in public schools differs from policing adults on the street.  A study commissioned by the U.S. Department of Education found, "One [of] the most frequent and destructive mistakes many [] programs make is to fail to define [law enforcement's] roles and responsibilities in detail before—or even

after—the officers take up their posts in schools.  When programs fail to do this, problems are often rampant in the beginning of the program—and often persist for months and even years."

7.      Such problems are endemic in New York City, where the 1998 MOU transferring school safety responsibilities to the NYPD failed to adequately define the roles and responsibilities of members of the NYPD School Safety Division.  This failure by the City to institute an adequate school safety governance structure is evident in the challenged policy and practice of unlawfully seizing and arresting schoolchildren absent probable cause and in the challenged policy and practice of using excessive force against schoolchildren.  Indeed, it is the stated policy of the NYPD that NYPD personnel should remove "unruly" children from New York City public schools, yet the term "unruly" has not been defined and no other limits to this policy, or protocols respecting this policy, have been enunciated.  This broad and undefined policy invites unconstitutional arrests of, and excessive force directed at, schoolchildren.

8.      As a result of these unconstitutional policies and practices, New York City public school students miss school and suffer psychological and physical injury.  They also suffer ongoing harm.  They face the humiliation and degradation of being paraded in handcuffs in front of their classmates and teachers and taken to seclusion rooms.  They face the humiliation and degradation of being hauled out of their schools in handcuffs—again in front of classmates and teachers—and being brought to police precincts for booking.  Because the arrests made by NYPD School Safety Division personnel are often groundless, any resulting criminal cases are frequently dismissed and/or diverted to non-punitive processes.  However, these subsequent dispositions do

not mitigate the harm suffered by schoolchildren at the time of arrest and leave the children to deal with the aftermath of having missed time in class and sometimes even physical injuries.

9.      In addition, the challenged policies and practices severely compromise students' ability to learn.  Far from creating an environment of support and trust as needed by students, these policies and practices generate fear, distrust, and even violence within the schools.  As a result of these policies and practices, students fear the School Safety Officers in their schools.  Many avoid certain hallways where they know a School Safety Officer will be patrolling; some even avoid going to school altogether. Students report that they feel like criminals when they enter their school buildings. Fearful of abuse by School Safety Officers, many of these students are forced to transfer to different schools, significantly disrupting their education.  Others, for whom a transfer is unavailable, face the prospect of withdrawing from school entirely or remaining in a school where they feel unsafe each day.  Indeed, educational experts believe that excessive policing in schools is likely to produce alienation and mistrust among students, compromise the educational climate of schools, and may actually increase student disorder.

10.      The policies and practices challenged here constitute the official municipal policy of the Defendant City of New York and Defendants Michael R. Bloomberg, Raymond W. Kelly, and Brian Conroy (Conroy succeeded former Defendant Thomas Chan, who in turn succeeded former Defendant James Secreto, as the Assistant Chief and Commanding Officer of the NYPD School Safety Division, and thus is automatically substituted as a party pursuant to Rule 25(d) of the Federal Rules

of Civil Procedure) (collectively City-Defendants). First, the seizures of students—by means of handcuffing, seclusion, and/or formal arrest—for minor misbehavior that falls short of probable cause of criminal activity constitutes the official stated policy of the City-Defendants. Second, the unlawful seizures and arrests of, and use of excessive physical force against, schoolchildren constitute municipal policy because they occur with such frequency as to amount to a custom and usage of the City-Defendants. Finally, City-Defendants' failure to appropriately train and supervise the members of the NYPD School Safety Division in order to address a known pattern of unconstitutional arrests and seizures, and the use of excessive force, amounts to deliberate indifference, thus constituting official municipal policy.

11.     Accordingly, Plaintiffs seek class-wide declaratory and injunctive relief to prevent future abuses by members of the NYPD School Safety Division.

12.     In addition, four of the individually named Plaintiffs who have experienced serious physical assaults by members of the NYPD School Safety Division—Destiny Bruno, Lameak Williams, Nicholas Sutton, and Kion Dickey—seek money damages on behalf of themselves only.

## JURISDICTION AND VENUE

13.     This action is authorized by 42 U.S.C. §1983. Subject matter jurisdiction for Plaintiffs' federal claims rests upon 28 U.S.C. §§ 1331 and 1343(a)(4). This court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

14.     Pursuant to 28 U.S.C. §§ 2201 and 2202, this Court has jurisdiction to declare the rights of the parties and to grant all further relief deemed necessary and

proper.  Rule 65 of the Federal Rules of Civil Procedure authorizes injunctive relief. The Court has authority to award costs and attorneys' fees under 42 U.S.C. § 1988.

15.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), as this is a district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

### PARTIES

Plaintiffs

16.     Plaintiff Destiny Bruno is nineteen years old.  At the time of the incident described herein, Destiny was enrolled as a student at Maxwell High School in Brooklyn.  At all relevant times, Destiny was enrolled in public schools operated by the New York City Department of Education.

17.     Plaintiff D.Y. is seventeen years old and appears in this action by and through her mother, D.L.  D.Y. is enrolled in the 12th grade at the Urban Assembly School for Wildlife Conservation in the Bronx.  At all relevant times, D.Y. was, and she continues to be, enrolled in public schools operated by the New York City Department of Education.

18.     Plaintiff Nicholas Cruz-Carasquillo is eighteen years old.  Nicholas C. is enrolled in the 12th grade at the Urban Assembly School for Careers in Sports in the Bronx.  At all relevant times, Nicholas C. was, and he  continues to be, enrolled in public schools operated by the New York City Department of Education.

19.     Plaintiff Nicholas Sutton is eighteen years old.  Nicholas S. is enrolled as a student at W.E.B. Dubois Academic High School in Brooklyn.  At all relevant

times, Nicholas S. was, and he continues to be, enrolled in public schools operated by the New York City Department of Education.

20.     Plaintiff Lameak Williams is 21 years old.  At the time of the incident described herein, Lameak was enrolled as a student at Hillcrest High School in Queens. At all relevant times, Lameak was enrolled in public schools operated by the New York City Department of Education.

21.     Plaintiff Kion Dickey is nineteen years old.  At the time of the incident described herein, Kion was enrolled as a student at Grace Dodge Career and Technical Education High School in the Bronx.  At all relevant times, Kion was enrolled in public schools operated by the New York City Department of Education.

22.     Plaintiff El Puente de Williamsburg, Inc. (El Puente), is an incorporated not-for-profit membership human rights organization located in Brooklyn, New York. Founded in 1982, El Puente has approximately 2,000 members, many of whom are New York City public middle school and high school students.  El Puente supports the ability of New York City youth to become leaders for peace and justice.  To that end, it seeks to promote educational opportunities in a supportive and nurturing environment for New York City youth.  El Puente sponsors numerous educational programs dedicated to community and youth development.  It organizes and supports educational programs at the public school El Puente Academy for Peace and Justice.  It operates programs at four locations throughout Brooklyn known as Leadership Centers, as well as a Community Health and Environment Institute.

Defendants

23.     Defendant City of New York (referred to at times as the City) is a municipal corporation duly incorporated and existing pursuant to the laws of the State of New York.  The City has established and maintains the NYPD and the New York City Department of Education as constituent departments or agencies of the City.

24.     Defendant Michael R. Bloomberg is the Mayor of the City of New York, with supervisory authority over the NYPD and the New York City Department of Education.  He is sued here in his official capacity.

25.     Defendant Raymond W. Kelly is the Police Commissioner for the City of New York, with supervisory authority over all officers and operations of the NYPD, including responsibility for training, recruiting, and managing all members of the NYPD School Safety Division.  He is sued here in his official capacity.

26.     Since the filing of the initial Complaint in this action, Defendant Brian Conroy has succeeded former Defendant Thomas Chan, who succeeded former Defendant James Secreto, as the Assistant Chief and Commanding Officer of the NYPD School Safety Division, with supervisory authority over all personnel of the NYPD School Safety Division.  Leadership of the School Safety Division is particularly unstable, with a high turnover rate that has resulted in three commanding officers heading the School Safety Division in less than three years.  Defendant Conroy is sued here in his official capacity.

27.     Defendant School Safety Officer Sergeant Roslyn Downing-Lee is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  She is sometimes referred to by students

9

and school personnel as "Base."  She is sued here in her official and individual capacities.

28.     Defendant School Safety Officer Takasha Edmond is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  She is sued here in her official and individual capacities.

29.     Defendant School Safety Officer Kevin Mayes is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

30.     Defendant School Safety Officer Gregory Richardson is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

31.     Defendant School Safety Officer David Harrison is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

32.     Defendant School Safety Officer Joanna Baptiste is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  She is sued here in her official and individual capacities.

33.     Defendant School Safety Officer Timothy Jordan is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

34.     Defendant Police Officer Ron Ebreo is an employee of the NYPD School Safety Division and/or was an employee of the NYPD School Safety Division at all relevant times.  He is sued here in his official and individual capacities.

## CLASS ACTION ALLEGATIONS

35.     Pursuant to Federal Rule of Civil Procedure 23(a) and (b)(2), Plaintiffs bring this action on behalf of themselves and all other similarly situated individuals. Plaintiffs ask the Court to certify as a class all middle school and high school students enrolled in New York City public schools who:  (1) have been subjected to an unlawful seizure and arrest or who are at risk of being subjected to an unlawful seizure and arrest because of City-Defendants' policies and practices; or (2) have been subjected to excessive force or who are at risk of being subjected to excessive force because of City-Defendants' policies and practices.

36.     This action satisfies all four requirements of Rule 23(a):

a.     *Numerosity:*  Joinder of all class members is impracticable because of the size of the class and the fact that the class includes some members who cannot be identified with any degree of specificity.  According to the enrollment figures for the 2011-2012 academic year, approximately 205,450 students are enrolled in the City's middle schools and approximately 284,703 are enrolled in the City's high schools.  According to the New York City Department of Education 2011-2012 Demographic Data, approximately 75 percent of students in New York City public schools are eligible for free or reduced-price lunches.  The identity of those who will attend these schools and be subjected to the challenged policies and practices in the future cannot be determined.

b.     *Commonality:*  There are questions of law and fact common to all members of the class, including, but not limited to, whether City-Defendants maintain a policy and practice of unlawfully seizing and arresting schoolchildren,

11

and whether City-Defendants maintain a policy and practice of using excessive force against schoolchildren, in violation of federal and state law.

      c.     *Typicality:*  The claims of the representative Plaintiffs are typical of those of the class.  Each named Plaintiff has been subjected to the challenged policies and practices.

      d.     *Adequacy of Representation:*  The class representatives and class counsel will fairly and adequately represent the interests of the class.  The class representatives have no interests in this matter that are antagonistic to other class members.  Class counsel has many years of experience in civil rights and class action litigation.

    37.     Class-wide declaratory and injunctive relief is appropriate under Rule 23(b)(2) because City-Defendants have acted or refused to act on grounds generally applicable to the class as a whole.

## STRUCTURE OF THE NYPD SCHOOL SAFETY DIVISION

    38.     Since 1998, the NYPD School Safety Division has had authority to patrol the buildings and grounds of public schools operated by the New York City Department of Education and to engage in policing activities with respect to those schools.  The School Safety Division includes nearly 200 uniformed police officers assigned to patrol public schools who carry handguns, nightsticks, and other weapons during the course of their normal duties at schools.  In addition, the NYPD School Safety Division includes over 5,000 School Safety Officers assigned to patrol specific school sites.  Upon information and belief, the NYPD School Safety Division assigns

between three and eight School Safety Officers to each New York City public middle school and high school.

39.     School Safety Officers wear NYPD-issued uniforms and, as peace officers, maintain full authority to stop, frisk, detain, question, search, and arrest individuals both on and off school grounds.  School Safety Officers do not carry firearms, but they do carry handcuffs.

40.     Unlike other NYPD police officers who ordinarily receive six months of training prior to being deployed to city streets, School Safety Officers receive only fourteen weeks of training prior to being deployed to New York City public schools.

41.     Job qualifications for School Safety Officers differ from those for other NYPD police officers as well.  Unlike other NYPD police officers, School Safety Officers are not required to have at least sixty hours of college credit or at least two years of military service to qualify.  Upon information and belief, School Safety Officers are also subjected to less rigorous medical, psychological, and character screenings than other NYPD police officers.  The base salary for School Safety Officers is $30,057.  In contrast, the base salary for other NYPD police officers is $44,744, and many NYPD police officers earn a great deal more.

42.     According to testimony submitted to the New York City Council by Gregory Floyd, the president of the union representing all School Safety Officers, School Safety Officers who are injured on the job, unlike other NYPD officers, are not eligible for disability insurance coverage.  Rather, they are required to use their sick leave and vacation days, unless and until they obtain a favorable ruling from a

compensation hearing; such rulings typically are not made until a year and a half after an injury is sustained.

43.     Notwithstanding these differences, all members of the NYPD School Safety Division, including School Safety Officers, are law enforcement officers.  They are not employees of the New York City Department of Education, nor are they educators.  Principals and school administrators have no authority over School Safety Officers and have repeatedly informed parents of this.  Underscoring this fact, there have been a number of highly publicized incidents in which school principals and/or teachers were arrested for attempting to protect their students from abuses by members of the NYPD.

44.     For example, on October 9, 2007, a student at East Side Community High School in Manhattan, who was trying to enter school early to catch up on schoolwork, became involved in an altercation with a School Safety Officer who refused her entry.  The School Safety Officer decided to arrest the student and parade her in handcuffs out of the school's main entrance in front of other students who were gathering to enter the building to start the school day.  The school principal, concerned that such a display would be disruptive to other students and unnecessarily degrading to the arrested girl, argued that the School Safety Officer should escort the girl out of the building through a side door rather than the front door.

45.     In response, the School Safety Officer arrested the principal and charged him with obstruction of governmental administration and resisting arrest. Unsurprisingly, the judge who heard these charges ultimately dismissed them, observing:  "Unfortunately, this incident highlights the tension between school

14

administrators and the NYPD concerning a principal's authority in overseeing school premises. Further, this incident highlights the need to exercise sensitivity in effectuating student arrests." This incident was widely reported in the media, including by the *New York Daily News*, the *Village Voice*, the *New York Post*, and the *New York Times*.

46.     Similarly, on March 8, 2005, police personnel arrested two teachers from the New School for Arts and Sciences in the Bronx and charged them with disorderly conduct. The incident began with a fight between two students; the police were summoned, but by the time they arrived, the students had been separated and order had been restored. Nonetheless, the officers began directing abusive language at the teachers and tried to arrest one of the students. When the teachers objected to the officers' conduct, the officers arrested the teachers as well as the students. In March 2007, the City paid $60,002 to settle a civil lawsuit brought by the two teachers alleging unlawful arrest. This incident was widely reported in the media, including by the *New York Times* and the *New York Post*.

47.     In early February 2005, a School Safety Officer arrested the principal of the Bronx Guild High School for purportedly interfering with the School Safety Officer's attempt to arrest a student. According to accounts of the incident, the School Safety Officer barged into a classroom, without prior notice to the principal or classroom teacher, to arrest a student who had made a loud statement in the hallway. The principal and a school aide intervened to protect the student and were charged with second-degree assault and obstruction of governmental administration. The student missed almost two months of school as a result of the incident and ultimately

transferred to a different school.  The charges against the principal were later dropped, and the School Safety Officer was temporarily reassigned to another public school site.  This incident also gained wide media coverage, including in the *New York Times*, the *New York Daily News*, *Newsday*, and the *New York Post*.

<u>**FACTS RELATING TO THE CLASS REPRESENTATIVES**</u>

<u>D.Y.</u>

48.     During the 2009-2010 school year, Plaintiff D.Y. was enrolled in the 8th grade at the Lou Gehrig School in the Bronx when she was unlawfully arrested and physically assaulted by School Safety Officers at the school.

49.     At around 8:30 a.m. on October 7, 2009, when D.Y. was thirteen years old, D.Y.'s mother dropped off D.Y. and two friends across the street from the school.  As the three girls were approaching the school entrance, two adults they did not know began threatening them.  Frightened, D.Y. sent her mother a text message, asking her mother to return to the school.

50.     A School Safety Officer observed the threats from the two adults and instructed them and the girls to go into the school building.  The adults entered the building, but the girls were afraid to follow them.  D.Y. said that she did not want to enter the building, but rather that she would wait for her mother.

51.     When D.Y. refused to enter the school building, the School Safety Officer grabbed D.Y.'s arm and twisted it painfully.  A second School Safety Officer arrived and painfully twisted D.Y.'s other arm.  D.Y. reflexively tried to pull her arms towards her and asked the School Safety Officers to let her go.  In response to this entreaty from D.Y.—a thirteen-year-old girl whose arms were being restrained by two

adults—the first School Safety Officer spoke into his hand-held radio saying, "We need back-up."

52.     A third School Safety Officer then came out of the building and took one of D.Y.'s arms from the second School Safety Officer.  The third School Safety Officer stated "These little girls think they're all grown," and pushed D.Y. into a nearby gate.

53.     The first School Safety Officer told the School Safety Officer who had just arrived on the scene to "put handcuffs on her."  This latter School Safety Officer pulled D.Y.'s arms behind D.Y.'s back and fastened handcuffs to D.Y.'s wrists.

54.     The School Safety Officers then brought D.Y. into the school building. As they entered the building, the School Safety Officer who had handcuffed D.Y. tripped D.Y. with her foot, causing D.Y. to fall stomach-first onto the floor.  The School Safety Officer then put her knee on D.Y.'s back, while simultaneously yelling at D.Y. to "get up."

55.     After allowing D.Y. to get to her feet, the School Safety Officer brought D.Y. into the school's security office and forcibly threw her into a seat at a desk.  D.Y. sat there in handcuffs.

56.     When D.Y.'s mother arrived at the school at approximately 9:30 a.m., she encountered the School Safety Officer who had radioed for "back-up" and asked to see her daughter.  The School Safety Officer refused and sent D.Y.'s mother to the school office.  Eventually, D.Y.'s mother was allowed to go to the school security office where she found her daughter still handcuffed.  It was only at this point—and at the request of D.Y.'s mother—that D.Y.'s handcuffs were removed, approximately an

hour after they had been applied.  D.Y. was released from school and went home with her mother.

57.     Although School Safety Officers had told D.Y.'s mother that D.Y. would face a disorderly conduct charge, no charges were ever filed against D.Y.

58.     D.Y. required medical treatment for stomach and back pains sustained as a result of the assault.

59.     Following the incident, the School Safety Officers continued to harass and engage in menacing behavior toward D.Y.  One of the School Safety Officers involved in the original incident gave D.Y. intimidating looks in the hallways of the school on several occasions.  One of the other School Safety Officers shoved D.Y. in front of the school on several occasions.

60.     Even in her new school, the Urban Assembly School for Wildlife Conservation, D.Y. continues to fear that the School Safety Officers will assault or arrest her.

Nicholas Cruz-Carasquillo

61.     On November 25, 2009, Nicholas C. was thirteen years old and enrolled in the 8th grade at the Urban Assembly School for Wildlife Conservation in the Bronx when he was assaulted and unlawfully arrested by members of the NYPD School Safety Division.

62.     That morning, Nicholas C. and his classmates were lined up in the cafeteria, waiting to go to class.  The school principal told Nicholas C. that he had an in-school suspension for the day.  The principal informed Nicholas C. that he was being suspended for having left the lunchroom without permission the previous day.

63.     Nicholas C. protested that a suspension would be unfair and attempted to leave the cafeteria with the rest of his classmates.  The principal blocked Nicholas C.'s path.  Nicholas C. attempted to go through a different set of doors to get to his classroom, but the principal again blocked his path.  The principal then sent a staff member to summon a School Safety Officer.

64.     A School Safety Officer arrived and immediately grabbed Nicholas C. by the hood of his sweatshirt.  Nicholas C. asked to be let go.

65.     While pulling Nicholas C.'s sweatshirt—which caused the sweatshirt to tear—the School Safety Officer repeatedly said that if Nicholas C. did not calm down she would not release him.  Nicholas C. replied that it would be difficult to stay calm while the School Safety Officer was grabbing him.  Nicholas C. also told the School Safety Officer that he would go with the principal to serve the suspension if she would let him go.

66.     The School Safety Officer refused to release Nicholas C. and told Nicholas C. that she would let go when she was "good and ready."  She pushed him against a wall and asked that a second School Safety Officer be summoned.

67.     A second School Safety Officer arrived.  The first School Safety Officer pushed Nicholas C. against the wall a second time.  Nicholas C.'s head was cut and bleeding.

68.     The second School Safety Officer also grabbed Nicholas C.  Nicholas C. tried to move away and the first School Safety Officer pushed him against the wall for a third time.  While Nicholas C. was being held against the wall by both School Safety

Officers, the first School Safety Officer punched Nicholas C. in the face and struck him in the groin with her knee.

69.     The School Safety Officers then brought Nicholas C. to the ground.  The second School Safety Officer squeezed her legs tightly around Nicholas C.'s waist. Nicholas C. attempted to crawl away and the second School Safety Officer then sat on his back.  The first School Safety Officer jammed her knee into Nicholas C.'s right shoulder.  After a few minutes, the second School Safety Officer got up, but the first School Safety Officer continued to press her knee against Nicholas C.'s shoulder. Nicholas C. told the School Safety Officers that he had chronic asthma and was experiencing chest pains.  Nonetheless, the first School Safety Officer did not immediately get off of Nicholas C.  Nicholas C. was crying and pleading with the principal to call his mother.

70.     Several other School Safety Officers arrived.  One told Nicholas C. to put his hands behind his back, which Nicholas C. did.  The School Safety Officers handcuffed Nicholas C. and took him to a small room at the school before transporting him to a local precinct.

71.     Once at the precinct, Nicholas C. was taken into a small office and handcuffed to a metal bar for over two hours.  Nicholas C. was never given Miranda warnings or offered any medical attention by the police.  No charges were filed and no legal process was instituted against Nicholas C.

72.     After being handcuffed for over two hours, Nicholas C. was released to his mother.  Upon seeing that her son was injured and his clothes torn, Nicholas C.'s mother immediately demanded to speak to the School Safety Officers' supervisor.  She

was told that the supervisor was on vacation and that she would have to speak to a different supervisor.  When the other supervisor arrived, Nicholas C.'s mother lodged a verbal complaint.

73.     While waiting for the supervisor, Nicholas C.'s mother had been approached by a police officer who expressed concern about the way Nicholas C. had been treated.  This police officer gave Nicholas C.'s mother a phone number for the NYPD Internal Affairs Bureau (IAB) to report the mistreatment.  Nicholas C.'s mother called the IAB and spoke to an officer who asked whether Nicholas C. was hurt, and called an ambulance for Nicholas C.  Nicholas C. and his mother were eventually transported to the hospital by the ambulance.  A police captain spoke to Nicholas C.'s mother at the hospital about the incident.

74.     Also at the hospital, Nicholas C.'s wounds were treated by a doctor. These wounds included the cut to Nicholas C.'s head as well as bruises to his wrists.

75.     Following the incident, Nicholas C. experienced back pain and headaches.  He avoided the School Safety Officers at school and worried that he might be assaulted by them again in the future.

Destiny Bruno

76.     On December 8, 2008, Destiny Bruno was fourteen years old and in the 9th grade at Maxwell High School in Brooklyn when members of the NYPD School Safety Division physically assaulted and unlawfully arrested her.

77.     Every day, students at Maxwell High School are required to pass through metal detectors and to put their school bags through scanners that are staffed by School Safety Officers.

78.     At approximately 7:00 a.m. on December 8, 2008, Destiny arrived at school, put her book bag through the scanner, and walked through the metal detector. Initially her coat set the metal detector off, but after she removed her coat and placed it through the scanner, the metal detector did not sound when she walked through again. Both her book bag and her coat cleared the scanner.

79.     Satisfied that Destiny was not carrying any contraband, a School Safety Officer instructed Destiny to proceed to class.

80.     Destiny went to retrieve her book bag from the scanner.  However, at that moment, a second School Safety Officer, Sergeant Downing-Lee (known to students as Officer "Base") grabbed the book bag and tried to pull it away from Destiny without explanation.  Destiny held on to her book bag, and a tugging match ensued between Destiny and Sergeant Downing-Lee.

81.     Because Destiny's book bag had cleared the scanner, there was no reason to suspect that it contained any contraband or other suspicious items.

82.     Nonetheless, Sergeant Downing-Lee and a third School Safety Officer, Defendant Takasha Edmond, began to push Destiny out of the building.

83.     As Destiny was being forcibly, and for no apparent reason, ejected from the school building, she demanded her coat.

84.     Sergeant Downing-Lee, who had been pushing Destiny toward the door, shoved the coat in Destiny's face.  Destiny pushed her away.

85.     Sergeant Downing-Lee grabbed Destiny by the hair, and a physical altercation ensued between the then fourteen-year-old Destiny on the one hand and Sergeant Downing-Lee and School Safety Officer Edmond on the other.  During the

course of this altercation, Destiny was punched approximately seven times on the left side of her head.  Destiny was then placed in a headlock, handcuffed, and arrested.  Her bag, the strap of which had fallen around her neck, was pulling on her neck and choking her with its weight.  Destiny's requests that the strap be removed were ignored.

86.     Destiny was then taken to the dean's office to await transport to the local police precinct.  Destiny's mother, who had been informed of the situation by the dean, came to the school and saw Destiny in handcuffs in the dean's office.  Once the police arrived, Destiny was taken to the police precinct and charged with assault and trespass. Destiny's mother followed the police to the precinct, but was not allowed to see or speak to Destiny.  While at the precinct, Destiny's mother called 911 for medical assistance.

87.     Despite the fact that Destiny was physically injured, the police did not initially permit Destiny to go to the hospital.  In fact, it was only after Destiny's mother called 911 that EMTs arrived and determined that Destiny needed to go to the hospital. Destiny was then taken by ambulance from the precinct to the hospital, where she received medical treatment.  At the hospital, a School Safety Officer barred Destiny's mother from sitting with Destiny while Destiny received medical attention, threatening Destiny's mother with arrest if she violated this command.

88.     Destiny was then taken to Bridges Juvenile Center, where she was detained overnight.  For the first time since she left for school that morning, Destiny was finally able to speak with her mother, though it was over the phone.

89.     City officials permanently closed the Bridges Juvenile Center,
previously known as Spofford Juvenile Center, on March 30, 2011, due to subpar
conditions, dilapidated facilities, and inadequate resources.

90.     The charges against Destiny were eventually dismissed.  She entered
into Adjustment Services, a probation program designed to divert juveniles from the
criminal justice system, without ever seeing a judge.  A school discipline charge
accusing Destiny of injuring Sergeant Downing-Lee was dropped due to a lack of
evidence.  Destiny's probation officer released her from the Adjustment Services
program.

91.     As a result of the incident, Destiny suffered from headaches, nose
bleeds, neck and back pain, and anxiety.  She had difficulty sleeping and often slept
with her mother.

92.     Destiny and her mother filed a notice of claim with the Comptroller of
the City of New York with respect to this incident on March 3, 2009.  More than thirty
days have elapsed since service of that filing, and the City has made no attempt to
adjust or pay the claim.

93.     Destiny's mother filed a complaint against Defendants Downing-Lee
and Edmond with the NYPD in January 2009 concerning the seizure of, and the use of
force against Destiny.  The School Safety Division Investigations Unit was charged
with investigating the complaint.

94.     The NYPD officer assigned to investigate the case, an Assistant Integrity
Control Officer assigned to Patrol Borough Brooklyn North, interviewed Destiny's
mother, Defendants Downing-Lee and Edmond, and another witness, and reviewed

several documents, including the written statement of the assistant principal at
Destiny's school concerning the incident.  The investigator did not interview Destiny or
any students who witnessed the incident.  Upon information and belief, the investigator
did not review significant pieces of evidence concerning the incident, including
surveillance video footage of the scanning area where Destiny was assaulted and the
transcript of Destiny's suspension hearing where witnesses offered testimony
concerning the events leading to Destiny's seizure.

95.     At the suspension hearing, a dean and assistant principal testified.  The
suspension hearing officer deemed the assistant principal's testimony not credible
because he was "non-responsive, defensive, and his testimony was inconsistent with
other credible testimony."  The hearing officer therefore disregarded the assistant
principal's testimony.  The dean's testimony at the hearing conflicted with his written
statement.  Although his written statement indicated that he had seen the entire incident,
he admitted that he had not actually seen the entire incident at the hearing.  The assault
charge against Destiny at the suspension hearing was dismissed.

96.     Without reviewing this testimony or the surveillance video, or
interviewing Destiny or other witnesses, the NYPD Assistant Integrity Control Officer
who investigated the complaint against Defendants Downing-Lee and Edmond found
the claims unsubstantiated.  Defendants Downing-Lee and Edmond have not been
disciplined in connection with Destiny's seizure and assault.

97.     Following the incident, Sergeant Downing-Lee harassed Destiny by
making taunting noises, beating her hand on a desk when Destiny passed her, and
singling out Destiny for additional security checks and invasive scanning.  On one

occasion, while Destiny waited for the elevator by the security desk, Sergeant

Downing-Lee threatened Destiny and other students standing nearby that she would

kick them out of school if they did not leave the hallway.

Lameak Williams

      98.    On October 28, 2008, Lameak Williams was sixteen years old and

enrolled in the 10th grade at Hillcrest High School, when he was physically beaten and

unlawfully arrested by School Safety Officers.

      99.    During gym class, a classmate asked Lameak to pass a cell phone to

another classmate, which Lameak did.  Possession of a cell phone is a violation of

school rules, but not a violation of the criminal law.

      100.    The gym teacher observed the transfer of the cell phone and summoned

school officials.  The school officials escorted Lameak to the dean's office.

      101.    After Lameak arrived at the dean's office, three School Safety Officers,

Kevin Mayes, Gregory Richardson, and David Harrison, entered the office.

      102.    School Safety Officer Mayes informed Lameak that he had to be

searched.  No school officials were present at the time.

      103.    Lameak stated that he did not have a cell phone.  He shook out his shirt

and gym shorts to demonstrate that he did not have a cell phone or other contraband

and stated that he did not want the three School Safety Officers laying their hands on

him.

      104.    School Safety Officer Mayes insisted that Lameak would need to be

searched and began to put on rubber gloves.

105.     School Safety Officer Mayes then pushed Lameak into a storage room, grabbed Lameak's arm and shirt, swung at Lameak, and threw Lameak to the ground.

106.     School Safety Officer Mayes punched Lameak more than five times, including on his forehead, right eye, and right ear.  Lameak's face was swollen, and he was bleeding and spitting up blood.

107.     The School Safety Officers picked Lameak up from the ground, handcuffed him, and threw him back on the floor.  During this time, one of the School Safety Officers poked Lameak in the eye.  The School Safety Officers then removed Lameak's sneakers and searched Lameak's person, finding no cell phone or any other items.  Upon information and belief, School Safety Officers attempted to have Lameak transported to a psychiatric facility for an emergency evaluation.

108.     Approximately twenty minutes later, an ambulance arrived.  Medics immobilized Lameak on a stretcher and put him in a neck brace as precautionary measures to keep him stable.  They then transported Lameak to the hospital.

109.     Upon information and belief, hospital officials declined to conduct a psychiatric evaluation, but instead treated Lameak for his injuries, providing him with pain medication and conducting a CT scan.

110.     Lameak was later charged with disorderly conduct as a result of this incident.  Those charges have since been dismissed.

111.     In the year and a half following the assault on Lameak, the School Safety Division Investigations Unit investigated at least three complaints against the School Safety Officers who attacked Lameak.  The School Safety Division Investigations Unit investigated a complaint from a student at a high school in Queens

who alleged that in 2009, School Safety Officer Mayes grabbed him by the arm and backpack, and threw him towards a stage and some industrial fans.  The same year, an assistant principal at an intermediate school in Queens filed a complaint on behalf of the parents of two male students who accused School Safety Officer Richardson of assaulting their sons inside the boys' bathroom, including poking one in the eye.  A year later, the School Safety Division Investigations Unit investigated a complaint from a student at the same intermediate school in Queens that School Safety Officer Richardson tackled and handcuffed him.  As a result of the attack, that student allegedly sustained injuries to his face.

112.    Lameak served a notice of claim with the Comptroller of the City of New York on January 26, 2009.  More than thirty days have elapsed since service of that filing, and the City has made no attempt to adjust or pay the claim.

113.    On October 29, 2008, Lameak's mother filed a complaint with the IAB regarding the incident.  The investigation identified numerous other complaints that were filed against Schools Safety Officers Mayes and Harrison, and the pending complaints were consolidated.  Throughout the nearly three years that the investigation was pending, the Defendants Mayes, Harrison, and Richardson continued to work in New York City public schools and were exposed to schoolchildren.  During that time, students continued to file complaints against the Defendants Mayes, Harrison, and Richardson, including two of the complaints described *supra* Paragraph 111.

114.    A School Safety Division supervisor who was interviewed during the investigation into Lameak's case determined that the School Safety Officers "did not follow proper procedures" and their "actions may have escalated the incident."

28

115.    Despite considerable evidence that Defendants Mayes, Harrison, and Richardson had used excessive force against Lameak and other students, City-Defendants did not discipline the School Safety Officers or penalize them for impermissible conduct.  The IAB determined that Lameak's complaint was unsubstantiated and took no further action.

Nicholas Sutton

116.    On October 25, 2010, Nicholas S. was fifteen years old and enrolled in the 9th grade at the High School for Global Citizenship in Brooklyn when he was physically assaulted and unlawfully detained by School Safety Officers.

117.    At approximately 8:15 that morning, a school administrator approached Nicholas S. and a female student in the cafeteria and accused Nicholas S. of stealing the female student's hat.  Although both Nicholas S. and the female student informed the school administrator that the hat belonged to Nicholas S., the administrator continued to assert that Nicholas S. had taken the hat.

118.    Nicholas S. began walking to class to avoid being late, but the administrator stood in front of him and blocked his path with her arms.  When Nicholas S. tried to walk around her, the administrator raised her finger, aggressively pointed it in his face, and yelled at him.  When Nicholas S. asked her to remove her hand and then shielded his face from her finger, the administrator accused him of pushing her.  The administrator then summoned School Safety Officer Joanna Baptiste and told her that Nicholas S. had stolen a hat and pushed the administrator.

119.     Nicholas S. insisted that he had not stolen the hat and that he had to go to class or he would be late.  The administrator, along with School Safety Officer Baptiste and a dean who had responded to the administrator's call, ignored his pleas.

120.     A nearby student witnessed this interaction and intervened.  The student pulled Nicholas S. away from School Safety Officer Baptiste and the others and toward the corner of the cafeteria.  As the two students backed away from the scene, five adults, including School Safety Officer Baptiste and two other School Safety Officers, followed them into a corner of the cafeteria.  One of the School Safety Officers then pushed the other student away from the crowd of School Safety Officers and administrators surrounding Nicholas S.

121.     As the group converged on Nicholas S., School Safety Officer Baptiste yelled at Nicholas S. and shoved him in the chest with both hands, causing him to stumble backwards.  When Nicholas S. tried to regain his balance, School Safety Officer Baptiste accused him of aggressively threatening and pushing her.

122.     Other School Safety Officers ran over, and the group of adults cornered Nicholas S.

123.     Nicholas S. backed into the corner to avoid being hurt, but two of the School Safety Officers grabbed his arms and began twisting them behind him.

124.     Nicholas S. tried to explain to School Safety Officer Jordan that he had not done anything wrong.  School Safety Officer Jordan told Nicholas S. that it would be "easier" if he allowed the School Safety Officers to handcuff him, so Nicholas S. allowed School Safety Officer Jordan to place handcuffs on him.

125.     School Safety Officer Jordan dragged Nicholas S. across the back area of the cafeteria and through a part of the room that was full of students who stared at Nicholas S. as he was marched out in handcuffs.

126.     School Safety Officer Jordan brought Nicholas S. to a boys' locker room, where Nicholas S. was forced to sit on a metal chair with his arms handcuffed behind his back.  School Safety Officer Jordan left the room and School Safety Officer Baptiste and other School Safety Officers entered.  Nicholas S. sat down and said that the handcuffs were too tight and were cutting his wrist.  He requested that the handcuffs be removed, but all of the School Safety Officers ignored his appeal.  School Safety Officer Baptiste said the handcuffs were a tool to help Nicholas S. calm down, and that if he stopped moving the handcuffs would not hurt so much.

127.     Nicholas S. started crying because of the pain and embarrassment.  None of the School Safety Officers tried to help him.

128.     Eventually, Nicholas S. stood up next to the chair in an attempt to reduce the pain in his wrist.  One of the School Safety Officers ordered him to return to the chair.  When Nicholas S. explained that standing was less painful than sitting, the School Safety Officer ignored his complaint and ordered him to return to his seat.

129.     Nicholas S.'s mother arrived at the school approximately twenty minutes after Nicholas S. reached the locker room.  Immediately upon arriving at the school, Nicholas S.'s mother was told that her son had acted inappropriately in the cafeteria that morning.  Nicholas S.'s mother responded by asking to see any video footage from the school's surveillance cameras that would have captured the incident, but she was not allowed to do so.

130.    Nicholas S.'s mother stood outside the locker room and pleaded to speak to Nicholas S., but School Safety Officer Baptiste prevented them from speaking. School Safety Officer Baptiste told Nicholas S.'s mother that her son would not be arrested, but that he was going to remain in handcuffs so that he could calm down.

131.    Nicholas S. remained in handcuffs, sitting on a metal chair, crying and asking for his mother, for approximately two and a half hours.  He was eventually released to his mother.  He was not charged with any criminal wrongdoing or issued a summons.

132.    The day after the incident, Nicholas S. sought medical treatment for his swollen wrist.

133.    As a result of this incident, the High School for Global Citizenship charged that Nicholas S. violated the discipline code by using disrespectful language and allegedly pushing an administrator and a School Safety Officer.  Nicholas S. was suspended from school for thirty days and sought a hearing to contest the claims against him.  At the suspension hearing, Nicholas S. and his mother explained that he feared returning to the same school because he was afraid that he would face another assault. Although both Nicholas S. and his mother requested that he be allowed to attend a different school, the hearing officer denied the "safety transfer," a mechanism that is supposed to allow New York City public school students who have been the victim of a violent criminal offense to attend a safe school.

134.    Nicholas S. immediately withdrew from the High School for Global Citizenship due to his and his mother's fears that he would be attacked again by School Safety Officers.  Nicholas S. then enrolled in a G.E.D. program, but became dissatisfied

with the education provided there and decided to reenroll in public school to earn a high school diploma. Nicholas S. is currently enrolled in the W.E.B. Dubois Academic High School.

135. Although Nicholas S. is afraid that School Safety Officers may attack him again and embarrass him in front of his peers, he is committed to finishing high school.

136. Nicholas S.'s mother called 311 to file a complaint about the misconduct of Defendants Baptiste and Jordan shortly after Nicholas S. was seized at school. The operator redirected her to the Civilian Complaint Review Board. Upon information and belief, the complaint was forwarded to the School Safety Division Investigations Unit for investigation. An NYPD investigator called Nicholas S.'s mother and interviewed both Nicholas S. and his mother. Nicholas S.'s mother specifically asked the investigator to review video footage of the incident, including footage that the school had refused to provide. Nicholas S.'s mother attempted to contact the investigator on multiple occasions to ask for the status of the investigation, but the investigator has not returned her phone calls.

137. Upon information and belief, the investigator did not review significant pieces of evidence concerning the incident, including surveillance video footage of the cafeteria where Nicholas S. was seized or the transcript of Nicholas S.'s suspension hearing where Defendant Baptiste and other witnesses offered testimony concerning the events leading to Nicholas S.'s seizure and the seizure itself.

Kion Dickey

138.     Kion Dickey is nineteen years old and, at the time of the incident described herein, was enrolled as a student at the Grace Dodge Career and Technical High School in the Bronx.

139.     Just before 11:30 a.m. on November 28, 2011, Kion and a friend were walking in the stairwell at school discussing, arguably in disparaging terms, the increased presence of armed NYPD police officers in the building.

140.     School Safety Division Police Officer Ron Ebreo overheard the private conversation between the boys and confronted Kion when the two boys exited the stairwell.  Officer Ebreo demanded that Kion repeat his statement and then threatened Kion that he would punch him "in the fucking mouth."  Kion responded that Officer Ebreo could not touch him and began to walk down the hallway.

141.     Officer Ebreo followed Kion while a School Safety Officer told other students who were gathering to back away.  Shortly thereafter, Officer Ebreo positioned himself in the hallway to face Kion.  As a crowd of students gathered, Officer Ebreo began shaking his hands, cracking his neck, and punching his fist in his hand.  Kion believed that Officer Ebreo was preparing for a fight.  Kion asked him what he was doing.

142.     Officer Ebreo charged Kion and pinned him to the wall, twisting both his arms painfully behind his back.  Officer Ebreo then grabbed Kion's sweatshirt and dragged Kion down the hallway until his sweatshirt came off over his head.  At that point, Officer Ebreo expanded his nightstick and shoved it into Kion's stomach, pushing him into the wall.

34

143.   The School Safety Officer placed Kion in handcuffs and Officer Ebreo began pulling Kion down the stairs by the neck of his shirt, causing the shirt to tear. During the course of dragging Kion down four flights of stairs, Officer Ebreo slammed Kion's head into the stairwell banister, causing it to swell and resulting in a bump.

144.   On the first floor, Kion was taken to the dean's office where three School Safety Officers and three NYPD police officers were waiting.

145.   A School Safety Officer demanded that Kion tell them what happened, but Kion said he would not say anything without his mother present.  Kion had not been given Miranda warnings.  He remained in handcuffs in the office.

146.   After approximately fifteen minutes, Kion was transported to the 48th Precinct in a police van.

147.   Kion remained at the precinct for about three and a half hours.  During that time, he asked to speak to his mother, but was not allowed to do so.

148.   At 4:30 p.m., Kion was transported to Central Booking.  Even after he arrived, Kion was still not told what charges he would face.

149.   Kion remained in a cell in Central Booking overnight.  The next morning at 11:00 a.m., Kion met his attorney, appeared before a judge, and saw his mother for the first time since he was removed from school.  Only then did Kion learn that he was charged with resisting arrest and harassment in the second degree.  Kion was released to his mother.

150.   The day after his release, Kion sought medical attention for a bump on his head, bruised and swollen wrists from the handcuffs, and a sore shoulder.

151.    After his release, Kion returned to school.  School officials did not seek or impose even routine disciplinary action.

152.    Kion encounters Officer Ebreo at his school regularly.  Kion fears that School Safety Officers or School Safety Division police officers will assault him at school or in his neighborhood.

### FACTS RELATING TO ORGANIZATIONAL PLAINTIFF

153.    El Puente seeks to provide information to, and raise the consciousness of, parents and institutions regarding the problems and concerns of youth in New York City.  El Puente also strives to promote the establishment and the ongoing evaluation of community priorities in the service of New York City youth.

154.    To further its mission, El Puente engages in advocacy to reform and improve New York City public schools.  From 2007-2009, El Puente's members mounted a successful advocacy campaign to improve the nutritive value of lunches served in their schools.  In 1990, El Puente led a campaign to reorganize Brooklyn's Eastern District High School—then one of the most violent and over-crowded schools in the City—into several smaller schools that would better address the needs of students.  The campaign was successful and the Eastern District High School building, now the 850 Grand Street Campus, houses three high schools that boast low incident rates and improved graduation rates.  In 1987, El Puente coordinated a thirty-day community boycott of P.S. 16 to protest a wall built in the school hallway for religious purposes, because the wall created a disruptive physical barrier for public school students.  In addition, El Puente supports teachers and administrators in public schools

in creating a supportive educational environment for youth that emphasizes a greater role for administrators in school safety.

155.     El Puente's work to advance school reform is illustrated in the founding of the El Puente Academy for Peace and Justice (the Academy), a public high school with 213 students that is operated by the New York City Department of Education. Following its successful application to a school reform initiative by New Visions for Public Schools (formerly the Fund for New York City Education), El Puente founded the Academy in 1993.  El Puente's vision for the Academy was a small public school where education would emerge from the community.  The Academy has received citywide and national accolades for its excellence in education.  Although El Puente does not operate the Academy, the two institutions work in close collaboration.

156.     El Puente conducts annual training for Academy staff that includes a section on appropriate responses to incidents that implicate student safety and techniques for ensuring student safety in the event of NYPD involvement.  El Puente staff are notified when an El Puente student member has a serious conflict with NYPD School Safety Division personnel.  A member of El Puente's staff typically accompanies El Puente student members who are transported to the police precinct if a parent is not available, and that staff member remains to serve as an advocate for the student.

157.     El Puente operates four Leadership Centers for community and youth development that adopt a holistic approach to promote peace and justice in the community and beyond: the Bushwick Leadership Center, El Puente Leadership Center at Taylor-Wythe Center, El Puente of Williamsburg Leadership Center, and the Beacon

Leadership Center at M.S. 50.  El Puente's mission and programming at the Leadership Centers are geared toward supporting young people in their academic, social, political and personal development, and their membership largely consists of students currently enrolled in public middle schools and high schools.  These members attend various New York City public schools, including J.H.S. 291, Murry Bergtraum High School for Business Careers, J.H.S. 383 Philippa Schuyler, Progress High School for Professional Careers, Academy for Young Writers, and EBC High School for Public Service.

158.    El Puente staff at the Leadership Centers work closely with student members and speak with them about their experiences at school, including interactions with School Safety Division personnel.

159.    El Puente staff at the Bushwick Leadership Center frequently put aside their regular duties to respond to the requests of student members to speak about confrontations with School Safety Division personnel.  This happens with sufficient regularity that Bushwick Leadership Center staff began to organize "Know Your Rights" workshops for El Puente student members that focus on student interactions with police in schools.  The workshops occur at least three times each year.

160.    Bushwick Leadership Center staff have also met with Department of Education personnel at local schools to address concerns about the prominent NYPD presence at schools attended by El Puente members.  On at least a few occasions, staff at El Puente's Bushwick Leadership Center have responded to requests of El Puente student members to help coordinate meetings between students and school principals about confrontations with School Safety Division personnel.  Prior to the meetings, Bushwick Leadership Center staff have assisted student members by helping them

38

develop agendas and select materials for presentation to the school principals.  Staff at the Leadership Center at M.S. 50, a Department of Education "Beacon Program," have also marshaled resources to address violence by School Safety Division personnel against El Puente members.

161.    In one instance, an El Puente student member at a local middle school was physically assaulted at school by School Safety Division personnel.  The Director of the Bushwick Leadership Center met with the member and his mother, individually and together, at least five separate times about the interaction.  Despite the counseling, the student refused to return to school.  The Director wrote a letter to the Department of Education District Officer requesting that the student receive a "safety transfer," discussed *supra*, Paragraph 133, which was ultimately granted.

162.    In 2011, El Puente staff from the M.S. 50 Leadership Center responded when an El Puente student member was handcuffed at school.  M.S. 50 Leadership Center staff, including the Director, attempted to persuade School Safety Division personnel to loosen or remove the handcuffs.  The staff remained with the student, who was scared and had a black eye, until a family member arrived.

163.    Even El Puente's Executive Director has responded to violence by School Safety Division personnel against El Puente members.  On at least two occasions, she has put aside her typical workday duties to respond when El Puente student members have been seized and handcuffed by School Safety Division personnel.

164.    El Puente members are expected to advance the mission of the organization.  After an orientation to El Puente's mission and courses, members are

inducted into the organization in a formal initiation ceremony.  As part of this ceremony, members agree to abide by El Puente's guiding principles and rules of conduct, and acknowledge their rights and responsibilities as members.  Members also receive a Membership Handbook that outlines El Puente's mission and guiding principles.  Membership Coordinators at each Leadership Center work with individual members to ensure their curriculum includes courses in all of El Puente's core areas of arts, education, civic engagement, wellness, and community environmental action.

165.    El Puente members agree to participate in El Puente's various courses and advocacy campaigns as an integral part of membership; however, members also have input into the development of courses and the selection of campaigns.  In this way, El Puente provides a means through which members express their collective views and advance their collective interests.

166.    El Puente staff report that several student members have had or have witnessed altercations with School Safety Officers at their schools that were triggered by non-criminal behavior.  Staff members report that School Safety Officers sometimes taunt students and threaten them with arrest.  As a result, El Puente student members fear they will be victimized by School Safety Officers engaging in unlawful arrests and/or misusing physical force.

**FACTS ESTABLISHING OFFICIAL MUNICIPAL POLICY**

167.    The experiences of the class representatives do not constitute isolated incidents.  Rather, they are part of a larger pattern and practice that exists within the New York City public schools.

168.    Members of the NYPD School Safety Division engage in a pattern and practice of subjecting New York City public middle school and high school students to unlawful seizures and arrests by:  (a) arresting students for minor violations of school rules that do not constitute probable cause of criminal activity, and removing and holding those students off school grounds, often at police precincts; and (b) handcuffing students and detaining them in seclusion rooms in school buildings, for minor violations of school rules that do not constitute probable cause of criminal activity. Students who are arrested are then removed from schools, typically in handcuffs, and held at police precincts, or are transported to hospitals for emergency psychiatric evaluations in the absence of any legitimate cause for such evaluations.  In addition, a significant number of schoolchildren under the age of sixteen have been arrested at school for allegedly having committed non-criminal violations even though such arrests are prohibited by state law.

169.    Members of the NYPD School Safety Division also engage in a pattern and practice of using excessive force against schoolchildren.  Such excessive force includes pushing, shoving, grabbing, punching, and striking students.  In many instances this force is not used pursuant to a lawful arrest, but rather for the purpose of securing compliance with a directive from a School Safety Officer or for other unjustified reasons.  These uses of force often cause injuries to schoolchildren that, in some cases, require medical care or hospitalization.

170.    The challenged conduct by members of the NYPD School Safety Division constitutes official municipal policy.  First, the policy and practice of unlawfully seizing and arresting students for minor school misbehavior that does not

41

amount to probable cause of criminal activity is the official stated policy of the NYPD,
which broadly authorizes law enforcement personnel to remove "unruly" children from
schools.  Second, both challenged policies and practices—the unlawful seizures and
arrests of, as well as the use of excessive force against, schoolchildren—are so
widespread and frequent as to constitute a custom and usage of members of the NYPD
School Safety Division.  Third, City-Defendants were well aware of, yet deliberately
indifferent to, the prevalence of the challenged policies, failing to make meaningful
attempts to improve the training and supervision of members of the NYPD School
Safety Division.  For each of these reasons, the policies and practices here are directly
attributable to City-Defendants.

## **Official Stated Policy**

171.    The policy and practice of unlawfully seizing and arresting
schoolchildren for minor misbehavior that does not establish probable cause of criminal
activity constitutes the official policy of the City, as set forth by Defendant Police
Commissioner Raymond W. Kelly and the former Commanding Officer of the NYPD
School Safety Division, James Secreto, both of whom have or have had final decision-
making authority in these matters.

172.    On June 11, 2007, Defendant Police Commissioner Kelly submitted a
letter to New York City Councilmember Robert Jackson indicating that the duties of
School Safety Officers include "removing unruly students" and "enforc[ing] the rules
and regulations" of the "Student Disciplinary Code."

173.    Likewise, on October 10, 2007, James Secreto, then an Assistant Chief
and the Commanding Officer of the NYPD School Safety Division (and one of

Defendant Conroy's predecessors), submitted a written statement to the New York City Council, stating that School Safety Officers are responsible for "removing unruly" students from public schools.

174.    In this context, the removal of an "unruly" student by members of the NYPD School Safety Division constitutes a seizure and/or an arrest; students are not free to leave once seized and/or arrested, and often they are transported to a local police precinct even when they have done nothing more than arguably violate school rules in a non-criminal matter.  In addition, although neither Defendant Kelly nor former Assistant Chief Secreto further defined the term "unruly," as a matter of logic and plain language, the term encompasses minor misbehavior that does not amount to probable cause of criminal activity.

175.    The concept of taking police action against unruly students has been articulated by Mayor Bloomberg as well.  Specifically, in a December 23, 2003 press release, announcing the creation of the "Impact Schools" program, Mayor Bloomberg stated, "Just as the NYPD has successfully preempted major crimes by paying close attention to areas with frequent minor quality of life offenses, the new school safety plan will focus on areas where there is frequent disorderly behavior, such as cursing or taunting other students, which can create an atmosphere conducive to more serious incidents."

176.    In these ways, the policy and practice of unlawfully seizing and arresting schoolchildren for minor school misbehavior, absent probable cause of criminal activity, constitutes official municipal policy, as articulated by officials with final decision-making authority in these matters.

177.     Pursuant to the NYPD's official policy that permits the removal of "unruly students," NYPD personnel seize—by means of handcuffing or otherwise physically restraining—New York City public schoolchildren in circumstances under which such seizures are barred in schools operated by New York State.  In stark contrast to the NYPD's policy, the state regulation governing the use of physical restraints in state-operated schools explicitly prohibits handcuffing a student unless she poses an imminent physical threat to herself or to others.

178.     Similarly, the NYPD's policy on the removal of "unruly students" violates the New York State law that explicitly bans taking into custody minors under the age of sixteen for non-criminal violations.

### Custom and Usage

179.     The experiences of the eight class representatives are by no means unique or anomalous.  Rather, they are representative of widespread and frequent actions by members of the NYPD School Safety Division.  They occur as part of a larger pattern and practice of unlawfully seizing and arresting students absent probable cause and of using excessive force against schoolchildren, which is so prevalent as to amount to a custom and usage of City-Defendants.

180.     According to the NYPD's own statistics, from October 1, 2011, through December 31, 2011, School Safety Division officers made 279 arrests and issued 532 summonses at schools.  Disorderly conduct, graffiti, obstruction of governmental administration, or resisting arrest was the top charge in more than 20 percent of the arrests, and disorderly conduct charges accounted for 63 percent of all of the summonses.

181.    The existence of this custom and usage is underscored by reference to the remarkable number of complaints that are filed against School Safety Officers.  On June 11, 2007, Defendant Police Commissioner Kelly reported to New York City Councilmember Robert Jackson in a letter that, since 2002, the City had received 2,670 complaints against School Safety Officers, an average of 500 per year.  Assuming that there were between 4,000 and 5,000 School Safety Officers employed during this period, these figures indicate that one complaint had been filed for every eight to ten School Safety Officers per year.  Moreover, Defendant Police Commissioner Kelly noted in the letter that 27 percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against regular NYPD police officers.

182.    More recently, on November 10, 2009, James Secreto, then an Assistant Chief and Commanding Officer of the NYPD School Safety Division, testified before the New York City Council that during the 2008 calendar year, there had been 1,159 complaints filed against School Safety Officers.  This figure represents a staggering rate of almost one complaint for every four School Safety Officers.  Former Assistant Chief Secreto further explained that 15 percent of these complaints alleged excessive force, abuse of authority, discourtesy, or offensive language by School Safety Officers.

183.    Moreover, upon information and belief, these figures vastly underestimate the number of complaints that could have been lodged against School Safety Officers.  As stated during a New York City Council hearing on the NYPD School Safety Division held in 2007, and as set forth in a report published by the New York Civil Liberties Union and the American Civil Liberties Union submitted to City-

45

Defendants in 2007, many parents have been given improper information as to how to file a complaint regarding the conduct of a School Safety Officer.  For example, the report documents confusion among 311 operators, who directed calls to the Department of Education rather than the NYPD.

184.    Kathleen Nolan, an urban education expert and Princeton University lecturer, undertook an intensive study of disciplinary practices at a Bronx high school during the 2004-2005 school year.  Nolan's findings underscore the frequency with which School Safety Division personnel respond to mere violations of school rules by seizing students, including by means of handcuffing.  In the course of her research, Nolan spent approximately five hours per day at the school, several days per week, during which time she observed interactions among students and School Safety Division personnel in the school's hallways, cafeteria, deans' office, and detention room.  Nolan published her findings in a 2011 book, *Police in the Hallways: Discipline in an Urban High School*.

185.    Nolan concluded that low-level infractions of the Department of Education's Discipline Code, particularly a student's insubordination during an exchange with an adult, often led to police intervention.   She also concluded that "the issuance of a summons or an arrest for disorderly conduct appeared to be justified in the eyes of law-enforcement officials and deans by a student's display of 'irate,' 'insubordinate,' 'disrespectful,' 'uncooperative,' or 'uncontrollable' behavior."

186.    Nolan frequently observed School Safety Division personnel escort handcuffed students to the deans' office.  She also witnessed School Safety Division

personnel "rounding up" all students who were in close proximity of lunchroom fights, even if they were simply bystanders.

187.    To explore these issues systematically, Nolan reviewed all reports for the school entered into the Department of Education's Online Occurrence Reporting System (OORS reports) for the 2004-2005 school year.  In general, OORS reports are generated in connection with serious incidents in schools.  Of the 221 OORS reports Nolan reviewed, 52 percent concerned "disorderly conduct."

188.    The additional incidents described below underscore the systematic nature of the abuses suffered by schoolchildren in New York City public schools and provided City-Defendants with notice of the ongoing practices challenged here.

A.T.

189.    A.T. was subjected to an unlawful seizure and severely beaten by School Safety Officers when he was enrolled in the 11th grade at the High School for Law Enforcement and Public Safety in Queens.

190.    On November 5, 2008, A.T. was using a restroom in the school locker room between classes.  As he exited, two School Safety Officers ordered him to stop for no stated or apparent reason.  A.T. continued walking, explaining that he was going to his next class.  One of the School Safety Officers yelled that A.T. was being "disrespectful," and walked in front of A.T., putting his hand against A.T.'s chest.  A.T. told the School Safety Officer not to touch him and tried to walk around the School Safety Officer.  The School Safety Officer immediately pushed A.T. against the wall, stating, "Oh I see.  I have to teach you some respect."  He then said that A.T. was "little" and "weak."

191.    The School Safety Officer, an adult male weighing approximately 200 pounds, grabbed A.T., saying that he was going to "teach him a lesson."  A second School Safety Officer—a woman—hit A.T. in the head several times.  At that point, the male School Safety Officer put his foot behind A.T. and caused A.T. to fall to the ground before falling on top of A.T.

192.    The female School Safety Officer handcuffed A.T.'s right hand, but could not cuff the left hand, which was pinned under the weight of the 200-pound male School Safety Officer.  When A.T. attempted to free his left hand, the female School Safety Officer banged A.T.'s head repeatedly on the floor.  She then handcuffed A.T.'s left hand.

193.    A third School Safety Officer, who had been summoned, picked A.T. up from the floor, and began banging A.T.'s body against the wall, stating, "You hit my man.  You hit my friend."

194.    The School Safety Officers transported A.T. to the principal's office in an elevator.  In the elevator, the third School Safety Officer shoved A.T.'s body against the elevator wall.

195.    A.T. was held in the principal's office for several hours before being allowed to go home by himself.

196.    The School Safety Officers charged A.T. with disorderly conduct, although upon information and belief, those charges have been dismissed.

197.    As a result of this incident, A.T. was treated at a hospital for bruises sustained on the right side of his forehead, his cheek, and his hip, and for his swollen wrists.  He subsequently transferred to another school.

48

198.    A.T.'s mother filed a complaint regarding the incident with the IAB of the NYPD and met with IAB personnel.  Upon information and belief, the IAB has taken no further action to investigate the incident or discipline the offending School Safety Officers.

M.D.

199.    M.D. was sixteen years old and enrolled in the 10th grade at the Urban Assembly School for Applied Math and Science in the Bronx, when, towards the end of the 2008-2009 school year, he witnessed a thirteen-year-old female student in an argument with the school principal in the cafeteria.  A School Safety Officer assigned to the school overheard the argument as well and immediately grabbed the thirteen-year-old girl by the throat and pushed her against a wall.  The School Safety Officer threatened to place the girl in handcuffs if she tried to move or speak.  When the principal attempted to intervene, the School Safety Officer threatened to handcuff the principal as well.  The incident happened during a lunch period when the cafeteria was full of students.  According to M.D., the girl involved in the incident subsequently transferred to another school.

200.    In the winter of the previous school year, M.D. witnessed another incident between a different School Safety Officer and a 9th grade classmate.  The student had attempted to re-enter the school building shortly after school ended to retrieve a hat.  The School Safety Officer refused to permit the student to re-enter the building, resulting in a verbal exchange.  The School Safety Officer then challenged the student to a physical fight, throwing down his hands in an aggressive stance and asking

49

the student "Do you want to go at it?"  Two other students were able to defuse the situation by taking the student out of the building with them.

B.E.

201.    B.E. was seventeen years old and enrolled in the 11th grade at Samuel J. Tilden High School in Brooklyn when he was severely beaten by the School Safety Officers assigned to his school.

202.    On January 12, 2007, B.E. stayed late after his math class to speak with his teacher about additional work assignments.  In the hallway on the way to his next class, the assistant principal ordered B.E. to proceed to detention for being late.  When B.E. tried to explain the reason he was late, the assistant principal summoned an armed NYPD police officer.

203.    The officer immediately grabbed B.E., hit B.E.'s head against a brick wall, and sprayed B.E. with mace.  The officer handcuffed B.E. and summoned six additional officers, including both School Safety Officers and armed police officers.

204.    B.E. was arrested and transported to a hospital for treatment of his injuries.  He was then transported to the local precinct, where he spent approximately seven-and-a-half hours, and then to Central Booking, where he spent approximately nineteen hours.  He was charged with five criminal offenses, for which he received three days of community service and probation.  He was also suspended from school for five days, although, after an appeal, the New York City Department of Education expunged the suspension from B.E.'s records.

205.     This incident was reported in the *Village Voice* and documented in a report titled "Criminalizing the Classroom:  The Over-Policing of New York City Schools," described *infra* Paragraphs 256-60.

A.P.

206.     On October 10, 2007, A.P. testified before the New York City Council that on March 30, 2007, a 300-pound School Safety Officer physically assaulted him. He was twelve years old and enrolled in I.S. 291 in Brooklyn at the time.

207.     A.P. stated that he had been in the hallway during class time, when the School Safety Officer approached him, pushed him, and demanded his identification. A.P. complied, but the School Safety Officer continued to abuse him verbally and then shoved A.P. into lockers.  When A.P. pushed back, other School Safety Officers intervened and placed A.P.'s left hand in handcuffs.  The first School Safety Officer then punched A.P. in the chest.  A.P. hit the School Safety Officer's back with his remaining free hand and the other School Safety Officers immediately cuffed that hand as well.  Once both of A.P.'s hands were in handcuffs, the first School Safety Officer punched A.P. in the face, creating a laceration that resulted in significant bleeding.

208.     A.P. was charged with assaulting an officer, taken to the local precinct, and held over the weekend.  After a full trial, all charges against him were dismissed.

209.     When A.P.'s father went to the precinct to file a complaint against the School Safety Officer, the police refused to accept his complaint.  A.P.'s mother subsequently managed to lodge a formal complaint about the incident with the IAB, but that agency never responded.  As a result of the incident, A.P. transferred to a different school.

<u>C.S.</u>

210.    On November 10, 2009, C.S., then a sixteen-year-old senior at Bushwick School for Social Justice in Brooklyn, testified before the New York City Council about two unlawful seizures that she had suffered at the hands of School Safety Officers.  She testified that on one occasion, a School Safety Officer assigned to her school handcuffed her to a chair after she had a verbal argument with a classmate.

211.    On another occasion, when C.S. was a freshman, she activated the metal detector at the entrance of the school because she had bobby pins in her hair.  Three School Safety Officers escorted C.S. into a bathroom and instructed all of the other girls in the bathroom to leave.  A School Safety Officer then required C.S. to submit to an invasive search during which a metal detector wand was placed against C.S.'s skin under her bra, purportedly to ensure that she was not hiding a razor, cell phone, or iPod between her bra and her body.  In testimony, C.S. stated, "Every day I go to school and I face being harassed, pushed, shoved, yelled at, disrespected and illegally searched."  She continued, "I thought the School Safety Officers are supposed to keep me safe, but all they implement is fear."

<u>K.W.</u>

212.    On January 14, 2010, K.W. was fourteen years old and enrolled in the 8th grade at the William A. Morris School (I.S. 61) in Staten Island.  He was assaulted and unlawfully arrested by members of the NYPD School Safety Division.

213.    At about 12:30 p.m. that day, K.W. was on the playground during recess when he saw a friend being escorted into the school building by a School Safety

Officer.  K.W. followed his friend into the building and ultimately into the dean's office.

214.    K.W. knocked on the half-open office door and asked the School Safety Officer what was happening.  The School Safety Officer told K.W. it was "none of [his] business."  The School Safety Officer then partially closed the door on K.W., catching K.W.'s body between the door and its frame.

215.    As K.W. walked away, he muttered an insult to the School Safety Officer, and the School Safety Officer grabbed K.W. from behind by the jacket and put his right forearm into K.W.'s throat, pushing K.W. against the wall.  K.W. pushed the School Safety Officer's hands away from him.

216.    A second School Safety Officer grabbed K.W. by the arm.  The first School Safety Officer then handcuffed K.W. and sat him in a chair.  Approximately four more School Safety Officers entered the room.  The School Safety Officers searched K.W. by going through his pockets and removing his shoes before putting him back in the chair.  The School Safety Officers then brought K.W., still in handcuffs, into another room and left him there for approximately forty-five minutes.

217.    At about 2:30 p.m., School Safety Officers drove K.W. to the local precinct.  At the precinct, K.W. was taken to a back room and made to sit on a bench, still in handcuffs, for about four hours.  He was driven to the Bridges Juvenile Center at approximately 8:00 p.m.  Only there did the officers remove K.W.'s handcuffs before searching him and putting him in a cell.

218.    The next day K.W. was taken to Family Court, where he saw a probation officer and entered the Adjustment Services program.  He was given two months probation.

Legal Aid Society Clients

219.    Nancy Rosenbloom, an attorney for the Legal Aid Society, testified before the New York City Council on November 10, 2009, that a student client—a small twelve-year-old girl—had been improperly arrested for allegedly assaulting a large, male School Safety Officer assigned to her school.  She testified that after the juvenile court judge heard testimony and reviewed the videotape showing that the School Safety Officer, in fact, had been the initial aggressor, the judge dismissed all charges against the girl.

220.    Ms. Rosenbloom further testified that her office defended another child accused of assaulting a School Safety Officer.  All charges were dismissed, however, after a videotape of the incident showed that several School Safety Officers had initiated the altercation by pushing the student into a corner, hitting him, and then laughing.

221.    Ms. Rosenbloom also testified, in 2009, that her office had recently defended a student who had been unlawfully arrested by a School Safety Officer for standing outside his school at 2:45 p.m., immediately after classes had been dismissed. The child was incarcerated for over twenty-four hours as a result.

Queens Legal Services Client

222.    During the same New York City Council hearing on November 10, 2009, Tara Foster, an attorney with the Education Rights Project of Queens Legal

Services, testified that she had defended a student who had been charged with striking a School Safety Officer. During the child's hearing, student witnesses testified that, in fact, the School Safety Officer initiated the altercation by becoming verbally and physically aggressive toward the student, pushing her against the wall, grabbing her by the hair, dragging her, and punching her in the head. The School Safety Officer also stomped on the cell phone of one of the witnesses who attempted to videotape the incident. After a full hearing, school disciplinary charges against the student were dismissed on the merits. Upon information and belief, the School Safety Officer was not punished.

<u>Notices of Claim and Lawsuits</u>

<u>R.M.</u>

223.    The complaint in *Morgan v. City of New York, et al.*, No. 09-cv-3619 (E.D.N.Y filed Aug. 20, 2009) alleges that R.M., then fifteen years old and a student at Hillcrest High School in Queens, was severely assaulted by School Safety Officers on three separate occasions—two of which were spurred by alleged concerns regarding a cell phone.

224.    During the first incident, R.M. was observed using a cell phone in school and taken to the dean's office. School Safety Officers then took R.M. to a room in the dean's office and assaulted him "about the head, shoulders, arms, and legs."

225.    Later that same year, School Safety Officers assaulted R.M. when he asked them to hold his cell phone so as not to be late to class. R.M. was then handcuffed and taken to a locked office in the school. He was subsequently transported

in handcuffs to the psychiatric ward of North Shore-Long Island Jewish Medical Center and treated for his physical injuries.

226.    After R.M. filed notices of claim with respect to these two incidents, School Safety Officers retaliated against him by dragging him into a stairwell, choking him, and threatening him.

227.    As a result of these assaults, R.M. suffered extensive injuries, including to both knees, one of which required surgery to repair.  He was forced to transfer to another public school in New York City, disrupting his education.

228.    R.M. filed a civil complaint in the Eastern District of New York on August 20, 2009, naming as defendants the City and the NYPD, among others, and seeking compensatory and punitive damages as a result of these beatings.  In late 2011, City-Defendants settled the civil lawsuit for an undisclosed amount.

229.    In addition to receiving notice of these incidents through the notices of claim and the complaint, City-Defendants obtained knowledge of these incidents through widespread news coverage, including articles published in the *New York Times*, the *New York Daily News*, and the *Village Voice*.

A.G.

230.    On February 1, 2010, twelve-year-old A.G. was enrolled in the 7th grade at Russell Sage Junior High School in Queens when she was unlawfully arrested at her school.

231.    According to the complaint in *Gonzalez v. City of New York*, No. 10-cv-03822 (E.D.N.Y. filed Aug. 19, 2010), A.G. was arrested on February 1, 2010, because she "doodled on her desk with a light green . . . erasable, non indelible marker," even

though "the doodle was completely erasable simply by wiping it with a damp paper towel or cloth."  School Safety Officers were contacted and ordered A.G. to remove her jacket, sweater, and shoes.  The School Safety Officers searched A.G.'s belongings and then one of the School Safety Officers inserted his hands into the pockets of her jeans.  The School Safety Officers did not seek or gain A.G.'s consent for the search.  According to the complaint, the School Safety Officers told A.G., and later her mother, that A.G. was going to be arrested as a result of the "damage" A.G. had allegedly caused by doodling in a fashion that caused no permanent damage to school property.

232.    According to the complaint, A.G. was then placed in metal handcuffs, "grabbed . . . by her arm and 'perp-walked' . . . through the hallways of the School in full view of teachers and other students and across the street to the 112th Precinct building."  NYPD police officers told A.G.'s mother that "she would not be permitted to be with her [daughter] and ordered her to go home and await their call."

233.    At the precinct, A.G. "was photographed and handcuffed to a pole in an enclosed room . . . for over two (2) hours."

234.    A.G.'s mother, M.C., told the *New York Daily News* that when A.G. was released from police custody, she was given a summons for Family Court for later that week.  A.G. appeared in Family Court, and was told to complete eight hours of community service, a book report, and an essay on what she had learned from the experience.  In the days after her arrest, A.G. vomited due to the trauma of the incident.

235.    M.C. also reported to the media that school officials told her that they had no control over whether NYPD personnel handcuffed and arrested students, because it was a matter of "agency policy" and decision-making.  In addition to having

been arrested and detained, A.G. initially received a five-day suspension for her

doodling in erasable ink, but after media reports of this incident, the school terminated

the suspension early.

236.    In her complaint, A.G. named the City and the NYPD, among others, as

defendants.  City-Defendants settled the lawsuit for an undisclosed amount in July

2011.

S.C.

237.    In the fall of 2008, S.C. was seventeen years old and enrolled in the 12th

grade at Robert F. Kennedy High School in Queens when a School Safety Officer

assigned to his school kicked in the door to a bathroom stall occupied by S.C.  The door

hit S.C. in the head, causing bleeding and pain, but the School Safety Officer refused to

help him in a clear violation of the NYPD patrol guide.  The School Safety Officer said

to S.C. "That's life.  It will stop bleeding." before leaving the restroom.

238.    When S.C. reported the incident to his school principal, the principal

responded that there was nothing he could do about it.  S.C.'s father sought to complain

directly to the NYPD precinct that covers the school, but the precinct cancelled both

meetings that the father had scheduled.  Eventually, S.C. and his father found out that

the School Safety Officer had been transferred to a middle school in the area.

239.    Finding no other recourse, S.C. and his parents filed a civil suit against

the City, which settled for $55,500 in money damages.  They also filed a formal

complaint with the IAB and participated in an interview with IAB personnel.  In

addition to being presented in open testimony before the New York City Council and

being recounted in the legal suit against City-Defendants, this incident was widely

reported by the *New York Daily News*, the *New York Post*, *El Diario*, and television station New York 1.

240.    S.C. has since graduated and is now in his second year of college.

<u>J.R.</u>

241.    According to court filings, a School Safety Officer assigned to United High School in Manhattan allegedly arrested student J.R. unlawfully. *Ramos v. City of New York*, No. 05-cv-637 (S.D.N.Y. filed Jan. 18, 2005).  Specifically, it was alleged that the School Safety Officer assigned to the student's school refused to permit the student to leave class to attend a student council meeting and mocked him because he perceived the student to be gay.  When the student requested that the School Safety Officer consult with the principal regarding the student council meeting, the School Safety Officer placed the student in handcuffs, subjected him to a search, and pushed him against the wall.  The complaint further alleged a pattern and practice of School Safety Officers unlawfully using force and restraining students without legal justification, and a failure to discipline the officer involved in that case.  The case was settled for $12,500.

<u>R.B.</u>

242.    In 2007, R.B., a student enrolled in the Campus Magnet High School in Queens, filed a complaint alleging that School Safety Officers assigned to that school placed him in handcuffs, arrested him, and transported him to a local precinct for allegedly stealing a classmate's Metrocard, even though the classmate had clearly stated that R.B. was not the person who had taken the Metrocard.  *Bazile v. City of New*

*York*, No. 07-cv-5347 (E.D.N.Y. filed Dec. 19, 2007).  The case was settled for $32,500.

<u>A.H.</u>

243.    The complaint in *Brackson v. City of New York* (N.Y. Sup. Ct. filed on or about Dec. 14, 2009) alleges that School Safety Officers at Evander Childs High School in the Bronx subjected A.H. to false arrest, assault, battery, false imprisonment, and intentional infliction of emotional distress.  It also asserts claims for negligent hiring, training, supervision, and retention by the City.

244.    A.H. is a special education student.  She asserts that she was in class and "got up from her seat to help a fellow student who was having trouble with the class curriculum."  When the teacher observed A.H. get up, she ordered A.H. to leave the classroom.  According to the complaint, A.H. "refused to leave the classroom and tried to explain that she had just gotten up from her seat to help a fellow student."

245.    The teacher called School Safety Officers, who then "used physical force to remove [A.H.] from the classroom by first handcuffing one arm as they aggressively jerked and pried her away from her desk."  The officers handcuffed A.H.'s "arms behind her back so tight [*sic*] that her skin ruptured causing her to bleed and suffer severe pain and discomfort."  A.H. asked for medical attention, but when the school nurse arrived, officers "refused to take off the handcuffs so that the nurse could properly treat her."

246.    A.H. was then taken to a police precinct and charged with disorderly conduct and resisting arrest.  She spent approximately thirty hours in jail.  The criminal charges against A.H. were dismissed, but the excessive force used by the School Safety

Officers "resulted in permanent keloid scarring" on A.H.'s wrists. The civil lawsuit settled out of court.

C.R.

247.    Publicly available legal documents allege that student C.R., who was sixteen years old and enrolled in Samuel Gompers High School in the Bronx, was unlawfully seized, arrested, and beaten by School Safety Officers on March 19, 2007. The complaint in that case, *Rodriguez v. City of New York*, No. 08-cv-11300 (S.D.N.Y. filed Dec. 20, 2008), alleged that School Safety Officers assigned to C.R.'s school escorted C.R. out of a classroom for talking too much, shoved him, threw him against a wall, jumped on him when he fell to the ground, and handcuffed him. As alleged, C.R. began bleeding and had to be hospitalized, requiring stitches to his head. The School Safety Officers charged C.R. with assault, resisting arrest, and harassment. The defendants settled that suit for $39,000.

T.G.

248.    Publicly available legal documents indicate that student T.G., who was sixteen years old and enrolled in I.S. 291 in Brooklyn, filed a lawsuit, *Gray v. City of New York*, No. 4247-05 (N.Y. Sup. Ct., filed Feb. 2005), alleging that the School Safety Officers assigned to her school verbally and physically assaulted her.

C.C.

249.    A complaint was filed in *Crowther v. City of New York*, No. 08-cv-2671 (E.D.N.Y. filed July 2, 2008), by C.C., a student who was enrolled in Thomas Jefferson High School in Brooklyn. The complaint alleges that a School Safety Officer assigned

to C.C.'s school subjected C.C. to excessive force, false arrest, and malicious prosecution, and alleges a systemic pattern and practice of similar abuses.

250.    The City settled with C.C. on August 18, 2009, for $5,000.

<u>L.S.</u>

251.    Publicly available legal documents describe a lawsuit filed by student L.S., who was enrolled in M.S. 232 in the Bronx.  The documents relating to that suit, *Suazo v. City of New York*, No. 020389-08E (N.Y. Sup. Ct. filed May 12, 2008), allege that L.S. was walking on the sidewalk outside of his school right after classes were dismissed.  As alleged, without provocation School Safety Officers assigned to L.S.'s school physically assaulted him, resulting in his hospitalization.  The next day, when L.S. and his mother went to the school to file a complaint about the incident, L.S. was placed under arrest.  All criminal charges against L.S. were dismissed.

<u>J.G.</u>

252.    Publicly available legal documents indicate that student J.G. was enrolled in the High School of Fashion Industries in Manhattan and filed a lawsuit, *Gonzalez v. City of New York*, No. 116093-07 (N.Y. Sup. Ct. filed Nov. 20, 2007), alleging that he was stopped by School Safety Officers assigned to his school for being in the hallway without a hall pass.  As alleged, six School Safety Officers became involved, throwing J.G. to the ground and beating him, resulting in a fracture to J.G.'s left hand that required surgery, multiple bruises around his head, neck, and shoulders, and other physical injuries.

P.C.

253.    Publicly available legal documents indicate that P.C., who was enrolled

in Bryant High School in Queens, filed a suit, *Chiaramonte v. City of New York*, No.

18348-07 (N.Y. Sup. Ct. filed July 17, 2007), alleging that she was physically assaulted

and handcuffed by the School Safety Officers assigned to her school, resulting in

physical injury.

School Safety Division Investigations Unit Complaints

254.    When an individual files a complaint about School Safety Division

personnel, those complaints are typically directed to the School Safety Division

Investigations Unit.  Between January 2007 and July 2010, the School Safety Division

Investigations Unit conducted at least 160 investigations into allegations of unlawful

seizure, unconstitutional arrests, or use of excessive force by School Safety Division

personnel.  Many of the complaints stemmed from incidents that allegedly resulted in

substantial physical and psychological suffering by students and other members of the

school community.  Illustrative examples include:

   a.    Student A filed a complaint with the School Safety Division

   Investigations Unit claiming that a School Safety Officer at a high school in the

   Bronx grabbed her backpack and slammed her against a wall in 2007.  Student A

   claimed that the School Safety Officer then demanded that she produce her

   identification, but before she could reach it, the School Safety Officer began

   choking her.  According to Student A, when she tried to break the chokehold, the

   School Safety Officer slammed her against the wall again, causing her to fall.

The day after the assault, Student A sought medical treatment for back and neck pain and a significant cut on her right ear lobe.

b.      Student B filed a complaint with the School Safety Division Investigations Unit claiming that School Safety Division personnel at a second high school in the Bronx threw him on a table and kicked and hit him in the face and head in a room without surveillance cameras.  Student B alleged that during the attack, a School Safety Division supervisor instructed the other School Safety Division personnel to "break his arm and put him in handcuffs."  As a result of the assault, Student B sustained fractures to his right wrist and finger, cuts to both wrists, and a cut below his ear.

c.      According to a complaint filed with the School Safety Division Investigations Unit, a School Safety Officer ordered Student C to stop when she was leaving a third high school in the Bronx one afternoon.  Student C, an 80-pound girl, claimed that the School Safety Officer grabbed her, shoved her, slammed her to the ground, and pushed his knee into her back.  According to the complaint, a School Safety Division supervisor who responded to the scene noted that the School Safety Officer had used excessive force.  Following the assault, Student C was treated at a local hospital.  When Student C returned to the school, the School Safety Officer threatened that if Student C looked at him again, he would knock her out.

d.      The mother of Student D filed a complaint with the School Safety Division Investigations Unit alleging that in 2008, a School Safety Officer at a high school in Brooklyn seized and handcuffed her son for being in the hallway

during a "hallway sweep."  According to the mother, Student D was taken to the principal's office, where the School Safety Officer first instructed him to produce his identification card and then cut up the card and again ordered Student D to produce his identification card.

      e.      An assistant principal at a fourth high school in the Bronx filed a complaint with the School Safety Division Investigations Unit claiming that a School Safety Officer physically prevented Student E from going to class in 2009. The assistant principal claimed that the School Safety Officer threw Student E against an iron fence and handcuffed him when Student E tried to pass the School Safety Officer.  As a result of the assault, Student E sustained a contusion to the head.  The assistant principal reported that a School Safety Division lieutenant had described the particular School Safety Officer as "no good."

      f.      According to a 2009 complaint transferred to the School Safety Division Investigations Unit, Student F was assaulted by a School Safety Officer after she set off a metal detector at a high school in Brooklyn.  Student F claimed that School Safety Officers rushed her, pulled her backpack, and grabbed her arms.  Although another student warned the School Safety Officers that Student F was prone to seizures, the School Safety Officers allegedly continued to push and grab Student F, and one grabbed Student F's hair and pulled it "almost out of the roots," causing her scalp to turn red and swell.  Student F alleged that she was detained in handcuffs for about an hour, and during that time, School Safety Officers unzipped her pants, unlaced her sneakers, pulled on her bra, and hit her

breasts.  Following the attack, Student F suffered from tingling in her fingers, numbness in her wrists and hands, and headaches.

g.      The principal at a fifth high school in the Bronx filed a complaint with the School Safety Division Investigations Unit alleging that a School Safety Officer attacked Student G, a student with special needs, choking him and repeatedly slamming him against the wall after the student paced between the cafeteria and an outside yard.  When the principal arrived, the School Safety Officer and other School Safety Division personnel refused to allow her to intervene and help the student.

h.      The mother of Student H filed a complaint with the School Safety Division Investigations Unit alleging that in 2010, a School Safety Officer attacked her daughter in the auditorium of an intermediate school in the Bronx after Student H had a panic attack in front of the 300 assembled students. According to the complaint, the School Safety Officer grabbed Student H by the throat, slammed her against the wall, and threw her to the floor, causing a concussion and a black eye.  Student H's father claimed that when he tried to report the assault, officers at two different precincts refused to take the complaint and instead dismissed him without providing the procedure for filing a complaint against a member of the School Safety Division.

i.      According to a complaint filed with the School Safety Division Investigations Unit, in 2010, a School Safety Officer attacked Student I, who was en route to the nurse's office with a hallway pass from a teacher.  Student I claimed that the School Safety Officer said that he did not care about the pass and

that he "did not want to see [Student I's] face," and then grabbed Student I by the collar and slammed the student into the wall.  The complaint alleged that the School Safety Officer wrapped his arms around Student I and asked "Do you know who you are messing with?" before dragging Student I into the security room and slapping the student's face.  Student I's complaint stated that the School Safety Officer went through Student I's backpack and wallet and then instructed Student I to write out a statement.  According to the complaint, the School Safety Officer then accused Student I of trying to stab him with a pen and asked if Student I understood how easy it would be for the School Safety Officer to get Student I in trouble.  The complaint states that School Safety Officer only released Student I when Student I complained about difficulty breathing. Following the attack, Student I was transported to the hospital by emergency services.

j.      Student J filed a complaint with the School Safety Division Investigations Unit alleging that in 2010 a School Safety Officer grabbed and choked him in the hallway of the same Bronx high school in Paragraph 254a, *supra*.  According to the complaint, when Student J asked why the School Safety Officer had choked him, the School Safety Officer replied "I can do that."

**Deliberate Indifference in Failure to Train and Supervise**

255.    City-Defendants have been aware of the incidents described above and the pervasive nature of the pattern and practice by members of the NYPD School Safety Division of unlawfully seizing and arresting schoolchildren, and the pattern and practice of subjecting them to excessive force.  Yet, City-Defendants have been

deliberately indifferent to these patterns and practices, and have not attempted to remedy them.

256.    City-Defendants also have had actual knowledge of these patterns and practices for several years from sources other than described above.  In March 2007, the New York Civil Liberties Union and the American Civil Liberties Union published a report titled *Criminalizing the Classroom: The Over-Policing of New York City Schools*, documenting instances of abuses by members of the NYPD School Safety Division.

257.    The *Criminalizing the Classroom* report documented the unlawful seizure, arrest, and beating of B.E., described *supra* Paragraphs 201-205.

258.    In addition, the report documented the unlawful seizure and arrest of another student, "Jimmy," then a senior at New York Harbor School in Brooklyn. Jimmy was arrested for allegedly throwing, rather than handing, his wallet to a School Safety Officer as he passed through the metal detector; when school officials objected to Jimmy's arrest, the School Safety Officer threatened to handcuff them as well.  On another occasion, the report indicated, Jimmy was handcuffed and issued a summons for trying to retrieve his gym clothes from the gym.  All charges against the child were summarily dismissed.

259.    The report further documented the unlawful seizure and arrest of, and the use of excessive force on, a female student who at that time was a senior at the Bushwick School of Social Justice.  She asked for her cell phone, which had been confiscated, to be returned.  Two School Safety Officers threw the student to the ground, handcuffed her, and confined her to a holding room for approximately an hour.

260.    City-Defendants and all senior personnel within the NYPD School Safety Division received copies of the *Criminalizing the Classroom* report.

261.    City-Defendants obtained further knowledge of the challenged patterns and practices through the publication of other reports documenting abuses by members of the NYPD School Safety Division.  *See, e.g.*, Drum Major Institute for Public Policy, *A Look at the Impact Schools* (June 2005); Kevin P. Brady, Sharon Balmer and Deinya Phenix, *School-Police Partnership Effectiveness in Urban Schools: An Analysis of New York City's Impact Schools Initiative* (Education and Urban Society, Aug. 2007); National Education and Social Rights Initiative and Teachers Unite, *Teachers Talk: School Culture, Safety, and Human Rights* (Oct. 2008); and Urban Youth Collaborative, *Bill of Rights* (2006).

262.    City-Defendants also obtained actual knowledge of the pattern and practice by members of the NYPD School Safety Division of unlawfully arresting schoolchildren based on letters submitted by the American Civil Liberties Union and the New York Civil Liberties Union to Defendant Police Commissioner Kelly dated October 7, 2008 and November 4, 2008.  These letters documented that a significant number of schoolchildren under the age of sixteen have been arrested at school for non-criminal violations, even though such arrests are prohibited by state law.

263.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from media reports.  In addition to widespread coverage of the incidents involving the inappropriate arrests of school principals and schoolteachers, described *supra* Paragraphs 43-47, and the incidents involving R.M., *supra* Paragraphs 223-229, A.G., *supra* Paragraphs 230-236, and S.C., *supra*

Paragraphs 237-239, the *New York Daily News* reported on June 19, 2008, that a School Safety Officer handcuffed a five-year-old boy and transported him to a psychiatric hospital, without parental consent, after the boy threw what was described as a "temper tantrum."  Likewise, on March 10, 2008, the *New York Daily News* reported that a School Safety Officer handcuffed two four-year-old boys for refusing to take a nap.

264.   City-Defendants also obtained actual knowledge of the patterns and practices challenged here from complaints filed with the IAB regarding conduct by members of the NYPD School Safety Division.  As described *supra* Paragraph 181, between 2002 and 2007, the police received 2,670 complaints against School Safety Officers, which is an average of 500 per year, or one complaint for every eight to ten School Safety Officers per year.  Twenty-seven percent of those complaints were substantiated, a far higher rate than the 3.6 percent substantiation rate for complaints filed with the Civilian Complaint Review Board against NYPD police officers not assigned to the public schools.

265.   Also, as described more fully *supra* Paragraph 182, during the 2008 calendar year, there were 1,159 complaints filed against School Safety Officers, representing a staggering rate of almost one complaint for every four School Safety Officers employed.  Fifteen percent of these complaints alleged excessive force, abuse of authority, discourtesy, or offensive language by School Safety Officers.

266.   City-Defendants also obtained actual knowledge of the patterns and practices challenged here from notices of claims, civil actions, and complaints filed regarding the conduct of members of the NYPD School Safety Division.  Among the incidents for which notices of claims, civil actions, and complaints have been filed are

those involving the unlawful seizure, arrest, and/or physical assault of students R.M., A.G., S.C., J.R., R.B., A.H., C.R., T.G., C.C., L.S., J.G., P.C., and Students A-J, *supra* Paragraphs 223-254.

267.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on October 10, 2007, regarding the NYPD School Safety Division.  Former Assistant Chief James Secreto was present at this hearing and testified on behalf of himself and Defendant Police Commissioner Kelly.  At that hearing, a number of children offered testimony regarding abuses suffered at the hands of School Safety Officers as described above. At the same hearing, Gregory Floyd, the president of the union representing all School Safety Officers, testified that he agreed with the statement that "we need to have more mediation training, more conflict resolution, knowing [*sic*] how to diffuse [*sic*] situations among not only staff and teachers and administrators, but also for students . . . ."

268.    City-Defendants also obtained actual knowledge of the patterns and practices challenged here from the New York City Council hearing held on November 10, 2009 regarding the NYPD School Safety Division.  Former Assistant Chief James Secreto was present at this hearing and testified on behalf of himself and Defendant Police Commissioner Kelly.  During that hearing, testimony was offered regarding the unlawful seizures, arrests, and beatings of a number of children—including A.P., *supra* Paragraphs 206-209, C.S., *supra* Paragraphs 210-211, S.C., *supra* Paragraphs 237-240, Legal Aid Society clients and Queens Legal Services clients, *supra* Paragraphs 219-222—by members of the NYPD School Safety Division.

71

269.    In addition, during that same hearing, a representative from the National Economic and Social Rights Initiative (NESRI) reported the results of a survey of New York City public school parents and teachers that the organization had conducted. NESRI concluded that "Safety Agents are inappropriately involved in disciplinary matters that should be dealt with by school staff."  NESRI further reported that "Students [it] interviewed had been harassed, handcuffed, patted down and in some cases arrested for shouting in hallways, being late to school or class, [*sic*] talking back to a safety employee."

270.    Similarly, the President of the United Federation of Teachers, Michael Mulgrew, testified during the November 10, 2009, hearing as follows: "If a student is disruptive inside of a classroom, and the school has a real safety plan, there's a way for them to remove them without using a safety agent.  But in too many places, what they'll do is wait till [*sic*] the situation's getting out of control, they bring in a safety agent, and the next thing you know a student's getting arrested when nobody wants a student being arrested.  You should not be arrested for, you know, having a bad day in school.  Let's be clear.  You shouldn't be."

271.    Notwithstanding this detailed knowledge of the patterns and practices challenged here, City-Defendants have failed to undertake any meaningful attempt to curtail these patterns and practices, in blatant disregard of the rights of New York City public schoolchildren.

272.    The 1998 MOU transferring school safety responsibilities to the NYPD created the Joint Committee on School Safety (Joint Committee) to "ensure the effectiveness of the [school safety] program . . . by developing appropriate

72

programmatic recommendations, modifications or improvements."  The Joint
Committee published its first annual report in November of 2000, in which it stated that
its purpose was "to explore ways to improve this [school safety] program, address
issues that have local and system-wide implications and make recommendations to the
Joint Committee regarding policy issues."  Among other content, the report includes the
Joint Committee's "recommendations for future initiatives."  Four years later, in the
2004 Annual Report, the Joint Committee declared that "[e]valuation of school safety
citywide will continue."  Nonetheless, the Joint Committee's current role is largely
limited to "analyzing aggregate data," according to Michele Sviridoff, the Deputy
Criminal Justice Coordinator for Research and Planning for the New York City
Criminal Justice Coordinator.  The limited function of the Joint Committee leaves a
void in evaluating, modifying, and improving the school safety program.

273.     City-Defendants have actively resisted efforts to provide public
information to parents and students who seek to file complaints.  City-Defendants have
refused to institute an effective complaint mechanism for parents and students.  City-
Defendants have actively resisted reforming the process for reporting complaints
against School Safety Officers.  In particular, they have refused to support a
requirement that schools post information regarding the filing of a complaint against
School Safety Officers, even knowing that 311 operators often direct complainants to
the Department of Education or the Civilian Complaint Review Board, which have no
authority over School Safety Officers.

274.     City-Defendants have refused to restructure their training program.
According to testimony by the president of the union representing School Safety

Officers before the New York City Council on November 10, 2009, City-Defendants have made absolutely no changes to the NYPD's training program for School Safety Officers since 2007, notwithstanding the countless stories regarding abuses by School Safety Officers.

275.    Upon information and belief, the current training does not include instruction on the enforcement of the Penal Code as distinct from the New York City Department of Education's Citywide Standards of Discipline and Intervention Measures (the Discipline Code).  In fact, School Safety Officers describe their job duties and responsibilities to include "apprehending students and others violating Department of Education Rules and Regulations."  *Floyd et al. v. City of New York*, No. 10-cv-02426, Compl. ¶ 35(h) (S.D.N.Y. filed Mar. 17, 2010).

276.    The NYPD Patrol Guide, the official set of NYPD policies, is equally insufficient in providing guidelines and standards that incorporate the cognitive, behavioral, and developmental needs of children.  It does not adequately prepare School Safety Division personnel to distinguish between policing tactics that are appropriate for the school environment as opposed to those used on the streets.

277.    The training is also inadequate with respect to issues of adolescent development and behavior, as well as the unique environment of a school.  Upon information and belief, the Department of Education does not play any significant role in training School Safety Officers or ensuring that members of the School Safety Division are sufficiently prepared to interact with students in the school environment.

278.    Nor does the training include instruction in mediation and conflict resolution, despite indications by individuals such as Gregory Floyd, *supra* Paragraph

275, that such topics should be addressed.  Rather, the training manual, entitled Police

Academy School Safety – Police Science, characterizes schoolchildren as "extremely

violent" and warns School Safety Officers of "a ticking youth time bomb."

279.    Moreover, City-Defendants adopted a policy that allows School Safety

Division personnel nearly unbounded discretion to employ Velcro handcuffs against

schoolchildren without adequately evaluating the policy or training School Safety

Division personnel.  The policy is insufficiently detailed and imposes only a "common

sense standard" on School Safety Division personnel considering whether to use

restraining devices.

280.    City-Defendants have refused to discipline adequately offending School

Safety Officers who commit abuses.  They have failed to remove School Safety

Officers who are demonstrably unable to work with children in a safe and effective

manner.  Upon information and belief, in several instances, City-Defendants have

responded to complaints of abuse on the part of NYPD School Safety Division

personnel by temporarily transferring the personnel to other public school sites.

281.    The City fails to supervise School Safety Officers in part because it

relies on inadequate investigations by the School Safety Division Investigations Unit to

determine whether to discipline School Safety Officers who have been accused of

improperly seizing or using excessive force against schoolchildren.  Three investigatory

bodies address almost all allegations of misconduct by School Safety Division officers:

the School Safety Division Investigations Unit and Groups 53 and 54 of the IAB.  Upon

information and belief, Integrity Control Officers and Assistant Integrity Control

Officers assigned to the School Safety Division Investigations Unit investigate the vast

majority of complaints involving allegations of improper seizures, use of force, or other abuses by School Safety Officers.

282.    Upon information and belief, the School Safety Division Investigations Unit conducts inadequate investigations of complaints assigned to it.  For example, at times the School Safety Division Investigations Unit does not seek to interview students who witnessed alleged misconduct, does not seek to review transcripts of suspension hearings where School Safety Officers under investigation and other witnesses to alleged misconduct have testified, and does not review video surveillance in the public areas of schools, such as hallways and cafeterias, that may capture the events in question.  In light of the School Safety Division Investigations Unit's inadequate investigations of alleged misconduct by School Safety Officers, School Safety Officers are not disciplined appropriately, and sometimes not at all, when they violate the rights of schoolchildren to be free from unconstitutional seizures and the use of excessive force.

283.    City-Defendants have failed to convene the statutorily required monthly School Safety Committees in each school operated by the New York City Department of Education.  More specifically, school staff and members of the NYPD School Safety Division are required to review policies and procedures relating to School Safety Officers during such meetings.  These meetings have failed to take place even though the United Federation of Teachers has filed grievances based on this failure.

284.    City-Defendants have failed to provide the tools and support necessary to ensure a professionalized workforce within the NYPD School Safety Division.  As of 2007, the NYPD School Safety Division was losing approximately forty members per

month due to attrition.  As of 2009, the attrition rate was 50 percent over five years, meaning that about half of all School Safety Officers quit over a five-year period. According to the president of the union representing School Safety Officers, this occurs largely because School Safety Officers receive a low salary and believe that they do not receive sufficient "respect."

285.    In sum, City-Defendants know to a moral certainty that members of the NYPD School Safety Division will be called upon to address situations—involving  the seizure of, detention of, handcuffing of, or physical contact with, New York City public schoolchildren—in which the constitutional, statutory, and common law rights of the schoolchildren will be implicated.  Although there is a history of members of the NYPD School Safety Division mishandling such situations, as described *supra* Paragraphs 255-284, City-Defendants have failed to undertake any meaningful attempt to train members of the NYPD School Safety Division to avoid violations of schoolchildren's rights.  Appropriate training would improve the ability of members of the NYPD School Safety Division to make choices that prevent violations of schoolchildren's rights.  Without appropriate training, members of the NYPD School Safety Division will frequently continue to make choices that lead to the deprivation of schoolchildren's rights.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION:  UNLAWFUL SEIZURES AND ARRESTS IN VIOLATION OF THE FEDERAL CONSTITUTION

286.    Plaintiffs incorporate herein by reference Paragraphs 1 through 285.

287.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of unreasonably seizing and unlawfully arresting New

77

York City public middle school and high school students absent probable cause of criminal activity in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

288.    Defendants School Safety Officers Downing-Lee and Edmond are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and unlawfully arresting individually named Plaintiff Destiny Bruno in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

289.    Defendants School Safety Officers Mayes, Richardson, and Harrison are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and unlawfully arresting individually named Plaintiff Lameak Williams in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

290.    Defendants School Safety Officers Baptiste and Jordan are liable pursuant to 42 U.S.C. § 1983 for unreasonably seizing and unlawfully arresting individually named Plaintiff Nicholas Sutton in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

SECOND CAUSE OF ACTION:  EXCESSIVE FORCE IN VIOLATION OF THE
FEDERAL CONSTITUTION

291.    Plaintiffs incorporate herein by reference Paragraphs 1 through 285.

292.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of using excessive force against New York City public middle school and high school students in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

293.    Defendants School Safety Officers Downing-Lee and Edmond are liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named

78

Plaintiff Destiny Bruno in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

294.    Defendants School Safety Officers Mayes, Richardson, and Harrison are liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named Plaintiff Lameak Williams in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

295.    Defendants School Safety Officers Baptiste and Jordan are liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named Plaintiff Nicholas Sutton in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

296.    Defendant School Safety Division Police Officer Ebreo is liable pursuant to 42 U.S.C. § 1983 for using excessive force against individually named Plaintiff Kion Dickey  in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

THIRD CAUSE OF ACTION:  SUBSTANTIVE DUE PROCESS

297.    Plaintiffs incorporate herein by reference Paragraphs 1 through 285.

298.    City-Defendants are liable pursuant to 42 U.S.C. § 1983 for maintaining a policy, practice, and custom of committing physical abuses against New York City public middle school and high school students that shocks the conscience in violation of the Fourteenth Amendment to the United States Constitution.

299.    Defendants School Safety Officers Downing-Lee and Edmond are liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff Destiny Bruno that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

300.     Defendants School Safety Officers Mayes, Richardson, and Harrison are liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff Lameak Williams that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

301.     Defendants School Safety Officers Baptiste and Jordan are liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff Nicholas Sutton that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

302.     Defendant School Safety Division Police Officer Ebreo is liable pursuant to 42 U.S.C. § 1983 for abuses against individually named Plaintiff Kion Dickey that shock the conscience in violation of the Fourteenth Amendment to the United States Constitution.

FOURTH CAUSE OF ACTION:  UNLAWFUL SEIZURES AND ARRESTS IN
VIOLATION OF THE NEW YORK STATE CONSTITUTION

303.     Plaintiffs incorporate herein by reference Paragraphs 1 through 285.

304.     City-Defendants are liable for the unreasonable seizures and unlawful arrests of New York City public middle school and high school students in violation of Article I §12 of the New York Constitution.

305.     Defendants School Safety Officers Downing-Lee and Edmond are liable pursuant to Article I §12 of the New York Constitution for the unreasonable seizure and unlawful arrest of individually named Plaintiff Destiny Bruno.

306.     Defendants School Safety Officers Mayes, Richardson, Harrison are liable pursuant to Article I §12 of the New York Constitution for the unreasonable seizure and unlawful arrest of individually named Plaintiff Lameak Williams.

307.     Defendants School Safety Officers Baptiste and Jordan are liable pursuant to Article I §12 of the New York Constitution for the unreasonable seizure and unlawful arrest of individually named Plaintiff Nicholas Sutton.

**FIFTH CAUSE OF ACTION:  FALSE ARRESTS IN VIOLATION OF NEW YORK STATE LAW**

308.     Plaintiffs incorporate herein by reference Paragraphs 1 through 285.

309.     City-Defendants are liable for the false arrest of New York City public middle school and high school students in violation of New York State law.

310.     Defendants School Safety Officers Downing-Lee and Edmond are liable for the false arrest of individually named Plaintiff Destiny Bruno in violation of New York State law.

311.     Defendants School Safety Officers Mayes, Richardson, and Harrison are liable for the false arrest of individually named Plaintiff Lameak Williams in violation of New York State law.

312.     Defendants School Safety Officers Baptiste and Jordan are liable for the false arrest of individually named Plaintiff Nicholas Sutton in violation of New York State law.

**SIXTH CAUSE OF ACTION:  ASSAULT AND BATTERY IN VIOLATION OF NEW YORK STATE LAW**

313.     Plaintiffs incorporate herein by reference Paragraphs 1 through 285.

314.     City-Defendants are liable for the assaults and batteries of New York City public middle school and high school students in violation of New York State law.

315.     Defendants School Safety Officers Downing-Lee and Edmond are liable for the assault and battery of individually named Plaintiff Destiny Bruno in violation of New York State law.

316.     Defendants School Safety Officers Mayes, Richardson, and Harrison are liable for the assault and battery of individually named Plaintiff Lameak Williams in violation of New York State law.

317.     Defendants School Safety Officers Baptiste and Jordan are liable for the assault and battery of individually named Plaintiff Nicholas Sutton in violation of New York State law.

318.     Defendant School Safety Division Police Officer Ebreo is liable for the assault and battery of individually named Plaintiff Kion Dickey in violation of New York State law.

## PRAYER FOR RELIEF

WHEREFORE the Plaintiffs respectfully request that the Court:

1.     Assume jurisdiction over this matter;

2.     Certify this action as a class action pursuant to Fed. R. Civ. P. 23(b)(2);

3.     Declare that the policy and practice of City-Defendants to seize and arrest schoolchildren in New York City public middle schools and high schools absent probable cause of criminal activity violates these students' federal and state rights;

4.     Declare that the policy and practice of City-Defendants to use excessive force against schoolchildren in New York City public middle schools and high schools violates these students' federal and state rights;

5.      Enjoin any further violations of Plaintiffs' constitutional, statutory, and common law rights, including, but not limited to, an injunction that requires City-Defendants to:

a.   Develop a transparent and meaningful mechanism to file complaints against members of the NYPD School Safety Division;

b.   Develop guidelines to ensure that schoolchildren are not unlawfully or inappropriately arrested;

c.   Ensure sufficient accountability by revising the disciplinary policies and procedures for members of the NYPD School Safety Division who are found to have committed abuses, including, when appropriate, by prohibiting them from having future contact with students;

d.   Ensure that school administrators have an appropriate role with respect to the maintenance of school safety, including by mandating compliance with state law requiring regular communications between school-building officials and police personnel; and

e.   Implement improved training for members of the NYPD School Safety Division with respect to the use of the power to seize and arrest, and the use of force in the context of interactions with schoolchildren in New York City public middle schools and high schools;

6.      Award compensatory damages for injuries sustained by named Plaintiffs Destiny Bruno, Nicholas Sutton, Kion Dickey and Lameak Williams;

7.      Award the Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

8.      Grant any other relief the Court deems necessary or proper.

Dated this 18th day of December, 2013.

Respectfully submitted by.


_____/s/ Alexis Karteron_____
ALEXIS KARTERON, ESQ.
akarteron@nyclu.org
ARTHUR N. EISENBERG, ESQ.
aeisenberg@nyclu.org
BROOKE MENSCHEL, ESQ.
bmenschel@nyclu.org
SUSANNAH KARLSSON, ESQ.
skarlsson@nyclu.org
DONNA LIEBERMAN, ESQ.
JOHANNA E. MILLER, ESQ.*
NEW YORK CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 19th Floor
New York, NY 10004
(212) 607-3300



*Not admitted in the Eastern District
of New York

_____/s/ Laurence M. Schwartztol_____
LAURENCE M. SCHWARTZTOL, ESQ.
lschwartztol@aclu.org
DENNIS D. PARKER, ESQ.
AMERICAN CIVIL LIBERTIES
UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
(212) 519-7849

_____/s/ Joshua Colangelo-Bryan_____
JOSHUA COLANGELO-BRYAN, ESQ.
colangelo.bryan.joshua@dorsey.com
JONATHAN MONTCALM, ESQ.
montcalm.jonathan@dorsey.com
DORSEY & WHITNEY, LLP
51 West 52nd Street
New York, NY 10019
(212) 415-9200


Attorneys for Plaintiffs